UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NEW CENTURY FOUNDATION,

        Plaintiff,

    v.

SMALL BUSINESS ADMINISTRATION, et al.,

        Defendants.

Civil Action No. 24-1612 (TNM)

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

BACKGROUND ....................................................................................................................... 1

I.     Statutory and Regulatory Background .............................................................................. 1

II.    Factual and Procedural Background ................................................................................. 3

LEGAL STANDARD ................................................................................................................ 5

ARGUMENT ........................................................................................................................... 5

I.     SBA's Finding of Employment Discrimination Was Not Arbitrary or Capricious ............ 6

     A.    Substantial Evidence Supports SBA's Finding of Employment Discrimination.... 7

     B.    New Century's Assertion That It Has a Single Hispanic Employee Does Not Undermine SBA's Finding of Employment Discrimination ................................ 18

II.    New Century's First Amendment Argument is Meritless ................................................. 23

III.   Even if the Denial Was Erroneous, Injunctive Relief is Unavailable .............................. 26

CONCLUSION ........................................................................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ........................................................................... 25

*Affum v. United States,*
    566 F.3d 1150 (D.C. Cir. 2009) ...................................................... 19

*Allina Health Servs. v. Sebelius,*
    746 F.3d 1102 (D.C. Cir. 2014) ...................................................... 28

*Am. Rd. & Transp. Builders Ass'n v. EPA,*
    705 F.3d 453 (D.C. Cir. 2013) .......................................................... 6

*Bangor Hydro-Elec. Co. v. Fed. Energy Regul. Comm'n,*
    78 F.3d 659 (D.C. Cir. 1996) ............................................................ 7

*Banner Health v. Price,*
    867 F.3d 1323 (D.C. Cir. 2017) ...................................................... 23

*Biestek v. Berryhill,*
    587 U.S. 97 (2019) ........................................................ 7, 17, 18, 20

*Bloomberg L.P. v. SEC,*
    45 F.4th 462 (D.C. Cir. 2022) ..................................................... 7, 17

*Bob Jones Univ. v. United States,*
    461 U.S. 574 (1983) ........................................................................... 26

*Boy Scouts of Am. v. Dale,*
    530 U.S. 640 (2000) ........................................................................... 25

*Brown v. Immigr. & Naturalization Serv.,*
    775 F.2d 383 (D.C. Cir. 1985) ........................................................ 18

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) ........................................................................... 25

*Butte County v. Hogen,*
    613 F.3d 190 (D.C. Cir. 2010) .......................................................... 7

*Carson v. Bethlehem Steel Corp.,*
    82 F.3d 157 (7th Cir. 1996) ............................................................. 22

**Cases (cont.)**

*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989)................................................................................................ 26

*Dawson v. Delaware*,
    503 U.S. 159 (1992)................................................................................................ 23

*Desert Palace, Inc. v. Costa*,
    539 U.S. 90 (2003)........................................................................................... 16, 17

*Evergreen Am. Corp. v. Nat'l Lab. Rels. Bd.*,
    362 F.3d 827 (D.C. Cir. 2004)............................................................................ 8, 15

*Fed. Mar. Comm'n v. Aktiebolaget Svenska Amerika Linien*,
    390 U.S. 238 (1968).................................................................................................. 8

*Figueroa v. Pompeo*,
    923 F.3d 1078 (D.C. Cir. 2019)............................................................................. 19

*Flytenow, Inc. v. Fed. Aviation Admin.*,
    808 F.3d 882 (D.C. Cir. 2015)......................................................................... 24, 25

*George Hyman Constr. Co. v. Brooks*,
    963 F.2d 1532 (D.C. Cir. 1992).............................................................................. 28

*George v. Leavitt*,
    407 F.3d 405 (D.C. Cir. 2005)................................................................................ 21

*Golden Ent. PA, Inc. v. SBA*,
    Civ. A. No. 22-1731 (JDB), 2024 WL 1344421 (D.D.C. Mar. 29, 2024)................ 29

*Graham v. Long Island R.R.*,
    230 F.3d 34 (2d Cir. 2000)..................................................................................... 22

*Hi-Tech Furnace Sys., Inc. v. FCC*,
    224 F.3d 781 (D.C. Cir. 2000)........................................................................... 8, 15

*In re Gateway Radiology Consultants, P.A.*,
    983 F.3d 1239 (11th Cir. 2020) .......................................................................... 1, 2

*In re Hidalgo Cnty. Emergency Serv. Found.*,
    962 F.3d 838 (5th Cir. 2020) ................................................................................. 27

*Island Architectural Woodwork, Inc. v. Nat'l Lab. Rels. Bd.*,
    892 F.3d 362 (D.C. Cir. 2018) .......................................................................... 7, 15

**Cases (cont.)**

*J.C. Driskill, Inc. v. Abdnor*,
   901 F.2d 383 (4th Cir. 1990) ..................................................... 27

*L & J Energy Co., Inc. v. Sec'y of Lab.*,
   57 F.3d 1086 (D.C. Cir. 1995) ............................................... 8, 15

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*,
   991 F.2d 1249 (7th Cir. 1993) ................................................ 24

*Leboeuf, Lamb, Greene MacRae, L.L.P. v. Abraham*,
   347 F.3d 315 (D.C. Cir. 2003) ................................................ 23

*Liberman v. Dep't of Transp.*,
   227 F. Supp. 3d 1 (D.D.C. 2016) ............................................ 10

*MacDougall v. Banner Health*,
   Civ. A. No. 19-3456, 2021 WL 4307092 (D. Colo. Sept. 21, 2021) ....................... 22

*Mar v. Kleppe*,
   520 F.2d 867 (10th Cir. 1975) ................................................ 27

*Marshall Cnty. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*,
   923 F.3d 192 (D.C. Cir. 2019) ................................................. 8

*Mastro v. Potomac Electric Power Co.*,
   447 F.3d 843 (D.C. Cir. 2006) ............................................... 21

*Miles v. Dell, Inc.*,
   429 F.3d 480 (4th Cir. 2005) ................................................ 21

*MomoCon LLC v. SBA*,
   Civ. A. No. 21-2386 (RC), 2023 WL 8880335 (D.D.C. Dec. 22, 2023) ................... 19

*Morall v. Drug Enf't Admin.*,
   412 F.3d 165 (D.C. Cir. 2005) ................................................. 8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................... 6

*N.C. Fisheries Ass'n v. Gutierrez*,
   550 F.3d 16 (D.C. Cir. 2008) ................................................ 28

*N.Y. State Club Ass'n v. City of N.Y.*,
   487 U.S. 1 (1988) ........................................................... 25

**Cases (cont.)**

*Nader v. FCC*,
   520 F.2d 182 (D.C. Cir. 1975) ................................................................ 8

*Nat'l Tr. for Historic Pres. in U.S. v. Dole*,
   828 F.2d 776 (D.C. Cir. 1987) ................................................................ 6

*New LifeCare Hosps. of N.C., LLC v. Becerra*,
   7 F.4th 1215 (D.C. Cir. 2021) ................................................................ 5

*Nieto v. L&H Packing Co.*,
   108 F.3d 621 (5th Cir. 1997) ................................................................ 22

*Norwood v. Harrison*,
   413 U.S. 455 (1973) ................................................................ 26

*Nw. Immigr. Rts. Project v. USCIS*,
   496 F. Supp. 3d 31 (D.D.C. 2020) ................................................................ 19

*Patterson v. Easton Motorcars, LLC*,
   Civ. A. No. 19-2944, 2021 WL 3562917 (S.D. Ohio Aug. 11, 2021) ................................ 16

*Pharaohs GC, Inc. v. SBA*,
   990 F.3d 217 (2d Cir. 2021) ................................................................ 2

*Pivirotto v. Innovative Sys., Inc.*,
   191 F.3d 344 (3d Cir. 1999) ................................................................ 22

*Platte River Whooping Crane Tr. v. Fed. Energy Regul. Comm'n*,
   876 F.2d 109 (D.C. Cir. 1989) ................................................................ 7

*Powell v. SBA*,
   Civ. A. No. 24-0207 (TSC), 2024 WL 1577948 (D.D.C. Apr. 5, 2024) ............................. 27

*Pub. Citizen Health Rsch. Grp. v. Tyson*,
   796 F.2d 1479 (D.C. Cir. 1986) ................................................................ 8, 15

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000) ................................................................ 20

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ................................................................ 25

*Rothe Dev., Inc. v. Dep't of Def.*,
   836 F.3d 57 (D.C. Cir. 2016) ................................................................ 26

**Cases (cont.)**

*Runyon v. McCrary*,
    427 U.S. 160 (1976) ............................................................................................ 26

*Shurberg Broad. Co. of Hartford v. FCC*,
    876 F.2d 902 (D.C. Cir. 1989) ......................................................................... 19

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) ......................................................................... 18

*Sierra Club v. EPA*,
    353 F.3d 976 (D.C. Cir. 2004) ........................................................................... 6

*Singleton v. Babbitt*,
    588 F.3d 1078 (D.C. Cir. 2009) .................................................................... 9, 15

*Stella v. Mineta*,
    284 F.3d 135 (D.C. Cir. 2002) ......................................................................... 20

*Teneyck v. Omni Shoreham Hotel*,
    365 F.3d 1139 (D.C. Cir. 2004) ....................................................................... 21

*Thomas v. Helms Robison & Lee, P.A.*,
    Civ. A. No. 16-0139, 2016 WL 7173797 (W.D.N.C. Dec. 8, 2016) ................. 23

*Twin Rivers Paper Co. v. SEC*,
    934 F.3d 607 (D.C. Cir. 2019) ......................................................................... 18

*U.S. Sugar Corp. v. EPA*,
    830 F.3d 579 (D.C. Cir. 2016) ........................................................................... 6

*United Mine Workers of Am. v. Mine Safety Health & Admin.*,
    830 F.2d 289 (D.C. Cir. 1987) ........................................................................... 7

*United Parcel Serv. v. U.S. Postal Serv.*,
    184 F.3d 827 (D.C. Cir. 1999) ................................................................. 8, 9, 15

*United States v. Abel*,
    469 U.S. 45 (1984) ........................................................................................... 24

*United States v. Fed. Mar. Comm'n*,
    655 F.2d 247 (D.C. Cir. 1980) ..................................................................... 8, 15

*United States v. Harmon*,
    No. 21-3067, 2021 WL 6102456 (D.C. Cir. Dec. 20, 2021) ............................ 16

**Cases (cont.)**

*United States v. Kimbell Foods, Inc.*,
440 U.S. 715 (1979) ............................................................................................ 2

*United States v. Lee Way Motor Freight, Inc.*,
625 F.2d 918 (10th Cir. 1979) ......................................................................... 22

*United States v. Ring*,
706 F.3d 460 (D.C. Cir. 2013) ......................................................................... 24

*United States v. Sutton*,
801 F.2d 1346 (D.C. Cir. 1986) ....................................................................... 16

*Valley Forge Flag Co. v. Kleppe*,
506 F.2d 243 (D.C. Cir. 1974) ................................................................... 27, 28

*Vant Hul v. City of Dell Rapids*,
462 F. Supp. 828 (D.S.D. 1978) ...................................................................... 22

*Vill. of Freeport & Andrew Hardwick v. Barrella*,
814 F.3d 594 (2d Cir. 2016) ............................................................................ 19

*W. States Paving Co. v. Wash. State Dep't of Transp.*,
407 F.3d 983 (9th Cir. 2005) ........................................................................... 26

*Walker v. St. Anthony's Med. Ctr.*,
881 F.2d 554 (8th Cir. 1989) ........................................................................... 22

*Wendt Corp. v. Nat'l Lab. Rels. Bd.*,
26 F.4th 1002 (D.C. Cir. 2022) ........................................................................ 21

*Wisconsin v. Mitchell*,
508 U.S. 476 (1993) ............................................................................. 23, 24, 25

*Wofford v. Safeway Stores, Inc.*,
78 F.R.D. 460 (N.D. Cal. 1978) ....................................................................... 22

**Statutes**

5 U.S.C. § 706(2) ................................................................................................ 6, 23

15 U.S.C. § 634(b)(1) ............................................................................... 5, 26, 27, 28

15 U.S.C. § 636(a)(36) ............................................................................... 1, 2, 27, 29

15 U.S.C. § 636m(c)(3) ............................................................................................. 28

**Statutes (cont.)**

15 U.S.C. § 636m(k) ........................................................................................... 3

15 U.S.C. § 9005(b) ........................................................................................ 2, 3

15 U.S.C. § 9012 .................................................................................................. 2

42 U.S.C. § 2000d ........................................................................................... 1, 19

42 U.S.C. § 2000e-3(b) ...................................................................................... 14

Coronavirus Aid, Relief, and Economic Security Act,
  Pub. L. No. 116-136, 134 Stat. 281 (2020) ................................................... 1

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................ 5

**Regulations**

13 C.F.R. § 112.7(a) ........................................................................................... 14

13 C.F.R. §§ 112.1 ............................................................................................... 1

13 C.F.R. §§ 112.4 ............................................................................................. 19

**Other Authorities**

Business Loan Program Temporary Changes; Paycheck Protection Program—
  Nondiscrimination and Additional Eligibility Criteria,
  85 Fed. Reg. 27,287 (May 8, 2020) .............................................................. 2

Business Loan Program Temporary Changes; Paycheck Protection Program,
  85 Fed. Reg. 20,811 (Apr. 15, 2020) ............................................................ 2

Business Loan Program Temporary Changes; Paycheck Protection Program—SBA Loan
  Review Procedures and Related Borrower and Lender Responsibilities,
  85 Fed. Reg. 33,010 (June 1, 2020) .............................................................. 3

Business Loan Program Temporary Changes; Paycheck Protection Program—Revisions to
  Loan Forgiveness and Loan Review Procedures Interim Final Rules,
  85 Fed. Reg. 38,304 (June 26, 2020) ............................................................ 3

Defendants Small Business Administration and Administrator Isabella Casillas Guzman (collectively "SBA"), by and through undersigned counsel, respectfully file this memorandum of points and authorities in support of their cross-motion for summary judgment and opposition to Plaintiff New Century Foundation ("New Century")'s summary judgment motion, ECF No. 24.

## BACKGROUND

### I.    Statutory and Regulatory Background

Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI authorizes and requires federal agencies that "extend Federal financial assistance to any program or activity, by way of grant, loan, or contract" to issue "rules, regulations, or orders of general applicability" effectuating Title VI's requirements, with limited exceptions not relevant here. *Id.* § 2000d-1. Pursuant to Title VI, SBA has prohibited recipients of financial assistance from, as relevant, discriminating in employment on the basis of race, color, or national origin. *See* 13 C.F.R. §§ 112.1, 112.4, 112.7(a), 113.1, 113.3(b), 113.3(d).

"In response to COVID-19-induced economic fallout, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, or CARES Act." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1247 (11th Cir. 2020) (citing Pub L. No. 116-136, 134 Stat. 281 (2020)). "The [CARES Act [was] in large part aimed at helping businesses make payroll and pay operating expenses in order to keep people employed through the economic downturn." *Id.* The Paycheck Protection Program (the "Program"), in turn, was "[o]ne of the [CARES] Act's programs designed to accomplish that goal." *Id.* (citing Pub. L. No. 116-136, § 1102, 134 Stat. at 286 (codified at 15 U.S.C. § 636(a)(36))). "The [Program was] directed at small businesses and its principal function is to provide potentially forgivable loans to them." *Id.* (citing 15 U.S.C. § 636(a)(36)(D)(I)). In

particular, it was "designed to give loans to eligible businesses and, if the loaned funds are used for specified expenses, to allow those loans to be forgiven." *Id.* (citing 15 U.S.C. § 9005(b)).

"Congress placed the Program under [S]ection 7(a) of the Small Business Act," which "is the SBA's primary program for providing financial assistance to small businesses." *Pharaohs GC, Inc. v. SBA*, 990 F.3d 217, 224 (2d Cir. 2021) (citing 15 U.S.C. § 636(a)); *see also Gateway Radiology*, 983 F.3d at 1249 ("the [Program] was not created as a standalone program; instead it was added into § 7(a)"). Under the Section 7(a) loan program, SBA "prefers to guarantee private loans rather than to disburse funds directly." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 719 n.3 (1979). "Congress authorized the SBA Administrator to guarantee [Program] loans 'under the same terms, conditions, and processes' as [Section] 7(a) loans." *Pharaohs GC*, 990 F.3d at 224 (quoting 15 U.S.C. § 636(a)(36)(B)). SBA issued an interim final rule "provid[ing] guidance that for purposes of the [Program], nonprofits must meet their nondiscrimination obligations under existing Federal laws and Executive Orders." Business Loan Program Temporary Changes; Paycheck Protection Program—Nondiscrimination and Additional Eligibility Criteria, 85 Fed. Reg. 27,287, 27,288 (May 8, 2020); *see also* 15 U.S.C. § 9012 (SBA "shall issue regulations to carry out" the Program without first undergoing notice and comment review).

The CARES Act mandated that lenders make Program loans without prior SBA review. 15 U.S.C. § 636(a)(36)(F)(ii)(I), (iii). In issuing such a loan, the "lender may rely on any certification or documentation submitted by an applicant." *Id.* § 636m(h)(2). SBA issued an interim final rule that "allowed lenders to rely on the borrower's certifications." *Gateway Radiology*, 983 F.3d at 1249 (citing Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,812, 20,815-16 (Apr. 15, 2020)). A borrower can apply to a lender for forgiveness of the loan. 15 U.S.C. § 636m(b), (e). When a borrower applies for forgiveness of a Program loan,

it initially seeks forgiveness from the lender, which determines whether the borrower is entitled to forgiveness and, if so, requests payment to SBA. 15 U.S.C. § 636m(e)-(g). SBA then "remit[s] to the lender an amount equal to the amount of forgiveness" plus interest. *Id.* § 636m(c)(3).

"If SBA determines that a borrower is ineligible for the [Program] loan, SBA will direct the lender to deny the loan forgiveness application." Business Loan Program Temporary Changes; Paycheck Protection Program—SBA Loan Review Procedures and Related Borrower and Lender Responsibilities, 85 Fed. Reg. 33,010, 33,012 (June 1, 2020); *see also* 15 U.S.C. § 636m(k) (SBA "shall issue guidance and regulations implementing" loan forgiveness). One reason a borrower might be ineligible for a loan is that "the borrower lacked an adequate basis for the certifications that it made in its [Program] loan application." Business Loan Program Temporary Changes; Paycheck Protection Program—Revisions to Loan Forgiveness and Loan Review Procedures Interim Final Rules, 85 Fed. Reg. 38,304, 38,306 (June 26, 2020). If the borrower was ineligible for the Program loan in the first place, then "the loan will not be eligible for loan forgiveness." *Id.*

## II.    <u>Factual and Procedural Background</u>

New Century characterizes itself as a "non-profit educational organization" that publishes *American Renaissance*, a magazine dedicated to "discussions of fact and opinion concerning racial and other issues," and hosts conferences on such topics. Compl. ¶ 3, ECF No. 1. According to New Century, "[r]ace and racial conflict are at the heart of some of the most serious challenges the Western World faces in the 21st century." *About Us*, Am. Renaissance, https://www.amren.com/about. New Century promotes what it characterizes as "race realism" and "white advocacy." *Id.*

New Century applied to Capital One, N.A., for and received a $51,600 loan under the Program. Administrative Record ("AR") 21. New Century later applied to Capital One for loan forgiveness. AR 11. Capitol One denied New Century's application for loan forgiveness on the ground that New Century was not in compliance with SBA's regulations implementing Title VI's

nondiscrimination requirements, contrary to its certification in its application for a Program loan. AR 36. New Century disputed Capital One's denial of loan forgiveness with SBA. Compl. ¶ 15. SBA determined that New Century was ineligible for loan forgiveness. AR 1. New Century then appealed SBA's adverse determination to SBA's Office of Hearing and Appeals. AR 3.

An Administrative Law Judge ("ALJ") affirmed SBA's decision, concluding that New Century is ineligible for loan forgiveness on the ground that, as relevant, it practiced employment discrimination in violation of SBA's Title VI regulations. AR 189. The ALJ emphasized that New Century "supports discrimination" and "describes itself as a 'white advocacy' organization. AR 199. The ALJ also quoted two statements published in *American Renaissance*: (1) "Our ancestors understood that people and races are not interchangeable, and that failure to discriminate would produce a warring mix of incompetents and unassimilable[s]" and (2) "Far-seeing whites should think carefully about arguments against discrimination in principle because discrimination, private and even public, is necessary to our survival." *Id.* Finally, the ALJ cited a job posting for *American Renaissance* seeking applicants with "[s]trong commitment to race realism and white advocacy" and requesting a "brief description of applicant's political views and how he came to them" and "why the applicant believes he would be a good fit for American Renaissance." *Id.*

New Century petitioned for reconsideration of the ALJ's decision, asserting for the first time that it employs an individual of Hispanic ethnicity. AR 204. The ALJ denied New Century's petition. AR 212. In his order denying reconsideration, the ALJ quoted two additional statements published in *American Renaissance*: (1) "so long as blacks and whites continue to live together, whites will pay the high price of sharing their society with an inveterately violent racial minority" and (2) "Our nation achieved character and greatness precisely because of discrimination." AR

216. New Century then petitioned the Administrator to reverse the ALJ's decision. Compl. ¶ 23.

The Administrator declined to disturb the ALJ's decision. *Id.*

## LEGAL STANDARD

Summary judgment is proper if "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under the Administrative

Procedure Act ("APA"), courts "review the administrative record to determine whether the agency's

decision was arbitrary and capricious, and whether its findings were based on substantial evidence."

*New LifeCare Hosps. of N.C., LLC v. Becerra*, 7 F.4th 1215, 1222 (D.C. Cir. 2021).

## ARGUMENT

SBA's denial of New Century's application for loan forgiveness was neither arbitrary nor

capricious. Substantial evidence supports SBA's finding that New Century practices employment

discrimination, and New Century's uncorroborated assertion that it has a single Hispanic employee

does not undermine that finding because it is both factually unsupported and legally immaterial.

For largely the same reasons, New Century's First Amendment argument is meritless. SBA denied

New Century's application for loan forgiveness based on a finding that New Century discriminates

in employment against non-white persons, not due to its protected speech. The First Amendment

permitted SBA to consider New Century's statements as evidence that it engages in discriminatory

conduct. Regardless, SBA's denial decision satisfies any level of First Amendment scrutiny given

the compelling governmental interest in combatting employment discrimination, and especially in

preventing the use of taxpayer funds to support such discrimination. Finally, even if this Court

concludes that SBA's denial of loan forgiveness was erroneous, the only proper remedy would be

vacatur and remand to SBA for a new decision, not an injunction directing SBA to forgive New

Century's loan. 15 U.S.C. § 634(b)(1) prohibits injunctions against SBA. And regardless, vacatur

and remand is the appropriate remedy because it is not clear that New Century is eligible for loan

forgiveness or spent its Program loan on permissible expenses even putting aside the finding of employment discrimination entirely. For all these reasons, this Court should grant SBA summary judgment and deny New Century's motion for summary judgment.

## I.     SBA's Finding of Employment Discrimination Was Not Arbitrary or Capricious

A court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quotation marks omitted). "The arbitrary and capricious standard is highly deferential" to agencies and "presumes the validity of agency action." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 663 (D.C. Cir. 2016). Agency action satisfies this standard if it "meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 979 (D.C. Cir. 2004). All that is necessary to clear this low bar is that the challenged action is "not unreasonable." *Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 456 (D.C. Cir. 2013); *see also Nat'l Tr. for Historic Pres. in U.S. v. Dole*, 828 F.2d 776, 781 (D.C. Cir. 1987) (action is "not unreasonable, and a fortiori neither arbitrary nor capricious").

SBA's denial of New Century's application for loan forgiveness was neither arbitrary nor capricious. When a court reviews an agency's factual finding under the arbitrary and capricious standard, it asks whether substantial evidence supports the agency's finding. The administrative record firmly establishes three facts: New Century (1) views non-white people as inferior to white people, (2) believes that white and non-white people generally should remain separate—indeed, believes that it is not good for society when white and non-white people mix, and (3) applies the foregoing beliefs specifically in the context of making hiring decisions. In light of these three facts,

a reasonable person could infer that New Century discriminates in employment against non-white persons. New Century's mere assertion that it has a single Hispanic employee does not undermine this finding. New Century submitted no evidence that this individual either works for it or is non-white, and in any event, the notion that an employer hires a single member of a certain group does not preclude an inference that an employer discriminates against members of that group generally. For these reasons, SBA's denial of loan forgiveness is not arbitrary or capricious.

### A.    Substantial Evidence Supports SBA's Finding of Employment Discrimination

When a court reviews agency factual findings under the arbitrary and capricious standard, it applies the substantial evidence test. *See Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("in their application to the requirement of factual support the substantial evidence test and the arbitrary or capricious test are one and the same"); *Platte River Whooping Crane Tr. v. Fed. Energy Regul. Comm'n*, 876 F.2d 109, 114 (D.C. Cir. 1989) ("The substantial evidence test is no more than a recitation of the application of the 'arbitrary and capricious' standard to factual findings."). In other words, the "'substantial evidence' and 'arbitrary and capricious' standard connotes the same substantive standard of review," *Bangor Hydro-Elec. Co. v. Fed. Energy Regul. Comm'n*, 78 F.3d 659, 663 (D.C. Cir. 1996), and any daylight between them "is largely semantic," *United Mine Workers of Am. v. Mine Safety Health & Admin.*, 830 F.2d 289, 293 (D.C. Cir. 1987).

"The substantial evidence standard requires a very high degree of deference" to an agency's factual findings. *Island Architectural Woodwork, Inc. v. Nat'l Lab. Rels. Bd.*, 892 F.3d 362, 370 (D.C. Cir. 2018) (quotation marks omitted). Substantial evidence "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Bloomberg L.P. v. SEC*, 45 F.4th 462, 475 (D.C. Cir. 2022). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "Under the substantial evidence standard," a "court may not reject reasonable

findings and conclusions, even if [it] would have weighed the evidence differently." *Marshall Cnty. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 923 F.3d 192, 201 (D.C. Cir. 2019) (quotation marks omitted). A "court reverses for lack of substantial evidence only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Evergreen Am. Corp. v. Nat'l Lab. Rels. Bd.*, 362 F.3d 827, 837 (D.C. Cir. 2004) (quotation marks omitted).

The substantial evidence test requires affirming a factual finding if any reasonable person could find it, "[e]ven if a reasonable person could also draw the opposite conclusion," *Pub. Citizen Health Rsch. Grp. v. Tyson*, 796 F.2d 1479, 1489 (D.C. Cir. 1986)—even if the opposite finding is "better and fairer," *Hi-Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 792 (D.C. Cir. 2000); *see also Morall v. Drug Enf't Admin.*, 412 F.3d 165, 176 (D.C. Cir. 2005) (a "decision may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view" (quotation marks omitted)); *Nader v. FCC*, 520 F.2d 182, 195 (D.C. Cir. 1975) ("That reasonable persons evaluating the record could draw different inferences does not prove that [the agency] was arbitrary and capricious or lacked substantial evidence").

Last, under the substantial evidence test, "direct evidence of a fact is not required." *L & J Energy Co., Inc. v. Sec'y of Lab.*, 57 F.3d 1086, 1088 n.4 (D.C. Cir. 1995). Rather, an agency can satisfy the substantial evidence test solely "by drawing inferences from indirect evidence." *United States v. Fed. Mar. Comm'n*, 655 F.2d 247, 253 (D.C. Cir. 1980); *see also Fed. Mar. Comm'n v. Aktiebolaget Svenska Amerika Linien*, 390 U.S. 238, 249 (1968) (an agency is "fully entitled to draw inferences . . . from the incomplete evidence that was available" when "positive proof" is "not available one way or the other"); *United Parcel Serv. v. U.S. Postal Serv.*, 184 F.3d 827, 835 (D.C. Cir. 1999) ("an agency must have latitude to draw permissible inferences from the record"). Accordingly, "[c]ircumstantial evidence is . . . sufficient" to support an agency's factual findings

under the substantial evidence test. *Id.*; *see also Singleton v. Babbitt*, 588 F.3d 1078, 1083 (D.C. Cir. 2009) (an agency can satisfy the substantial evidence test based on "circumstantial evidence").

The administrative record firmly establishes three facts. First, New Century views non-white people as inferior to white people. Second, New Century believes that white people generally should remain separate from non-white people, and indeed, that it is not good for society when white and non-white people mix. Third, New Century applies the foregoing beliefs specifically in the context of making its hiring decisions. These three facts collectively support a reasonable inference that New Century discriminates in employment against non-white persons.

A speech that New Century's founder Jared Taylor delivered to an *American Renaissance* conference and later published in the magazine crystalizes New Century's beliefs that non-white people are inferior to and should remain separate from white people. Taylor asserted that "the best possible citizenship policy" is the idea that that "[o]nly free white persons of good character could become Americans." AR 84. "How did we go wrong?," Taylor asked. *Id.* Well, "the race problem was always there," Taylor asserted, because "there were Indians here from the beginning," and "we imported a completely insane and avoidable second race problem by bringing in Africans." *Id.* Taylor continued: "not content with two race problems, in 1965, we completely upended our immigration policies and imported every possible race problem on earth." *Id.* Taylor also criticized "diversity," mocking the idea that it is "America's greatest strength" and sarcastically stating that "the more alien, incomprehensible, and unassimilable they are, the greater the strength they bring. They rescued us from that horrible almost-all-white country our ancestors had brought." *Id.* In Taylor's view, America has "gone horribly wrong [ ] on race." AR 85. He also attacked the very concept of racial integration, stating that "[a]ll we want is . . . . [a] place of our own, where we can be ourselves" and "[t]his multiracial experiment has failed. We separate or face oblivion." AR 86.

Such remarks are typical of Taylor's writings in *American Renaissance*. Elsewhere, Taylor has argued that "[f]ar-seeing whites should think carefully about arguments against discrimination in principle because discrimination, private and even public, is necessary to our survival. AR 128 (emphasis omitted). Taylor also has criticized diversity as "one of the most divisive forces on the planet" and "dangerous," put forward "a modest proposal" for a white "racial state," and asserted that "[n]ature has dealt blacks an unfortunate hand when it comes to crime." AR 73, 76, 78.

A 2003 *American Renaissance* article, meanwhile, lamented the diminishing white share of America's population. The writer warned his readers of a "decline from overwhelming majority to minority in little more than a lifetime" and that "white children born today will enter middle age as minorities in their own country." AR 94-95. The writer also advocated for immigration policies that are "intended to keep America white and culturally cohesive," AR 95, and asserted that "[t]o concede that discrimination was wrong" in principle is "to concede a moral position that could only lead to defeat." AR 98. According to the writer, "[n]o one can point to just how diversity is actually benefitting the country but everyone is convinced it is a great thing." AR 105. The writer complained that while "as late as the 1950s, whites still had enough unspoken racial consciousness to pass laws in their own interests," they did not "put the case in clear, racial terms." AR 107. To the writer, America's experience with diversity has taught a harsh but clear lesson:

> Our nation achieved character and greatness precisely because of discrimination. Our ancestors understood that people and races are not interchangeable, and that failure to discriminate would produce a warring mix of incompetents and unassimilables. If we are not to lose our country, it is up to us once again to make racial principles an explicit part of the national debate.

AR 107.

The administrative record also includes *American Renaissance*'s website, which SBA reviewed in determining that New Century did not satisfy SBA's regulatory nondiscrimination requirements. AR 53; *see also Liberman v. Dep't of Transp.*, 227 F. Supp. 3d 1, 4 (D.D.C. 2016)

(website brought to agency's attention "at the time [it] considered the [ ] issue" was "incorporated into the administrative record"). There, New Century asserts that "the threats against our race and culture . . . must be met in specifically racial terms;" that "[o]ne of the most destructive myths of modern times is that people of all races have the same average intelligence;" and that "[o]ne of the most obvious consequences of an increase in the black population is an increase in crime." *Our Issues*, Am. Renaissance, https://www.amren.com/about/issues. New Century also decries "the continuing tragedy of multi-racialism" and "the degeneracy of the marchers who descended on the small town of Selma." *Id.* Elsewhere, the website contains commentary and blog posts with titles like "Unpleasant and Illuminating Encounters with Non-Whites" and "Which Way, White Man?," AR 53, 57, links to books with titles like "A Dissident's Guide to Blacks and Africa," AR 58, and links to websites like "WhiteDate.net," which invites users to "Continue Your Lineage." AR 59.

Last, the website contains a full archive of *American Renaissance*'s back issues dating back twenty-four years. These articles are replete with statements that demonstrate a belief that non-white people are inferior to and generally should remain separate from white people. While SBA cannot reproduce an exhaustive list of such statements, the following examples are illustrative:

- The first very article to appear in *American Renaissance*'s pages said that "America is an increasingly dangerous and disagreeable place because of growing numbers of blacks and Hispanics;" that "[b]y no definition of international competitiveness can the presence of these populations be anything but a disadvantage;" that "[w]e cannot expect Mexican immigrants, Vietnamese refugees, or militant blacks to care if Shakespeare disappears from our schools or if the Jefferson Memorial falls into decay;" and that "[i]n another half century, if whites continue to cooperate in their own dispossession, this nation will have no core and no identity." *Who Speaks For*

*Us? A Word of Introduction to Our Readers*, Am. Renaissance (Nov. 1990), https://www.amren.com/archives/back-issues/november-1990/; *accord* AR 70-71 (same).

- The second article to appear in *American Renaissance*'s pages asked, "What if New York City were all white?," then immediately answered, "New York City would be a considerably safer, more civilized place." Marian Evans, *Race, Crime, and Numbers*, Am. Renaissance (Nov. 1990), https://www.amren.com/archives/back-issues/november-1990. It also characterized "mugging" as "a black specialty." *Id.*

- A column later in the same issue asserted that "[p]eople from the underdeveloped world bring their standards with them." *Third World Moving to Manhattan*, Am. Renaissance (Nov. 1990), www.amren.com/archives/back-issues/november-1990.

- An article in the second issue of *American Renaissance* rejected both (1) the idea "that blacks are just as intelligent and hard-working as whites" and (2) "a theory of equality that is agreeable but for which there is scarcely any evidence." Thomas Jackson, *On the Trail of the Great Taboo Part II*, Am. Renaissance (Dec. 1990), https://www.amren.com/archives/back-issues/december-1990/. It also asserted that "the distribution of intelligence among blacks is not the same as for whites." *Id.*

- A letter from a reader published in the same issue asserted "the inherent deficiencies of blacks and Hispanics." *Letters From Readers*, Am. Renaissance (Dec. 1990), https://www.amren.com/archives/back-issues/december-1990.

- In the June 1994 issue of *American Renaissance*, Taylor wrote that "crime is clearly a racial problem." Jared Taylor, *The Color of Crime*, Am. Renaissance (June 1994), https://www.amren.com/archives/back-issues/june-1994. He stated that "whites are justified in avoiding black neighborhoods and in not wanting blacks to move into

their neighborhoods. Of course, crime is not the only result when neighborhoods become black. Schools decline, housing decays, stores close, vandalism increases, and all the familiar signs of ghetto squalor begin to appear. So long as blacks and whites continue to live together, whites will pay the high price of sharing their society with an inveterately violent racial minority." *Id.*; *accord* AR 216.

- Another article later in the same issue asserted that "blacks are more violent and dangerous than whites." Marian Evans, *Race and the Law*, Am. Renaissance (Nov. 1994), https://www.amren.com/archives/back-issues/june-1994.

- In an article about Hurricane Katrina's aftermath in New Orleans, Taylor asserted that "we have Africa in our midst, that utterly alien Africa of road-side corpses, cruelty, and anarchy that they thought could never wash up on these shores." Jared Taylor, *Africa In Our Midst*, Am. Renaissance (Oct. 2005), https://www.amren.com/news/2015/08/africa-in-our-midst/. "For blacks—at least the lower-class blacks of New Orleans—disaster was an excuse to loot, rob, rape and kill," Taylor wrote. *Id.* To him, "the story of Hurricane Katrina [has] a moral for anyone not deliberately blind. The races are different. Blacks and whites are different. When blacks are left entirely to their own devices, Western Civilization—any kind of civilization— disappears. And in a crisis, it disappears overnight." *Id.*; *see also* AR 71 (same).

- In an article about a Buffalo, New York snowstorm in December 2012, the writer asserted that "many blacks immediately start looting when they get the chance." Gregory Hood, *Africa in Our Midst: Buffalo Edition*, Am. Renaissance (Dec. 27, 2022), https://www.amren.com/blog/2022/12/africa-in-our-midst-buffalo-edition/.

The writer then asserted: "Most groups show their best when disaster strikes. With some honorable exceptions, blacks generally show their worst." *Id.*

- A February 4, 2020, article argued that "blacks are more psychopathic than whites." F. Roger Devlin, *Race and Psychopathic Personality* (Feb. 4, 2020), https://www .amren.com/news/2020/02/race-psychopathic-personality. The writer asserted that "blacks must have some other characteristic, besides low intelligence, that explains their high levels of criminality," concluding that psychopathy must be that missing trait. *Id.* In the writer's view, this explains why "blacks in white societies have been overrepresented in all indices of social pathology: crime, illegitimacy, poverty, school failure, and long-term unemployment," phenomena for which, he said, "the low average IQ of blacks" is only "a partial explanation." *Id.*; *accord* AR 71 (same).

Last, the administrative record shows that New Century applied the foregoing racial views specifically in the context of making its hiring decisions. A job posting on New Century's website said "the ideal applicant" would have "[s]trong commitment to race realism and white advocacy." AR 56. The posting also requested that applicants submit a cover letter with "[a] brief description of the applicant's political views and how he came to them," along with an explanation of "[w]hy [the] applicant believes he would be a good fit for American Renaissance." AR 56-57; *cf.* 42 U.S.C. § 2000e-3(b) (prohibiting discriminatory job postings); 13 C.F.R. § 112.7(a) (same).

In short, the administrative record firmly established three facts: New Century (1) views non-white people as inferior, (2) believes that white and non-white people generally should remain separate, and indeed, that it is not good for society when white and non-white people mix, and (3) applies the foregoing beliefs in the context of making hiring decisions. In light of these three facts, a reasonable person could infer that New Century discriminates in employment against non-white

persons. Because New Century views non-white people as inferior to white people, a reasonable person can infer that New Century would fear that a non-white job applicant's attitude, level of effort, and work product would be inferior to those of a white applicant. Because New Century believes that non-white people and white people generally should remain separate, a reasonable person could infer that New Century would not want its employees to interact on a regular basis with a non-white person in a professional setting. And because New Century applies these beliefs specifically in the context of making its hiring decisions, a reasonable person could infer that New Century is less willing to hire a non-white person than a white person. A reasonable person thus could find that New Century discriminates in employment against non-white persons.

Even if this were not the only inference that a person reasonably could draw, "[e]ven if a reasonable person could also draw the opposite conclusion," *Pub. Citizen*, 796 F.2d at 1489, and even if that opposite finding is in fact "better and fairer," *Hi-Tech Furnace Sys.*, 224 F.3d at 792, that would not invalidate SBA's finding. Under the "very high degree of deference" that "[t]he substantial evidence standard requires" for SBA, *Island Architectural Woodwork*, 892 F.3d at 370, all that matters is whether "no reasonable factfinder could fail to find to the contrary," *Evergreen Am.*, 362 F.3d at 837. A reasonable person could find, based on New Century's beliefs that non-white persons are inferior to and generally should be separate from white people and its application of these beliefs in the specific context of making hiring decisions, that New Century discriminates in hiring against non-white persons, even if a reasonable person also can view the facts differently. Nor does it matter that SBA's finding rests on "circumstantial evidence," *Singleton*, 588 F.3d at 1083, or "indirect evidence," *Fed. Mar. Comm'n*, 655 F.2d at 253. Under the substantial evidence test, SBA had "latitude to draw permissible inferences from the record," *United Parcel Serv.*, 184 F.3d at 835, and "direct evidence of a fact is not required," *L J Energy*, 57 F.3d at 1088 n.4.

While New Century argues that SBA cannot rely on circumstantial evidence alone to find employment discrimination, it offers no authority for this notion. To the contrary, "the law makes no distinction between the weight or value to be given to either direct or circumstantial evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003). "The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Id.* (quotation marks omitted). That is so even where the burden of proof is most stringent, as circumstantial evidence alone is sufficient to secure "a criminal conviction, even though proof beyond a reasonable doubt is required." *Id.*; *see also United States v. Sutton*, 801 F.2d 1346, 1358 (D.C. Cir. 1986) ("no legal distinction exists between circumstantial and direct evidence" in a criminal case). New Century's failure to cite a single case carving out an exception to this rule for findings of conduct, much less discriminatory conduct in the employment setting, counsels against recognizing such an exception.

SBA thus properly relied on circumstantial evidence in making its finding of employment discrimination. *See, e.g.*, *United States v. Harmon*, No. 21-3067, 2021 WL 6102456, at *1 (D.C. Cir. Dec. 20, 2021) ("The government proffered circumstantial evidence regarding [a defendant's] conduct, and [the defendant] cites no authority that direct evidence is required"); *Patterson v. Easton Motorcars, LLC*, Civ. A. No. 19-2944, 2021 WL 3562917, at *5 (S.D. Ohio Aug. 11, 2021) ("A plaintiff can prove unlawful conduct through either direct or circumstantial evidence"). And regardless, SBA did not rely on New Century's statements alone to make this finding. Rather, SBA considered New Century's statements in conjunction with separate evidence that New Century applies its beliefs—namely, that non-white people both are inferior to and generally should remain separate from white people—specifically in the context of making its hiring decisions.

- 16 -

Even assuming, moreover, that the evidence SBA considered would not support a finding of employment discrimination in a Title VII case, it still suffices under the deferential substantial evidence test that applies here. Title VII cases follow "the conventional rule of civil litigation that . . . . requires a plaintiff to prove his case by a preponderance of the evidence," *Desert Palace*, 539 U.S. at 99 (cleaned up), whereas the substantial evidence test "can be satisfied by something less than a preponderance of the evidence," *Bloomberg*, 45 F.4th at 475. Assuming for argument's sake that the evidence before SBA would not satisfy the preponderance of the evidence test, it satisfies the lower substantial evidence test because "a reasonable mind might accept as adequate to support a" finding that New Century practices employment discrimination. *Biestek*, 587 U.S. at 103.

Last, New Century's self-comparison to certain other nonprofit organizations that advocate for particular groups is unpersuasive. Plainly, the mere fact that an entity advocates for a particular group or seeks to hire only individuals who share its commitment to advocating for that group does not by itself suggest discrimination, as the organizations that New Century cites demonstrate. But SBA's finding did not rely merely on the fact that New Century advocates for a particular group or seeks to employ like-minded persons. Rather, the evidence in the administrative record firmly established that New Century does not merely advocate for a particular group but believes in that group's supremacy over and separation from others—i.e., that others are inferior to and generally should be separate from members of the group. These facts readily distinguish the organizations to which New Century compares itself, which may advocate for certain groups but do not, as far as SBA is aware, believe that others are inferior or should remain separate from such groups. For this reason, substantial evidence supports SBA's finding that New Century practices employment discrimination but would not necessarily support such a finding against other advocacy entities.

- 17 -

For the foregoing reasons, substantial evidence supports SBA's finding that New Century discriminates in employment against non-white persons.

### B. New Century's Assertion That It Has a Single Hispanic Employee Does Not Undermine SBA's Finding of Employment Discrimination

New Century's assertion that it has a single Hispanic employee does not undermine SBA's finding that it discriminates in employment against non-white persons. As an initial matter, New Century submitted no evidence that the individual in question, Martin Rojas, actually works for it. Regardless, New Century submitted no evidence that Rojas is not white, so hiring him does not necessarily mean that New Century does not discriminate against non-white persons. And at a minimum, Rojas undisputedly is not black, so hiring him does not undermine the idea that New Century discriminates in employment against black persons. Lastly, even assuming for argument's sake that that Rojas works for New Century and is not white, that would not preclude a finding that New Century discriminates in employment against non-white persons because an employer can discriminate against a particular group even if it employs a person who belongs to that group.

*First*, New Century adduces no evidence that Rojas in fact works for it. While New Century submits a picture of what appears to be a passport of an individual with Rojas' name, this does not demonstrate that Rojas works for it. AR 210. New Century asserted that Rojas "writes under the name of Chris Roberts," but adduced no evidence that the "Chris Roberts" who wrote for *American Renaissance* is in fact Rojas. AR 209. All that New Century offers it is an unsworn assertion of its counsel, which does not constitute evidence. *Id.*; *see also Sierra Club v. EPA*, 292 F.3d 895, 901 (D.C. Cir. 2002) ("mere allegations in [a] brief . . . are not evidence" (quotation marks omitted)); *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019) ("briefs are not evidence" (quotation marks omitted)); *Brown v. Immigr. & Naturalization Serv.*, 775 F.2d 383, 388 (D.C. Cir. 1985) ("[T]hese allegations . . . were assertions of counsel, not evidence."). Accordingly, SBA

was not required to credit New Century's uncorroborated assertion that Rojas works for it. *See MomoCon LLC v. SBA*, Civ. A. No. 21-2386 (RC), 2023 WL 8880335, at *6 (D.D.C. Dec. 22, 2023) (SBA need not accept a grant applicant's "self-serving statements made while applying for [grant] funds"); *Affum v. United States*, 566 F.3d 1150, 1164 (D.C. Cir. 2009) ("the agency need not accept a [participant in a federal program's] claim"); *Nw. Immigr. Rts. Project v. USCIS*, 496 F. Supp. 3d 31, 75 (D.D.C. 2020) ("agencies need not accept uncritically any evidence submitted").

*Second*, New Century offered no evidence that Rojas is not white, so hiring him would not necessarily undermine a finding that it discriminates against non-white people.[1] Notably, Title VII and SBA's regulations prohibit discrimination on the basis of color as well as race. *See* 42 U.S.C. § 2000d; 13 C.F.R. §§ 112.4, 112.7(a), 113.3(b), 113.3(d). Even assuming that Rojas is Hispanic— which itself is not entirely clear from the record, AR 210; *cf. Shurberg Broad. Co. of Hartford v. FCC*, 876 F.2d 902, 954 (D.C. Cir. 1989) (statement of MacKinnon, J.) ("having a Hispanic surname is no guarantee that a person is 'Hispanic'")—it does not follow that Rojas is not white. That is because according to the U.S. Census Bureau, "Hispanic" is an ethnic category, not a racial category, meaning that "people of Hispanic origin may be of any race(s)." *Why We Ask Questions About… Hispanic or Latino Origin*, U.S. Census Bureau, https://www.census.gov/acs/www/about /why-we-ask-each-question/ethnicity; *see also Figueroa v. Pompeo*, 923 F.3d 1078, 1083 (D.C. Cir. 2019) ("Hispanic or Latino ethnicity" is not a "race"); *Vill. of Freeport & Andrew Hardwick v. Barrella*, 814 F.3d 594, 610 (2d Cir. 2016) ("the federal government defines 'Hispanic' as an

---

[1]    Nothing herein should be taken to suggest that Title VI, SBA's Title VI regulations, or any other federal civil rights statutes or regulations do not protect Hispanic persons regardless of their race. Rather, SBA argues only that under the specific facts of this case, the evidence in the record supports a rational inference that New Century draws the line at white versus non-white persons. The idea that New Century hired a white Hispanic person thus would not necessarily undermine a finding that New Century discriminates against non-white persons, whether Hispanic or otherwise.

ethnicity, not a race"). Notably, New Century submitted a photograph of Rojas, which is far from conclusive on this question. AR 210. Because New Century adduced no evidence that Rojas is not white, hiring him would not necessarily mean it does not discriminate against non-white persons. Indeed, New Century's failure to adduce any clear evidence that it ever has hired a non-white individual in its twenty-four history only buttresses SBA's finding of employment discrimination.

*Third*, even assuming that Rojas is not white, his hiring does not suggest that New Century discriminates in employment against black persons, given that Rojas undisputedly is not black.

*Fourth*, the mere fact that an employer "employed many" members of a particular group, "although relevant, is certainly not dispositive" of an employment discrimination claim. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). Here, New Century does not show that it employs "many" non-white persons, *id.*—at the very most, it employed a single non-white person. Such evidence "is certainly not dispositive," *id.*, meaning it does not compel a reasonable factfinder to find that no discrimination occurred. As such, under *Reeves*, a reasonable factfinder could find employment discrimination even if an employer employs a member of the group in question. Of course, a reasonable person might well infer that the presence of an employee who belongs to a certain group undercuts an inference of discrimination against that group, but *Reeves* holds that the factfinder is not required to make such a finding. Under the deferential substantial evidence test, the question simply is whether SBA could have found discrimination despite Rojas' presence. *See Biestek*, 587 U.S. at 103. Under *Reeves*, the answer to that question plainly is yes.

Indeed, the D.C. Circuit frequently has explained that the mere presence of an employee who belongs to a specific group does not preclude a finding of employment discrimination against members of that group. In *Stella v. Mineta*, 284 F.3d 135, 146 (D.C. Cir. 2002), for example, the D.C. Circuit held "that a plaintiff in a discrimination case need not demonstrate that she was

replaced by a person outside her protected class in order to carry her burden of establishing a prima facie case." An employment discrimination claim can be viable, then, even if an employer hires a member of the plaintiff's own group. The D.C. Circuit reaffirmed this holding in *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1150 (D.C. Cir. 2004), explaining that "it is not necessary for an African-American plaintiff to show that . . . the employer's hiring of a Caucasian applicant, or for a female plaintiff to show that a male was hired in her stead." Then, in *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005), the D.C. Circuit explained again that "an inference of discrimination" can exist even if an employer hires a member of the plaintiff's own group. In *Mastro v. Potomac Electric Power Co.*, 447 F.3d 843, 851 (D.C. Cir. 2006), meanwhile, the D.C. Circuit "expressly rejected as immaterial a requirement that the plaintiff be replaced by an individual outside her protected class." Finally, in the highly analogous context of federal labor law, the D.C. Circuit held that substantial evidence can support a finding that an employer discriminates against union supporters even if the employer treats some union supporters favorably, as "[a]n employer's failure to discriminate against every union supporter does not disprove a conclusion that it discriminated against one of them." *Wendt Corp. v. Nat'l Lab. Rels. Bd.*, 26 F.4th 1002, 1011 (D.C. Cir. 2022).

These cases teach a clear lesson: the mere fact that an employer hires a member of a group does not necessarily preclude a finding that it discriminates against that group. While a factfinder certainly can find that the presence of an employee who is part of the group undercuts an inference of discrimination, it is not compelled to make such a finding. Under the substantial evidence test, that is all that matters. Even if SBA could have found that Rojas' hiring undermines an inference of discrimination, Circuit precedent forecloses the idea that SBA needed to make such a finding.

Other Circuits agree on this point, as well. *See, e.g.*, *Miles v. Dell, Inc.*, 429 F.3d 480, 489 (4th Cir. 2005) ("This is race discrimination, which the employer cannot purge by hiring another

person of the same race later" (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158 (7th Cir. 1996))); *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 353 (3d Cir. 1999) (same); *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000) ("an employer may not escape liability for discriminating against a given employee on the basis of race simply because it can prove it treated other members of the employee's group favorably"); *Nieto v. L&H Packing Co.*, 108 F.3d 621, 624 n.7 (5th Cir. 1997) ("the single fact that a plaintiff is replaced by someone within the protected class does not negate the possibility that the discharge was motivated by discriminatory reasons" (cleaned up)); *Walker v. St. Anthony's Med. Ctr.*, 881 F.2d 554, 558 (8th Cir. 1989) ("it is entirely conceivable that a woman discharged and eventually replaced by another woman may be able to establish that she was the object of impermissible discrimination related to her gender"); *United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 950 (10th Cir. 1979) ("The employer is not excused from discriminating simply because he hired a member of one or more minorities.").

After all, there are many reasons why an employer that discriminates against a particular group may nonetheless hire a member of the group. The employer may hold members of the group to a higher standard than it holds other people. *See Carson*, 82 F.3d at 158 ("Suppose an employer evaluates its staff yearly and retains black workers who are in the top quarter of its labor force, but keeps any white in the top half. A black employee ranked in the 60th percentile of the staff according to supervisors' evaluations is let go, while all white employees similarly situated are retained."). Or perhaps an employer might hire a member of the group "to cover up or conceal [its] discrimination" against that group generally. *Wofford v. Safeway Stores, Inc.*, 78 F.R.D. 460, 470 (N.D. Cal. 1978); *accord Vant Hul v. City of Dell Rapids*, 462 F. Supp. 828, 833 n.3 (D.S.D. 1978) (same). Or it might think that the group is inferior generally, but that a certain member of the group is "one of the good ones." *MacDougall v. Banner Health*, Civ. A. No. 19-3456, 2021 WL 4307092,

at *2 (D. Colo. Sept. 21, 2021); *accord Thomas v. Helms Robison & Lee, P.A.*, Civ. A. No. 16-0139, 2016 WL 7173797, at *1 (W.D.N.C. Dec. 8, 2016), *R. & R. adopted*, 2017 WL 382244 (W.D.N.C. Jan. 26, 2017) (same). This last possibility is particularly plausible as to New Century, as illustrated by its writer's assertion that while "when disaster strikes . . . . blacks generally show their worst," there are "some honorable exceptions." *Africa in Our Midst: Buffalo Edition*, *supra*.

For the foregoing reasons, New Century's assertion that it has a Hispanic employee does not undercut SBA's finding that it discriminates in employment against non-white persons.

## II.    New Century's First Amendment Argument is Meritless

A court may set aside agency action found to be "not in accordance with law" or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B)-(C). New Century's First Amendment argument fails, however, as it rests on the erroneous premise that SBA denied its loan forgiveness application due to its protected "opinions." Pl.'s Mem. at 16. That is incorrect. SBA's decision cited a finding of employment discrimination, not New Century's opinions, as the basis for its denial of New Century's loan forgiveness application, AR 189-203, "and the agency is entitled to a presumption of regularity," *Leboeuf, Lamb, Greene MacRae, L.L.P. v. Abraham*, 347 F.3d 315, 320 (D.C. Cir. 2003); *see also Banner Health v. Price*, 867 F.3d 1323, 1348 (D.C. Cir. 2017) ("agency proceedings enjoy a presumption of regularity" (quotation marks omitted)).

True, SBA relied on New Century's statements as evidence that it practices employment discrimination, but that is consistent with the First Amendment. The First Amendment permits the use of protected speech as evidence of unprotected conduct. *See, e.g.*, *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent"); *Dawson v. Delaware*, 503 U.S. 159, 165 (1992) ("the Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and

associations are protected by the First Amendment"); *United States v. Abel*, 469 U.S. 45, 53 & n.2 (1984) ("First Amendment associational rights . . . were not implicated by" testimony concerning a defendant's "membership in the Aryan Brotherhood"); *Flytenow, Inc. v. Fed. Aviation Admin.*, 808 F.3d 882, 894 (D.C. Cir. 2015) (an agency's "reliance on [petitioner's] speech as evidence of [prohibited conduct] is fully compatible with the First Amendment"); *United States v. Ring*, 706 F.3d 460, 471 (D.C. Cir. 2013) (rejecting the idea "that permitting a jury to draw adverse inferences from constitutionally protected activity violates a defendant's First Amendment rights"). After all, "[w]hile the [F]irst [A]mendment in fact does preserve the right to speak offensively, it does not provide a shield against the logical import of that speech." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*, 991 F.2d 1249, 1260 (7th Cir. 1993).

New Century's effort to draw a distinction between using speech as evidence of intent and as evidence that a prohibited action occurred is no more persuasive in the First Amendment context than under the substantial evidence test. The First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent," *Mitchell*, 508 U.S. at 489, meaning that the permissible evidentiary use of speech is not limited to proving motive or intent, but includes proving the other "elements" of a claim, *id.*—in other words, the prohibited conduct itself. Indeed, the D.C. Circuit allows agencies to rely on protected speech as evidence of unprotected conduct during administrative proceedings. In *Flytenow*, 808 F.3d at 894, for example, the D.C. Circuit concluded that "using speech . . . as evidence that pilots are offering service that exceeds the limits of their certifications"—in other words using speech, as evidence of prohibited conduct itself, not just as evidence of intent—was "fully compatible with the First Amendment."

Tellingly, New Century cites no case for the fine-grained distinction between using speech to prove intent versus using speech to prove conduct that it attempts to draw. And as best SBA is

aware, there are none, which is reason enough to view New Century's attempt to generate such a distinction with skepticism. To the contrary, as noted earlier, the Supreme Court and D.C. Circuit have squarely held that the First Amendment permits the use of protected speech as evidence of the prohibited conduct itself, not just as evidence of intent. *See Mitchell*, 508 U.S. at 489; *Flytenow*, 808 F.3d at 894. And even putting that aside, the Supreme Court and D.C. Circuit repeatedly have reaffirmed that the First Amendment permits the use protected speech as evidence of unprotected conduct without ever limiting this rule only to evidence of intent rather than evidence of conduct.

Anyhow, SBA's denial of loan forgiveness to an entity it has found practices employment discrimination satisfies any level of First Amendment scrutiny. "The Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 590 (2023) ("governments in this country have a 'compelling interest' in eliminating discrimination in places of public accommodation"); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 680 (2000) (the "purpose of eliminating discrimination is a compelling state interest that is unrelated to the suppression of ideas"); *Mitchell*, 508 U.S. at 487 (Supreme Court has "rejected the argument that Title VII infringed employers' First Amendment rights" and "cited Title VII . . . as an example of a permissible content-neutral regulation of conduct" (citing cases)); *N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 14 n.5 (1988) (recognizing the "compelling interest in combating invidious discrimination"); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984) ("acts of invidious discrimination . . . cause unique evils that government has a compelling interest to prevent—wholly apart from the point of view such conduct may transmit . . . . potentially expressive activities that produce special harms distinct from their communicative impact . . . are

entitled to no constitutional protection"); *Runyon v. McCrary*, 427 U.S. 160, 176 (1976) (the First Amendment does not protect "the practice of excluding racial minorities" (emphasis omitted)).

SBA's interest in combatting employment discrimination is even stronger given its interest in ensuring that taxpayer dollars are not used to support such discrimination. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (plurality op.) ("It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice."); *Rothe Dev., Inc. v. Dep't of Def.*, 836 F.3d 57, 73 (D.C. Cir. 2016) (same); *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) ("the Government has a fundamental, overriding interest in eradicating racial discrimination in education" that "substantially outweighs whatever burden denial of tax benefits places on [the] exercise of their religious beliefs"); *Norwood v. Harrison*, 413 U.S. 455, 456, 469-70 (1973) (schools with "racially discriminatory policies" have no First Amendment right to government-funded benefits as Constitution "places no value on discrimination . . . [i]nvidious private discrimination . . . . has never been accorded [the] affirmative constitutional protections" of getting public funds); *W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 991 (9th Cir. 2005) ("The federal government has a compelling interest in ensuring that its funding is not distributed in a manner that perpetuates the effects of either public or private discrimination"). SBA is not attempting to shut New Century down or silence it. Rather, SBA is merely ensuring, as Congress intended, that public dollars do not go toward subsidizing employment discrimination.

For all these reasons, New Century's First Amendment argument is meritless.

## III.    Even if the Denial Was Erroneous, Injunctive Relief is Unavailable

Even assuming that SBA's denial of New Century's application for loan forgiveness was erroneous, injunctive relief would be unavailable to New Century for two reasons. First, 15 U.S.C. § 634(b)(1) prohibits courts from issuing injunctions against SBA. Second, the appropriate remedy

under the APA for an erroneous denial decision would be remand and vacatur, not an injunction, especially as it remains unclear whether New Century is eligible for loan forgiveness or spent its Program loan on permissible expenses even without the employment discrimination finding.

*First*, 15 U.S.C. § 634(b)(1) prohibits a court from issuing an injunction against SBA. That statute provides that "no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against [SBA] or [its] property." 15 U.S.C. § 634(b)(1). This statute prohibits a court from issuing an injunction against SBA with respect to a matter "within the scope of [its] authority." *Valley Forge Flag Co. v. Kleppe*, 506 F.2d 243, 245 (D.C. Cir. 1974) (citing 15 U.S.C. § 634(b)(1)); *see also In re Hidalgo Cnty. Emergency Serv. Found.*, 962 F.3d 838, 840 (5th Cir. 2020) (explaining, in a case under the Program, that "all injunctive relief directed at the SBA is absolutely prohibited" (cleaned up)); *J.C. Driskill, Inc. v. Abdnor*, 901 F.2d 383, 386 (4th Cir. 1990) ("courts have no jurisdiction to award injunctive relief against the SBA"); *Mar v. Kleppe*, 520 F.2d 867, 869 (10th Cir. 1975) ("this statute effectively precludes injunctive relief against" SBA); *Powell v. SBA*, Civ. A. No. 24-0207 (TSC), 2024 WL 1577948, at *3 (D.D.C. Apr. 5, 2024), *aff'd*, No. 24-5167, 2024 WL 4370897 (D.C. Cir. Oct. 2, 2024) (an injunction "is strictly prohibited under the APA pursuant to the provisions of the Small Business Act"). Whether or not to forgive a Program loan plainly is a matter within the scope of SBA's authority, *see* 15 U.S.C. § 636(a)(36), 636m(b), so 15 U.S.C. § 634(b)(1) prohibits an injunction here. *See Valley Forge*, 506 F.2d at 25.

While New Century "urge[s] this court to follow the reasoning of [other Circuits], finding that any bar to injunctive relief is appropriate only where such relief will interfere with internal agency operations, especially through attachment of agency funds," Pl.'s Mem. at 22 (quotation marks omitted), this argument fails for two reasons. The D.C. Circuit, unlike those other Circuits, has construed 15 U.S.C. § 634(b)(1) to prohibit injunctive relief as to any matter "within the scope

of [SBA's] authority," not merely where such relief will interfere with internal agency operations. *Valley Forge*, 506 F.2d at 245. And as noted, whether to forgive a Program loan is a matter within the scope of SBA's authority. Accordingly, Circuit precedent forecloses New Century's preferred reading of 15 U.S.C. § 634(b)(1). Further, an injunction is improper even under New Century's preferred approach. New Century concedes that an injunction is improper if it would result in "attachment of agency funds," Pl.'s Mem. at 22, but that exactly is what an injunction would do, as SBA must "remit to the lender" the amount of the forgiven loan, 15 U.S.C. § 636m(c)(3).

*Second*, vacatur and remand, not an injunction, is the traditional remedy for an erroneous agency action. "[U]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008). In other words, "remand to the agency for further proceedings" is what a court "normally does when it identifies an agency error." *Id.* As such, a "court err[s] by directing [an agency] how to [act] . . . rather than just remanding after identifying the error." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1111 (D.C. Cir. 2014). "Only in rare cases, when the reviewing court is convinced that remand would serve no purpose, does the court direct the agency how to resolve a problem." *Id.* at 1111 n.6.

This is not one of the "rare cases," *Allina Health*, 746 F.3d at 1111 n.6, where an injunction rather than vacatur and remand would be the appropriate remedy for erroneous agency action. New Century fails to demonstrate that "remand would serve no purpose," *id.*, such as because "only one disposition is possible as a matter of law," *George Hyman Constr. Co. v. Brooks*, 963 F.2d 1532, 1539 (D.C. Cir. 1992). Even without SBA's employment discrimination finding, it is far from clear that New Century satisfies all the eligibility requirements for loan forgiveness. The requirements

- 28 -

for loan forgiveness eligibility, after all, are numerous and complex. *See* 15 U.S.C. §§ 636(a)(36), 636m(b). Because SBA found that New Century discriminates against non-whites in employment, it did not consider whether New Century satisfies every other eligibility requirement for loan forgiveness. Nor does New Century demonstrate that it meets every other eligibility requirement. And even assuming for argument's sake that New Century satisfies all the eligibility requirements, it has not demonstrated, nor did SBA find, that it spent its Program loan on permissible expenses. *See* 15 U.S.C. §§ 636(a)(36)(F)(i), 636m(b) (permissible expenses for Program loan funds).

In short, even putting aside SBA's finding of employment discrimination entirely, whether or not New Century is entitled to loan forgiveness turns on a host of additional considerations that SBA has not yet evaluated and New Century has not yet demonstrated it satisfies. Whether New Century is eligible for and entitled to loan forgiveness even without the employment discrimination finding thus "is a question for the agency, not for the Court, to decide in the first instance." *Golden Ent. PA, Inc. v. SBA*, Civ. A. No. 22-1731 (JDB), 2024 WL 1344421, at *9 (D.D.C. Mar. 29, 2024). Indeed, granting an injunction would risk forcing SBA to extend loan forgiveness to an entity that is ineligible and/or has spent its loan on any number of impermissible expenses. For these reasons, vacatur and remand, not an injunction, would be the appropriate remedy if this Court determines that SBA erred in denying New Century's application for loan forgiveness.

\*       \*       \*

**CONCLUSION**

For the foregoing reasons, this Court should grant SBA summary judgment and deny New

Century's motion for summary judgment.

Dated: December 27, 2024          Respectfully submitted,

                                  MATTHEW M. GRAVES, D.C. Bar #481052
                                  United States Attorney

                                  BRIAN P. HUDAK
                                  Chief, Civil Division

                                  By:  _____/s/ Bradley G. Silverman_____
                                        BRADLEY G. SILVERMAN, D.C. Bar #1531664
                                        Assistant United States Attorney
                                        601 D Street, NW
                                        Washington, DC 20530
                                        (202) 252-2575
                                        bradley.silverman@usdoj.gov

                                  *Attorneys for the United States of America*