

# SMALL BUSINESS ADMINISTRATION
# WASHINGTON, DC 20416

12/29/2021

VIA FORGIVENESS PLATFORM

Capital One, National Association

Re: PAYCHECK PROTECTION PROGRAM FINAL SBA LOAN REVIEW DECISION


    Borrower: New Century Foundation
    SBA Loan No.: 2075417809
    Approved Loan Amount: $51,600.00
    Loan Approval Date: 05/22/2020
    Lender Forgiveness Decision Submission Date: 11/2/2021
    Lender Forgiveness Decision Amount: $0.00
    SBA Final Forgiveness Amount: $ 0.00


The U.S. Small Business Administration (SBA) has completed its review of the above-referenced Paycheck Protection Program (PPP) loan.  Based on a review of lender and/or borrower submissions, and consideration of the facts and circumstances, SBA has made a final SBA loan review decision.

---

**SBA has determined that the borrower was ineligible for the PPP loan. The reason for SBA's decision is as follows:**

**After a review of the documentation provided, the SBA concludes that the borrower's business activities are ineligible per SBA guidelines.**

**To be eligible for a Paycheck Protection Program loan, each Borrower must certify on the Form 2483 that businesses must agree not to discriminate in any business practice, including employment practices and services to he public on the basis of categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations.**

---

Based on the above stated reason(s), SBA has determined that forgiveness in the amount of $0.00 is appropriate. Additional details regarding the forgiveness payment

SBA000002

amount (if any) will be provided in a Notice of Paycheck Protection Program Forgiveness Payment.

Within 5 business days of the date of this letter, you must provide a copy of this final SBA loan review decision to the borrower.

You must continue to service the loan. You must notify the borrower that the remaining balance of the loan after application of the forgiveness payment (if any) must be repaid on or before the maturity date. The notification must include the date on which the first principal and interest payment is due and the amount of the borrower's regular payment. As set forth below, if the borrower files a timely appeal with SBA's Office of Hearings and Appeals (OHA), the deferment period of the loan will be extended pursuant to 13 CFR § 134.1211.

Pursuant to 13 CFR § 134.1201(b), the borrower has the right to appeal to SBA's Office of Hearings and Appeals a final SBA loan review decision that the borrower:

1. was ineligible for a PPP loan;
2. was ineligible for the PPP loan amount received or used the PPP loan proceeds for unauthorized uses;
3. is ineligible for PPP loan forgiveness in the amount determined by the lender in its full approval or partial approval decision issued to SBA; and/or
4. is ineligible for PPP loan forgiveness in any amount when the lender has issued a full denial decision to SBA.

Any appeal must be made in accordance with the SBA Rules of Practice for Borrower Appeals of Final SBA Loan Review Decisions Under the Paycheck Protection Program, located at 13 CFR § 134.1201, *et seq.*, including but not limited to the following:

- An appeal petition must be filed with SBA's Office of Hearings and Appeals (OHA) within 30 calendar days after the borrower's receipt of the final SBA loan review decision. 13 CFR § 134.1202(a). To file and manage an appeal of a final SBA loan review decision with OHA, refer to Office of Hearings and Appeals.
- Borrower must include, among other things, a copy of this final SBA loan review decision with its appeal. 13 CFR § 134.1204(a).
- Borrower must provide you (the lender) with a copy of the timely appeal petition filed with OHA so that you can extend the deferment period of the loan. 13 CFR § 134.1202(b).
- An appeal to OHA is an administrative remedy that must be exhausted before judicial review of a final SBA loan review decision may be sought in a federal district court. 13 CFR § 134.1201(d).

Thank you for your cooperation.

Sincerely,

Office of Capital Access
U.S. Small Business Administration

SBA000003

Dear Sir or Madam,

On January 3, 2022, New Century Foundation (NCF) received a final loan review decision from the Small Business Administration (SBA) regarding NCF's application for forgiveness of a Paycheck Protection Program (PPP) loan in the amount of $51,600.

The decision was a denial of NCF's request for loan forgiveness. Specifically, SBA alleges NCF violated the PPP requirement that recipients not discriminate "in any business practice, including employment practices and services to the public on the basis of categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations." NCF denies this allegation.

The cited sections of the Code of Federal Regulations prohibit acts of discrimination based on race, sex, national origin, and other forbidden grounds by any SBA loan or grant recipient in carrying out its activities. In denying loan forgiveness, SBA did not cite a single instance of such discrimination by NCF, and in fact there has never been such discrimination.

Since SBA did not cite examples of discrimination, requiring an appeal amounts to a demand that NCF prove a negative. This is a logical impossibility. It is instead incumbent upon the SBA to submit factual accusations that can be rebutted. SBA cannot make such factual accusations because NCF has never violated 13 C.F.R., Parts, 112, 113, and 117 of SBA Regulations.

In a letter addressed to SBA dated December 14, 2021, the lender, Capital One made specific accusations. If those are the bases for SBA's denial of loan forgiveness — and we can only speculate because SBA itself makes no specific accusations — they are groundless.

NCF is a 501(c)3 non-profit educational organization whose primary activities are publishing articles, videos, and podcasts, and hosting conferences. Its mission is to educate the public on matters of race, race relations, and immigration.

NCF is small. It has never had more than five employees, and now has four. In its hiring decisions, NCF considers only the job-related qualifications of the candidate and whether the candidate has knowledge and beliefs consistent with the organization's mission. In its letter, Capital One cites an online NCF job posting NCF did not even know was still on its website. The last time NCF solicited job applications was in 2017. NCF has had male and female employees, and to its knowledge has never received a job application from anyone belonging to

SBA000004

protected categories other than sex, so it would have been impossible to discriminate against anyone in those other categories.

To the extent SBA relied upon the job listing cited by Capital One in reaching its adverse decision, it is punishing speech protected by the First Amendment to the United States Constitution. The job listing did not specify race, gender, or other protected characteristics as a requirement for job applicants; it stated only that candidates for employment should agree with NCF's mission. An applicant of any race might agree with NCF's mission, and there is no evidence that NCF has or would reject a candidate based on race.

This conclusion would be uncontroversial if an organization advertised for employees who agreed with advocacy on behalf of black people, Hispanics, Native Americans or other people of color. We strongly suspect that neither the SBA nor any other government agency would construe such an advertisement as a civil rights violation, so long as the organization did not use race as a basis for a hiring decision. Unless SBA can demonstrate that its decision is based upon NCF's conduct, rather than its beliefs, SBA is engaged in unlawful viewpoint discrimination that will be subject to strict scrutiny by a court.

NCF engage in forbidden discrimination in its business practices or services to the public. When NCF publishes articles, videos, and podcasts, they are made available publicly on the internet, so it is impossible to discriminate against anyone in any protected class. NCF has published articles written by people of many backgrounds, including racial minorities. It has published videos and podcasts featuring people of many backgrounds, including racial minorities.

Similarly, when NCF hosts conferences, it never discriminates against potential attendees based on any categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations. It is a matter of public record that people of many backgrounds attend NCF's conferences, including racial minorities. It is also of public record that NCF has had people of many backgrounds speak at its conferences, including racial minorities.

It is true that NCF has published articles pointing out that choice is an essential part of freedom. It has published articles arguing that private entities should have the right to choose employees and clients on whatever grounds they see fit. This constitutionally protected speech does *not* mean that NCF has ever discriminated against a member of a protected class. Indeed, NCF has never wished to do so, nor has it ever had an opportunity to do so.

SBA000005

In sum, SBA claims NCF is ineligible for PPP loan forgiveness because NCF engaged in forbidden discrimination. SBA cited no instances of such discrimination, and there has been none. If SBA believes there has been discrimination, let it offer examples so NCF can respond to them. Otherwise, NCF requests SBA's decision be overturned and NCF's request for PPP loan forgiveness be approved.

Thank you for your consideration.

Sincerely,

Samuel Jared Taylor
President, New Century Foundation

SBA000006

### United States Small Business Administration
### Office of Hearings and Appeals

PAYCHECK PROTECTION
PROGRAM APPEAL OF:

New Century Foundation

      Appellant

Appealed from
SBA PPP Loan Number
2075417809

Issued: March 8, 2022

Docket No. PPP-2075417809

### NOTICE AND ORDER

The U.S. Small Business Administration (SBA) Office of Hearings and Appeals (OHA) hereby notifies all currently known parties that it received an appeal petition in the above-captioned matter from New Century Foundation (Appellant) on January 28, 2022. OHA conducts Paycheck Protection Program (PPP) appeals under the authority of 13 C.F.R. part 134 Subpart L.

## I. **Administrative Record**

SBA shall file the Administrative Record with OHA electronically, via the OHA Case Portal, no later than **March 28, 2022**. The Administrative Record must contain every document relevant to Appellant's PPP loan that the SBA possessed on the date of its final loan review decision. See 13 C.F.R. § 134.1207.

## II. **Objection to Administrative Record**

Appellant shall file and serve, on or before **April 7, 2022**, any objections it has to the absence of any document in the Administrative Record. See 13 C.F.R. § 134.1207(e). Any objection not filed by this date will be deemed waived, regardless of any agreements between the parties. Appellant may object to the absence of a document, previously submitted to, or sent by, SBA, which Appellant believes was erroneously omitted from the Administrative Record. An objection to an incomplete Administrative Record must include either a copy or a detailed description of the missing document or other information Appellant believes is missing, and why Appellant believes the Administrative Record should include it.

## III. **Appeal Response**

SBA may, but is not required to, file a response to this appeal. If SBA files a response to this appeal, it must be filed by no later than **April 22, 2022**, which is the close of record. If SBA elects not to respond, such election shall not be interpreted as an admission or waiver of any allegation of law or fact. In addition, after review of the appeal petition, OHA may

request SBA to respond. Only SBA may respond. If filed, the response should set forth the relevant facts and legal arguments to the issues presented on appeal.  *See* 13 C.F.R. § 134.1208.

## IV. <u>Filing and Service Instructions</u>

A party seeking to file and serve any pleading or other submission must do so by utilizing the OHA Case Portal at <u>https://appeals.sba.gov</u>. A filing received by OHA after 5 p.m. eastern time is considered filed on the next business day. See 13 C.F.R. § 134.204(b)(2); § 134.1202.

## V. <u>PPP Loan Deferment</u>

Appellant must provide their lender with a copy of the appeal to extend the deferment period of the PPP loan until OHA's decision becomes final. See 13 C.F.R. § 134.1204(d).

*Raul Pardo*
_____

RAUL PARDO
Administrative Judge

SBA000010



Lender
# Capital One, National Association

Borrower
# New Century Foundation

| | | |
|---|---|---|
| Review Type: | R1 Review | |
| Assigned to: | Unassigned | Auto Review Passed |
| Workflow Status: | Not Approved | |

SBA000011

## About Request

Draw Type : **First Draw**
SBA # : **2075417809**
Lender PPP Loan # : **117900115361**
Borrower Name: **New Century Foundation**
Borrower Type: **Non-Profit Organization**
PPP Loan Disbursement Date: **06/12/2020**

NAICS Code: **Other Social Advocacy Organizations (813319)**

| | |
|---|---|
| Initially Submitted on | 11/02/2021 (Nov. 2, 2021, 1:25 p.m.) |
| Lender Decision | Denied |
| Last Updated by SBA on | 12/29/2021 |
| Last Updated by Lender on | 11/02/2021 |
| Sent to Auto Review | Nov. 4, 2021, 11:18 a.m. |
| Last Update from Auto Review | Nov. 8, 2021, 2:13 p.m. |
| COVID Flag | N/A |

| Name | Email | Phone |
|---|---|---|
| Tejas Bhandari | tejas.bhandari@capitalone.com | 2012388338 |
| Renu Sharma | renu.sharma@capitalone.com | 2403282510 |
| Leslie Lindsey | leslie.lindsey@capitalone.com | 9728378327 |
| Katherine Coelho | katherine,coelho@capitalone.com | 7032820588 |
| Mary Brooks | mary.brooks@capitalone.com | 8046173577 |
| Thota Swathi | swathi.thota@capitalone.com | 8049288795 |
| Joseph French | joseph.french@capitalone.com | 7164442408 |
| Priscilla Smith | priscilla.smith@capitalone.com | 8049722574 |

## Forgiveness Results

| | |
|---|---|
| Loan Amount | $51,600.00 |
| Lender Requested Unforgiven Amount | - $51,600.00 (100.00%) |
| Lender Requested Forgiveness Amount | $0.00 (0.00%) |
| **SBA Final Forgiveness Amount** | **$ 0.00** |

## Review Progress

| Reviewed By | Accepted By |
|---|---|
| Lorena Gogo | Kelvin Davis_fte_lr |
| 3 months, 1 week ago | 3 months, 1 week ago |
| Recommends *Not Approved* | Recommends *Not Approved* |

I have reviewed the Paycheck Protection Program (PPP) loan forgiveness application submitted by the borrower, the forgiveness decision submitted by the lender, supporting documentation, and relevant Contractor reports on the loan, for any indications of fraud, abuse, negligence, misrepresentation, misconduct by the lender or borrower, ineligibility or material noncompliance with the PPP and Forgiveness requirements. My recommendation is based upon my review of the preceding items, documentation submitted with the Borrower's PPP loan forgiveness application, and documents submitted by the lender in connection with this loan review. According to guidance which I have been instructed to follow for reviewing and recommending forgiveness, this submission is an acknowledgement of my completion of relevant review and procedural questions, and an attestation that I have made this recommendation in accordance with PPP requirements.

| Higher Level Authority Reviewed By | OCA Reviewed By |
|---|---|
| julie wallace | Emily Doxzon_lr |
| 3 months ago | 2 months, 3 weeks ago |
| Recommends *Not Approved* | Recommends *Not Approved* |

Decision Letter *Denial Justification Document - Term*

Decision Narrative
SBA has determined that the borrower was ineligible for the PPP loan. The reason for SBA's decision is as follows: After a review of the documentation provided, the SBA concludes that the borrower's business activities are ineligible per SBA guidelines. To be eligible for a Paycheck Protection Program loan, each Borrower must certify on the Form 2483 that businesses must agree not to discriminate in any business practice, including employment practices and services to he public on the basis of categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations.

## Borrower Employment Detail

| Field | Lender Supplied |
|---|---|
| Employees at Time of Loan Application | 5 |
| Employees at Time of Forgiveness Application | 4 |
| EIDL Advance Amount | $ 0.00 |
| EIDL Application Number | |

**SBA PPP Loan & Forgiveness Review Procedures**
## A. Eligibility

1.  **Are the SBA Loan Records free of any indication that special handling may be required during this review? You must answer NO to all three of the following sub-questions, to answer yes to this question.** 

    a. Does the file have a report for further action provided by the Previous Reviewer?

    - If "YES", discontinue work on this loan and contact your supervisor to seek permission to escalate to an R3.
    - If "NO", continue to b.

    b. Are there unresolved Hold Codes/Flags (if applicable)?

    - If "YES", discontinue work on this loan and contact your supervisor to seek permission to escalate to an R3.
    - If "NO", continue to c.

    c. Are there any Chron Entries in the Centralized Loan Chron System (a.k.a. CHRON) that indicate potential misuse of funds or fraud?

    - If "YES", discontinue work on this loan and contact your supervisor to seek permission to escalate to an R3.
    - If "NO", answer YES.
    - If you have any questions, please ask your team lead/supervisor.

2.  **In reviewing the SBA Form 2483 Borrower Application Form or Lender's equivalent form, did you find that the form was completed, signed and dated with all certifications initialed by the borrower and that questions (1), (2), (5) and (6) were answered "No"?** 

    - If "YES", continue to the next question.
    - If "NO", recommend denial based on the applicable question. If the Approver concurs with this recommendation, the loan review will be escalated to for a final decision in HQ.

3.  **Was the SBA Form 3508 Request for Forgiveness Form or Lender's equivalent form completed, signed, and dated with all attestations completed by the borrower?** 

    **a.  If "YES," continue to the next question.**

    **b.  If "NO," confirm with the lender that the borrower has correctly completed the form.** If the lender responds that they have, discontinue work on this loan and contact your supervisor to seek permission to escalate to an R3. If the lender can provide an updated form that is properly completed, obtain the updated copy and proceed to the next question.

4.  **Is the borrower structure eligible?** 

    - C-Corporation, S-Corporation, LLC
    - Sole proprietorship
    - Independent contractor
    - Partnership
    - Nonprofit organization described in IRC § 501(c)(3)
    - Housing cooperative, section 501(c)(6) organization, and destination marketing organizations employing less than 300 people
    - News organization that is majority owned or controlled by a NAICS code 511110 or 5151 business or a nonprofit public broadcasting entity with a trade or business under NAICS 511110 or 5151.
    - Faith-based organization that does not have 501(c)(3) status
    - Veterans organization described in IRC § 501(c)(19)
    - IRC 501(c)(12) electric and telephone co-operative
    - Tribal business concern described in 15 USC § 657a(b)(2)(c)
    - Nonprofit hospital owned by governmental entities if they are described in IRC § 501(c)(3) (or otherwise adhere to the parameters of IRC § 501(c)(3) and are tax exempt under IRC § 115) and receive less than 50 percent of their funding from state or local government sources, exclusive of Medicaid.

    a. **If the borrower's legal organization structure is listed above, answer YES to this question and advance to the next question.**

    b. **If the borrower's legal organization structure is not listed above, answer NO to this question and recommend denial of loan eligibility. If the Approver concurs with this recommendation, the loan review will be escalated to Higher Authority Review for a final decision**

## Supporting Forgiveness Documentation

| Document Name | Document Uploaded | Document Category | Actions |
|---|---|---|---|
| Denial Justification Document - Term | Dec. 29, 2021, 5:30 p.m. | Denial Justification Document | View |
| 2019 Form 990 Filled In-1 | Dec. 15, 2021, 3:16 p.m. | Miscellaneous | View |
| KY Declaration of Trust | Dec. 15, 2021, 3:16 p.m. | Miscellaneous | View |
| NCF Letter to Capital One | Dec. 15, 2021, 3:15 p.m. | Miscellaneous | View |
| SBA Loan Review.pdf | Dec. 15, 2021, 2:59 p.m. | SBA Correspondence - Request Clarifications | View |
| Capital One Response to SBA loan review request | Dec. 14, 2021, 9:24 p.m. | Miscellaneous | View |
| SBA Loan Review.pdf | Nov. 26, 2021, 3:29 p.m. | SBA Correspondence - Request Clarifications | View |
| WestVirginia_August | Nov. 24, 2021, 3:19 p.m. | Miscellaneous | View |
| Virginia_June | Nov. 24, 2021, 3:18 p.m. | Miscellaneous | View |
| Virginia_July | Nov. 24, 2021, 3:18 p.m. | Miscellaneous | View |
| Virginia_August | Nov. 24, 2021, 3:18 p.m. | Miscellaneous | View |
| June2020Checking | Nov. 24, 2021, 3:17 p.m. | Miscellaneous | View |
| July2020Checking | Nov. 24, 2021, 3:17 p.m. | Miscellaneous | View |
| GeorgiaJuly | Nov. 24, 2021, 3:17 p.m. | Miscellaneous | View |
| Georgia_June | Nov. 24, 2021, 3:17 p.m. | Miscellaneous | View |
| Georgia_August | Nov. 24, 2021, 3:16 p.m. | Miscellaneous | View |
| WestVirginia_June | Nov. 24, 2021, 3:16 p.m. | Miscellaneous | View |
| WestVirginia_July | Nov. 24, 2021, 3:16 p.m. | Miscellaneous | View |
| Form 941_Third_Quarter_2020 | Nov. 24, 2021, 3:14 p.m. | Miscellaneous | View |
| Form 941_Second_Quarter_2020 | Nov. 24, 2021, 3:14 p.m. | Miscellaneous | View |
| August2020Checking | Nov. 24, 2021, 3:14 p.m. | Miscellaneous | View |
| Evidence of Payroll Effective 2-15-20 | Nov. 24, 2021, 3:13 p.m. | Miscellaneous | View |
| 941 - Quarterly Federal Tax Return (Corporation)Q4 | Nov. 24, 2021, 3:13 p.m. | Miscellaneous | View |
| 941 - Quarterly Federal Tax Return (Corporation) Q3 | Nov. 24, 2021, 3:13 p.m. | Miscellaneous | View |
| 941 - Quarterly Federal Tax Return (Corporation) Q2 | Nov. 24, 2021, 3:13 p.m. | Miscellaneous | View |

SBA000015

| Document Name | Document Uploaded | Document Category | Actions |
|---|---|---|---|
| 941 - Quarterly Federal Tax Return (Corporation) Q1 | Nov. 24, 2021, 3:13 p.m. | Miscellaneous | View |
| NEW CENTURY FOUNDATION_Lender_s Transcript of Account | Nov. 24, 2021, 3:11 p.m. | Transcript of Account | View |
| New Century Foundation_Borrower Note | Nov. 24, 2021, 3:11 p.m. | Borrower Note | View |
| New Century Foundation_Borrower Application | Nov. 24, 2021, 3:11 p.m. | SBA Form 2483 | View |
| SBA Loan Review.pdf | Nov. 8, 2021, 2:13 p.m. | SBA Correspondence - All documents | View |
| Denial Justification | Nov. 2, 2021, 1:26 p.m. | Denial Justification | View |
| PPP Forgiveness Application Form 3508S.pdf | Nov. 2, 2021, 1:25 p.m. | SBA Form 3508S | View |

**SBA Internal Notes**

| Note | Author | Date |
|------|--------|------|
| **Comment**<br>We are in concurrence with the lender's recommendation to deny this application due to a false certification on the 2483, as the borrower's business operations do not comply with the Civil Rights eligibility criteria as outlined on the application for federal benefits.<br><br>A search of public records identified the borrower's website as www.amren.com. The borrower's website states, "We also believe that all whites, like all racial groups, have legitimate interests that must be defended. The defense of those interests is white advocacy. We seek to advance only those interests that we recognize and would defend for all other racial groups. We seek no advantages as whites - only the expression of preferences for our own people and culture that are taken for granted by people of other races but denied to us."<br><br>After a review of the documentation provided, the SBA concludes that the borrower's business activities are ineligible per SBA guidelines.<br><br>To be eligible for a Paycheck Protection Program loan, each Borrower must certify on the Form 2483 that businesses must agree not to discriminate in any business practice, including employment practices and services to he public on the basis of categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations.<br><br>HC 41 and HC 69 have been added to this file.<br><br>It is determined that the borrower has a false certification on the 2483. The 2483 states:<br><br>'Civil Rights (13 C.F.R. 112, 113, 117) – All businesses receiving SBA financial assistance must agree not to discriminate in any business<br><br>practice, including employment practices and services to the public on the basis of categories cited in 13 C.F.R., Parts 112, 113, and 117 of<br><br>SBA Regulations. All borrowers must display the 'Equal Employment Opportunity Poster' prescribed by SBA.'<br><br>The nature of business operations, as reported on the borrower's website indicate that the borrower does not meet the requirements of the Civil Rights criteria as outlined on the 2483.<br><br>The HC 69 is added to this file for further investigation into the lender's decision to approve the PPP loan at origination for this borrower. | Emily Doxzon_lr | Dec. 29, 2021, 5:28 p.m. |
| **Comment**<br>OCA: An OCA Review Notification Email has been sent to the Lender before the final OCA Decision is submitted by the OCA reviewer. | Elainea Myers | Dec. 28, 2021, 5:35 p.m. |
| **Comment**<br>12.22.2021 HAR<br><br>In order to advance this forgiveness request and enable the lender to receive the correct letter, I am advancing the status to NOT APPROVED. I have not reviewed this case, as it is not required. | julie wallace | Dec. 22, 2021, 4:28 p.m. |
| **Comment**<br>I concur with the lender's & 1st reviewer's recommendation to decline forgiveness. I have selected Not Approved in order to advance the request and allow the correct letter to be sent to the lender. | Kelvin Davis_fte_lr | Dec. 15, 2021, 1:09 p.m. |

| Note | | Author | Date |
|------|------|--------|------|
| **Comment** | | Lorena Gogo | Dec. 15, 2021, 12:43 p.m. |
| I concur with the lender's recommendation to decline forgiveness. I have selected Not Approved in order to advance the request and allow the correct letter to be sent to the lender. | | | |
| **Comment** | | Lorena Gogo | Nov. 26, 2021, 3:13 p.m. |
| Capital One's denial justification letter states that New Century Foundation violated the 13 C.F.R. 112,113,117, which per 2483 app refers to the following:<br><br>Civil Rights (13 C.F.R. 112, 113, 117) – All businesses receiving SBA financial assistance must agree not to discriminate in any business practice, including employment practices and services to the public on the basis of categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations. All borrowers must display the "Equal Employment Opportunity Poster" prescribed by SBA.<br><br>The nature of activities is not allowed by the SBA. Denial letter sent for eligibility. | | | |

Internal Attachments

| Attachment Name | Mime Type | Size | Actions |
|-----------------|-----------|------|---------|
| DENIAL NOTICE 112621 | application/pdf | 1.1 MB | View |

SBA000018

SBA000019



**SMALL BUSINESS ADMINISTRATION
WASHINGTON, DC 20416**

12/29/2021

VIA FORGIVENESS PLATFORM

Priscilla Smith

Capital One, National Association

Re: PAYCHECK PROTECTION PROGRAM FINAL SBA LOAN REVIEW DECISION
    Borrower: New Century Foundation
    SBA Loan No.: 2075417809
    Approved Loan Amount: $51,600.00
    Loan Approval Date: 05/22/2020
    Lender Forgiveness Decision Submission Date: 11/02/2021
    Lender Forgiveness Decision Amount: $0.00
    SBA Final Forgiveness Amount: $ 0.00

## *Dear: Priscilla Smith*

The U.S. Small Business Administration (SBA) has completed its review of the above-referenced Paycheck Protection Program (PPP) loan.  Based on a review of lender and/or borrower submissions, and consideration of the facts and circumstances, SBA has made a final SBA loan review decision.

---

**SBA has determined that the borrower was ineligible for the PPP loan. The reason for SBA's decision is as follows:**

**After a review of the documentation provided, the SBA concludes that the borrower's business activities are ineligible per SBA guidelines.**

**To be eligible for a Paycheck Protection Program loan, each Borrower must certify on the Form 2483 that businesses must agree not to discriminate in any business practice, including employment practices and services to he public on the basis of categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations.**

---

Based on the above stated reason(s), SBA has determined that forgiveness in the amount of $0.00 is appropriate. Additional details regarding the forgiveness payment

amount (if any) will be provided in a Notice of Paycheck Protection Program Forgiveness Payment.

Within 5 business days of the date of this letter, you must provide a copy of this final SBA loan review decision to the borrower.

You must continue to service the loan. You must notify the borrower that the remaining balance of the loan after application of the forgiveness payment (if any) must be repaid on or before the maturity date. The notification must include the date on which the first principal and interest payment is due and the amount of the borrower's regular payment. As set forth below, if the borrower files a timely appeal with SBA's Office of Hearings and Appeals (OHA), the deferment period of the loan will be extended pursuant to 13 CFR § 134.1211.

Pursuant to 13 CFR § 134.1201(b), the borrower has the right to appeal to SBA's Office of Hearings and Appeals a final SBA loan review decision that the borrower:

1. was ineligible for a PPP loan;
2. was ineligible for the PPP loan amount received or used the PPP loan proceeds for unauthorized uses;
3. is ineligible for PPP loan forgiveness in the amount determined by the lender in its full approval or partial approval decision issued to SBA; and/or
4. is ineligible for PPP loan forgiveness in any amount when the lender has issued a full denial decision to SBA.

Any appeal must be made in accordance with the SBA Rules of Practice for Borrower Appeals of Final SBA Loan Review Decisions Under the Paycheck Protection Program, located at 13 CFR § 134.1201, *et seq.*, including but not limited to the following:

- An appeal petition must be filed with SBA's Office of Hearings and Appeals (OHA) within 30 calendar days after the borrower's receipt of the final SBA loan review decision. 13 CFR § 134.1202(a). To file and manage an appeal of a final SBA loan review decision with OHA, refer to Office of Hearings and Appeals.
- Borrower must include, among other things, a copy of this final SBA loan review decision with its appeal. 13 CFR § 134.1204(a).
- Borrower must provide you (the lender) with a copy of the timely appeal petition filed with OHA so that you can extend the deferment period of the loan. 13 CFR § 134.1202(b).
- An appeal to OHA is an administrative remedy that must be exhausted before judicial review of a final SBA loan review decision may be sought in a federal district court. 13 CFR § 134.1201(d).

Thank you for your cooperation.

Sincerely,

Office of Capital Access
U.S. Small Business Administration

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net



# U.S. Small Business Administration

# NOTE

| | |
|---|---|
| SBA Loan # | 2075417809 |
| Borrower DBA/Trade Name (if applicable) | American Renaissance |
| Date | June 1, 2020 |
| Loan Amount | $ 51,600 |
| Interest Rate | One percent (1.00%) fixed rate note |
| Borrower | New Century Foundation |
| Lender | Capital One, N.A. |

1.    PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of $ 51,600 _____ , interest on the unpaid principal balance, and all other amounts required by this Note.

2.    DEFINITIONS:

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower.

"SBA" means the Small Business Administration, an Agency of the United States of America.

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

**THIS IS A COPY**
The Authoritative Copy of this record is held at na2.docusign.net

3.   PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

1.   **Maturity:** This Note will mature in **2 years** from date of Note.

2.   **Repayment Terms:**

The interest rate is **1.00**% per year.
Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

**Loan Prepayment:**
Notwithstanding any provision in this Note to the contrary:

**Borrower may prepay this Note.** Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

a.   Give Lender written notice;
b.   Pay all accrued interest; and
c.   If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable 2 years from date of Note.

3.   **Additional Terms:**

**Payment Dates:**

No payments of principal or interest will be due for the first six (6) months of this Note. Borrower shall make monthly payments of principal and interest commencing on the date of the seventh (7th) month anniversary of this Note (the "First Payment Date"), and continuing on the same day of each month through the term of this Note. Although no payments will be due until the First Payment Date, Borrower acknowledge(s) and agree(s) that this Note will begin accruing interest from the date of this Note.

**Payment Amount:**

Each monthly payment shall be in the amount which would fully amortize the principal balance outstanding under this Note as of the First Payment Date, inclusive of accrued interest, in equal monthly payments over the remaining term of this Note.

Lender may adjust the payment amount as needed to amortize principal over the remaining term of the Note.

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net

4.   DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower:

A.   Fails to do anything required by this Note and other Loan Documents;
B.   Defaults on any other loan with Lender;
C.   Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;
D.   Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;
E.   Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;
F.   Fails to pay any taxes when due;
G.   Becomes the subject of a proceeding under any bankruptcy or insolvency law;
H.   Has a receiver or liquidator appointed for any part of their business or property;
I.   Makes an assignment for the benefit of creditors;
J.   Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;
K.   Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or
L.   Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5.   LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A.   Require immediate payment of all amounts owing under this Note;
B.   Collect all amounts owing from any Borrower; or
C.   File suit and obtain judgment.

6.   LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A.   Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document.  Among other things, the expenses may include reasonable attorney's fees and costs.  If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance; and
B.   Take any action necessary to collect amounts owing on this Note.

SBA000024

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net

7.      WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8.    SUCCESSORS AND ASSIGNS:

Under this Note, Borrower includes its successors, and Lender includes its successors and assigns.

9.    GENERAL PROVISIONS:

A.    To the extent multiple individuals and/or entities are obligated pursuant to this Note, such individuals and/or entities are jointly and severally liable.

B .    Borrower must sign all documents necessary at any time to comply with the Loan Documents.

C.    Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

D.    Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

E.    If any part of this Note is unenforceable, all other parts remain in effect.

F.    To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor.

SBA000025

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net

10.    **BORROWER SIGNATURE.**

Borrower: New Century Foundation
_____

By: _Samuel Taylor_
_____

Name: SAMUEL TAYLOR
_____

Title: President
_____

Date: 6/10/2020
_____

COPY VIEW

SBA000026

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net

# LOAN AGREEMENT

THIS LOAN AGREEMENT, made and entered into this __1__ day of __June__, 2020, (this "Loan Agreement") is by and between __New Century Foundation__ (collectively, "Borrower") and CAPITAL ONE, N.A. ("Lender").

## W I T N E S S E T H

WHEREAS, of even date herewith, Lender and Borrower have entered into that certain U.S. Small Business Administration ("SBA") loan wherein the Lender agreed to provide a loan (the "Loan") to Borrower for up to $ __51,600__ under the Paycheck Protection Program ("PPP") offered by the SBA under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the "CARES Act"), section 7(a)(36) of the Small Business Act; and

WHEREAS, in order to loan funds to Borrower, Lender enters into this Loan Agreement with Borrower for the purposes herein contained; and

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## AMOUNT AND TERMS OF LOAN

1.1    RECITALS. Each of the above recitals are hereby incorporated into and made a part of this Loan Agreement by this reference.

1.2    LOAN AND NOTE. The term "Loan" herein shall refer to the indebtedness of Borrower to Lender evidenced by a Note in the original principal amount of $ __51,600__ in form satisfactory to Lender (the "Note").

1.3    FORGIVENESS ELIGIBILITY.  The Note is subject to partial or full forgiveness, the terms of which are dictated by the SBA, Interim Final Rule RIN 3245-AH34, subsequent SBA guidance, the Code of Federal Regulations, the PPP, and all related rules, laws, regulations, and guidance, as may be amended from time to time (the "Forgiveness").  Borrower acknowledges that the calculation methodology for the amount of Forgiveness (the "Forgiveness Amount") is solely dictated by SBA and federal rules, regulations, and laws, and is not dictated by the policies, procedures, or guidelines of Lender.  Therefore, Borrower agrees to hold Lender and its respective affiliates, subsidiaries, directors, officers and employees ("Lender Parties") harmless against, and releases Lender Parties from, all losses, claims, and damages which Borrower and its affiliates, subsidiaries, directors, officers and employees incur arising out of or relating to the Forgiveness and the calculation of the Forgiveness Amount.  Borrower hereby expressly acknowledges and agrees that it will be fully liable to pay all amounts owed and due to Lender due under and in connection with the Note in excess of the Forgiveness Amount.

{N3997988.7}

SBA000027

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net

1.4     FORGIVENESS APPLICATION.   As a part of the application for the Loan, Borrower has provided Lender certain documentation verifying the number of full-time equivalent employees on the Borrower's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, covered utilities for the Loan, and other supporting documentation ("Documentation").  Borrower certifies that it shall:

a.     During the 8-week period immediately following the funding of the Loan (the "Forgiveness Period"),  (i) use the Loan proceeds solely to pay covered payroll costs, mortgage interest, rent and utilities, and (ii) use at least 75% of such payments to pay covered payroll costs;

b.     Maintain supporting documentation as required by Section 1006(e) of the CARES Act, similar in form and fashion to the Documentation, as well as any other tax filings, cancelled checks and additional information Lender or SBA may request in accordance with a request for Forgiveness under the Paycheck Protection Program, and deliver such information promptly upon request of Lender or SBA; and

c.     Promptly, but in no event later than 6 weeks after the end of the Forgiveness Period, submit an application for loan forgiveness to Lender and promptly take all additional actions requested or demanded by the SBA in connection with such application for Forgiveness.

## ARTICLE II
## CONDITION OF LENDING

2.1     CONDITIONS PRECEDENT TO THE LOAN. As a condition precedent to Lender making the Loan, the Borrower shall deliver to Lender on or before the date of the Loan closing, the following, in form and substance satisfactory to Lender:

a.     Fully executed Note; and

b.     Such other documents as reasonably may be required by the Lender or Lender's counsel.

The Loan documents as provided above (collectively, the "Loan Documents"), when prepared, shall set forth the matters contained in the Loan Agreement and contain such other provisions as are deemed necessary or desirable by Lender. The form and substance of all such documents must be satisfactory to Lender prior to disbursement by Lender of any of the proceeds of the Loan.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BORROWER

The Borrower represents and warrants to, and agrees with the Lender as follows:

3.1     POWER AND AUTHORIZATION.

{N3997988.7}

SBA000028

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net

a.    The Borrower has authorized the execution, delivery, and performance of the Note, this Loan Agreement and all other documents contemplated by this Loan Agreement, and such execution, delivery, and performance will not violate any law, or any other agreement to which Borrower is a party. Borrower hereby certifies that the undersigned is an authorized signer on behalf of Borrower. The execution, delivery, and performance of the Note, this Loan Agreement, and all other documents contemplated by this Loan Agreement have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) any of Borrower's organizational documents or agreements, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order application to Borrower or Borrower's properties.

b.    This Loan Agreement constitutes, and upon execution and delivery thereof, the Note, and the Loan Documents will constitute, legal, valid and binding obligations of the Borrower enforceable against the Borrower.

3.2    BORROWER CERTIFICATIONS.    The Borrower affirms that the SBA representations and certifications stated in **Exhibit A** are true and correct and are incorporated by reference. The Borrower expressly acknowledges and agrees that it may be required to make additional certifications in connection with the Loan and/or ratify the certifications, representations and warranties in any of the Loan Documents.

3.3    FINANCIAL CONDITION. The reports and financial statements of Borrower submitted to Lender in connection with the Loan have been prepared from Borrower's records in accordance with generally accepted accounting principles and practices, consistently applied, cash basis accounting principles, consistently applied, or the Financial Reporting Framework for Small and Medium Sized Entities, and fairly reflect the financial condition of Borrower for the periods therein defined. No material adverse changes have since occurred.

3.4    SBA & PPP GOVERN.  Borrower acknowledges and agrees that the Loan and this Loan Agreement are subject to SBA SOP, rules, regulations, guidelines, guidance, and requirements and any other federal rules, regulations, guidelines, or guidance applicable or pertaining to the PPP, as such may be amended from time to time.

## ARTICLE IV
## COVENANTS BY BORROWER

Until all the obligations of Borrower under this Loan Agreement have been performed and paid in full, Borrower covenants and agrees as follows:

4.1    MAINTENANCE OF BUSINESS AND CORPORATE EXISTENCE. Borrower shall comply with all valid and applicable statutes, ordinances, rules and regulations and shall keep in force and effect all licenses, permits, bonds and franchises necessary for the proper conduct of its business.

{N3997988.7}

SBA000029

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net

4.2     MANAGEMENT AND OWNERSHIP. No material change shall be made without the prior written consent of Lender in the management or ownership of Borrower, or in the manner in which its business is conducted. Said consent shall not be unreasonably withheld by Lender.

4.3     TAXES. Borrower shall pay promptly, when due, all taxes, assessments and governmental charges or levies imposed upon the Borrower or upon the income or any property of the Borrower.

4.4     FINANCIAL STATEMENTS. Borrower shall promptly furnish a copy of its financial statements, tax returns, and such other or additional financial information as Lender may from time to time request.

4.5     EXAMINATION OF RECORDS. Borrower shall permit any representative of Lender to examine and to audit any or all of Borrower's books and records and to copy portions thereof upon receipt of reasonable notification and request.

4.6     USA PATRIOT ACT VERIFICATION INFORMATION. Borrower shall provide evidence of its legal name, tax identification number, and street address, and a driver's license and date of birth (if the Borrower is an individual), satisfactory to and sufficient for the Bank to verify the identity of the Borrower, as required under the USA Patriot Act. Borrower shall notify Bank promptly of any change in such information.

## ARTICLE V
## EVENTS OF DEFAULT

5.1     The occurrence of any one or more of the following shall constitute an "Event of Default":

a.     Nonpayment, when due, of any principal, accrued interest, premium, fee or other charge due under the Note.

b.     Default by Borrower in the due observance or performance of any term, covenant, condition or agreement on its part to be performed under this Loan Agreement, the Note, or under any other document contemplated by this Loan Agreement.

SBA000030

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net

    c.    If Borrower shall:

    1)    Make a general assignment for the benefit of its creditors;

    2)    File a voluntary petition in bankruptcy;

    3)    Be adjudicated as bankrupt or insolvent;

    4)    File any petition or answer seeking, consenting to, or acquiescing in, reorganization, arrangement, composition, liquidation, dissolution or similar relief, under any present or future statute, law or regulation;

    5)    File an answer admitting or failing to deny the material allegations of the petition against it for any such relief;

    6)    Admit in writing its inability to pay its debts as they mature;

    7)    Discontinue business; or

    8)    Be unable to pay debts as they become due.

    d.    Borrower fails to have vacated or set aside within thirty (30) days of its entry any court order appointing a receiver or trustee for all or a substantial portion of the Borrower's property.

    e.    Any warranty, representation, certification or statements made or furnished to Lender by Borrower in connection with the Loan or in connection with this Loan Agreement (including any warranty, representation or statement in the application of Borrower for the Loan or in any accompanying financial statements) or to induce Lender to make the Loan, proves to be untrue, misleading or false in any material respect.

    f.    Borrower defaults in the payment of any principal or interest on any obligation to Lender or to any other creditor.

## ARTICLE VI
## REMEDIES ON EVENT OF DEFAULT

    6.1    DECLARE NOTE DUE. Upon the occurrence of any Event of Default as defined in this Loan Agreement, the Note, or any other document contemplated by this Loan Agreement, then in any such event, Lender at its option, may declare the entire unpaid balance of the Note to be forthwith due and payable, and thereupon such balance shall become so due and payable without presentment, protest or further demand or notice of any kind, all of which are hereby expressly waived, and Borrower will forthwith pay to Lender the entire principal of and interest accrued on the Note.

    6.2    OTHER REMEDIES. Upon the occurrence or discovery of an Event of Default the Lender shall, in addition to its option to declare the entire unpaid amount of the Note due and payable, at its option exercise any and all rights of setoff which Lender may have against any account, fund or property of any kind, tangible or intangible, belonging to Borrower and which shall be in Lender's possession or under Lender's control.

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net

## ARTICLE VII
## MISCELLANEOUS

7.1 CLOSING. The Lender shall not be obligated to make the Loan or advance any funds until Borrower has fully met all requirements herein set forth to be met by Borrower, and until Borrower has paid to Lender and any other parties entitled thereto, all fees and other charges due in connection with the Loan.

7.2 AMENDMENTS. No amendment of any provisions of this Loan Agreement, nor consent to any departure of Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

7.3 NOTICES. All notices and other communications provided for hereunder shall be in writing and mailed or telegraphed or delivered.  If to Borrower, the address noted in the Note. If to Lender, at Capital One, N.A., PO Box 259370 Plano, Texas 75025.

7.4 GOVERNING LAW AND PARTIES BOUND. This Loan Agreement and the Note shall be governed by and construed in accordance with the laws of the State of New York and shall be binding upon and shall inure to the benefit of the parties hereto, their successors and assigns.

7.5 ATTORNEY'S FEES AND EXPENSES. If Lender shall incur any cost or expense, including, without limitation, reasonable attorney's fees, in connection with enforcing this Loan Agreement, the Note or the Loan, in any manner whatsoever, direct or indirect, whether with regard to the collection of amounts due, defense of Lender or otherwise, upon demand by Lender, Borrower shall pay the same or shall reimburse Lender therefor in full.

7.6 ASSIGNMENT. No commitment issued by Lender to Borrower for the Loan nor any of Borrower's rights hereunder shall be assignable by Borrower without the prior written consent of Lender. Lender may assign this Loan and the Loan Documents, in whole or in part, or may sell one or more participation interests in the Loan, all without the consent of Borrower.

7.7 NO WAIVER; REMEDIES. No failure on the part of the Lender, and no delay in exercising any right under this Loan Agreement, shall operate as a waiver thereof; nor shall any single or partial exercise of any right under this Loan Agreement preclude any other or further exercise thereof or the exercise of any other right.

7.8 SEVERABILITY. In the event that any clause or provisions of this Loan Agreement or any document instrument contemplated by this Loan Agreement shall be held to be invalid by any court of competent jurisdiction, the invalidity of such clause or provision shall not affect any of the remaining portions or provisions of this Loan Agreement.

7.9 TIME. Time is the essence of this Loan Agreement.

{N3997988.7}

SBA000032

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net

**7.10    WAIVER OF JURY TRIAL. BORROWER AND LENDER, BY EXECUTION OF THIS LOAN AGREEMENT, ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES. TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS LOAN AGREEMENT, THE NOTE OR ANY OTHER LOAN DOCUMENTS.**

7.11    LOAN AS PERMITTED INDEBTEDNESS. If and to the extent the Loan would not be permitted under the terms of any documentation existing as of the date of this Loan Agreement evidencing bilateral extensions of credit by Lender to Borrower, Lender hereby consents to the making of the Loan to Borrower and the Loan shall be deemed indebtedness permitted to be incurred by Borrower under the terms of such existing credit documentation with Lender.

7.12    CONSENT TO SHARE INFORMATION. Borrower understands and acknowledges that Lender and the other "Receiving Parties," as hereafter defined, are authorized to obtain, use and share the Borrower's tax information, financial information, and Loan information for purposes of (i) originating, maintaining, managing, monitoring, servicing, selling, insuring, participating, or securitizing the Loan; (ii) marketing purposes, or (iii) as otherwise permitted by applicable laws, including state and federal privacy and data security laws.  This includes Lender's affiliates, agents, and any aforementioned parties' respective successors and assigns.  The term "Receiving Parties," as used above, includes (i) any actual owners of the Loan, (ii) any potential purchasers of the Loan, or (iii) any acquirers of any beneficial or other interest in the Loan (including, but not limited to, the United States Small Business Administration, any investor or participant to whom the Lender may sell or participate all or any portion of the loan, any servicers or service providers for the foregoing parties and any of aforementioned parties' respective successors and assigns).

[SEPARATE SIGNATURE PAGE FOLLOWS]

{N3997988.7}

SBA000033

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net

IN WITNESS WHEREOF, the parties have executed this Loan Agreement as of the date first above written.

BORROWER:

Borrower Name: New Century Foundation

By: _Samuel Taylor_

Name: SAMUEL TAYLOR

Title: President

6/10/2020

LENDER:

CAPITAL ONE, N.A.

By: _Hasmig Eskandarian_

Name: Hasmig Eskandarian

Title: Authorized Signatory

6/10/2020

{N3997988.7}

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net

EXHIBIT A

Borrower Certifications

**In order to induce Lender to make an SBA guaranteed Loan to Borrower:**

A.  Borrower affirms the representations in the SBA Form 2483 application and certifies that:

1.  It was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.

2.  Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Borrower.  The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule.  If the funds are knowingly used for unauthorized purposes, the federal government may hold Borrower and Loan applicant legally liable, such as for charges of fraud.

3.  The Borrower will provide to the Lender documentation verifying the number of full-time equivalent employees on the Borrower's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following the Loan.

4.  That Loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the forgiven amount may be for non-payroll costs.

5.  During the period beginning on February 15, 2020 and ending on December 31, 2020, the Borrower has not and will not receive another loan under the Paycheck Protection Program.

B.  Borrower certifies that:

1.  **Adverse Change -** There has been no adverse change in Borrower's financial condition, organization, operations or fixed assets since the date the Loan application was signed.

2.  **Child Support -**  No principal who owns at least 50% of the ownership or voting interest of the company is delinquent more than 60 days under the terms of any (1) administrative order, (2) court order, or (3) repayment agreement requiring payment of child support.

3.  **Current Taxes -** Borrower is current (or will be current with any loan proceeds specified for eligible tax payments) on all federal, state, and local taxes, including but not limited to income taxes, payroll taxes, real estate taxes, and sales taxes.

C.  Borrower certifies that it will:

1.  **Books, Records, and Reports-** Keep proper books of account in a manner satisfactory to Lender; furnish financial statements or reports whenever Lender requests them; allow

{N3997988.7}

SBA000035

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net

Lender or SBA, at Borrower's expense, to: (1) inspect and audit books, records and papers relating to Borrower's financial or business condition; and (2) inspect and appraise any of Borrower's assets; and (3) allow all government authorities to furnish reports of examinations, or any records pertaining to Borrower, upon request by Lender or SBA.

2. **Equal Opportunity -** Post SBA Form 722, Equal Opportunity Poster, where it is clearly visible to employees, applicants for employment and the general public.

3. **American-made Products -** To the extent practicable, purchase only American-made equipment and products.

4. **Taxes -** Pay all federal, state, and local taxes, including income, payroll, real estate and sales taxes of the business when they come due.

D. Borrower certifies that it will not, without Lender's prior written consent:

1. **Distributions -** Make any distribution of company assets that will adversely affect the financial condition of Borrower.

2. **Ownership Changes -** Change the ownership structure or interests in the business during the term of the Loan.

E. Borrower warrants and represents that all information provided to Lender, including without limitation, all information regarding the Borrower's financial condition, is accurate to the best of its knowledge and that Borrower, if any, has not withheld any material information. Borrower acknowledges that for the purpose of this transaction, Lender is acting on behalf of SBA, an agency of the United States Government, except that SBA accepts no liability or responsibility for any wrongful act or omission by Lender. Borrower further acknowledges that any false statements to Lender can be considered a false statement to the federal government under 18 U.S.C. § 1001, and may subject the Borrower to criminal penalties and that Lender and SBA are relying upon the information submitted by the Borrower.

SBA000036

DocuSign Envelope ID: 3DA5F08A-610D-44CA-A1C4-151F0DF0A110

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net

## Denial Justification

Re:     New Century Foundation

From:   Capital One


Capital One performed a good faith review of New Century Foundation's ("the borrower") loan forgiveness application in accordance with the requirements of Part III.2.a. of the PPP Interim Final Rule on Small Business Administration (SBA) Loan Review Procedures and Related Borrower and Lender Responsibilities, as amended, and has made the decision to deny forgiveness.

Capital One has denied forgiveness because Capital One believes the borrower is in violation of the Civil Rights requirement listed in SBA Form 2483, requiring compliance with 13 CFR Parts 112, 113, and 117, and that borrower was ineligible for its PPP loan.

Under SBA rules, the borrower has the right to request that SBA review Capital One's denial of forgiveness decision within 30 calendar days of receipt of this notification. SBA has the discretion to accept or decline a borrower's request for review. If you request SBA review and SBA accepts, we will notify you. Your request for review can be sent to SBA_PPP_DenialDispute@capitalone.com and must clearly state your intention to ask for SBA's review of Capital One's denial decision.


Borrower Acknowledgment of Receipt

Borrower acknowledges receipt of Capital One's rationale above for denying forgiveness based on SBA's rules for origination and forgiveness of PPP loans.

Initials:

SBA000050



December 14, 2021

Re:   SBA's PPP Loan Review Request for Production of Documents and Information

Dear Small Business Administration (SBA):

We write in response to your November 26, 2021 letter regarding SBA's review of New Century Foundation's PPP loan and forgiveness application (loan approval date 5/22/2020; SBA Loan No. 2075417809).  SBA's letter states that, based on the preliminary findings of its review, it is considering a "Full Denial" decision for the reason of business ineligibility.  The letter requests additional information that Capital One has regarding this issue, and also requests that the bank request that the borrower provide additional information as well, which the bank has done.

We recognize that SBA, not the bank, makes final decisions regarding a borrower's eligibility for a PPP loan and eligibility for forgiveness.  In light of SBA's request, the bank provides the following information.

It appears that New Century Foundation has violated the civil rights requirements that apply to recipients of PPP loans, including 13 C.F.R. 112 and 113.  In its SBA Form 2438 applying for a PPP loan, New Century Foundation certified that it would "comply, whenever applicable, with the civil rights and other limitations in this form."  The SBA Form 2438 provides that "[a]ll businesses receiving SBA financial assistance must agree not to discriminate in any business practice, including employment practices and services to the public on the basis of categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations."

After receiving its PPP loan, New Century Foundation maintained an online job posting for a full-time reporter for its monthly online magazine, American Renaissance, which promotes "race-realism" and describes itself as a "white advocacy" organization.  *See* Exhibit A.  The job posting seeks applicants with a "[s]trong commitment to race realism and white advocacy."  *See* Exhibit B.  The job posting also requests that applicants submit a cover letter with "[a] brief description of applicant's political views and how he came to them" and "why the applicant believes he would be a good fit for American Renaissance."

This job posting seeking applicants with a "[s]trong commitment to race realism and white advocacy" appears to be a discriminatory employment practice that violates SBA's civil rights requirements.  *See* 13 C.F.R. 112.4 (prohibiting employment discrimination); 13 C.F.R. 112.7 (prohibiting action that subjects an individual to discrimination on the ground of race, color, or national origin, "in any employment practice, including recruitment or recruitment advertising"); 13 C.F.R. 113.3(b),(e) (prohibiting discrimination with regard to employment practices and prohibiting the "use of employment tests or criteria that discriminate on the basis of race, color, … or national origin").



In addition, New Century Foundation also appears to be ineligible for a PPP loan because it restricts patronage for any reason other than capacity. *See* 13 C.F.R. 120.110(i); SOP 50 10 5(K) (effective April 1, 2019). The SOP cross-references SBA's civil rights regulations, including 13 C.F.R. 113.3(a), which prohibits discrimination "with regards to goods, services, or accommodations offered or provided by the aided business or enterprise, whether or not operated for profit, because of race, color, religion, sex, handicap, or national origin." The SOP indicates, as an example, that a fitness center that markets to one gender would be ineligible absent evidence that the business is in fact open to both men and women, such as "documented membership demographics."

New Century Foundation, which operates American Renaissance and sponsors annual conferences, appears to broadly promote the exclusion of and discrimination against non-white persons. This is supported by two publicly available reports we reviewed by the Southern Poverty Law Center and the Anti-Defamation League, both of which analyzed American Renaissance publications and outlined considerable evidence of New Century Foundation's statements and activities in pursuit of discrimination against non-white persons. *See* Exhibit C; Exhibit D.

Additionally, a range of publicly available statements shows New Century Foundation's discriminatory approach. For example, an American Renaissance article posted in May 2020 states that, "[s]o long as blacks and whites continue to live together, whites will pay the high price of sharing their society with an inveterately violent racial minority." *See* Exhibit E. A September 2011 article titled "Fade to Brown" states that "[o]ur nation achieved character and greatness precisely because of discrimination," and that "[o]ur ancestors understood that people and races are not interchangeable, and that failure to discriminate would produce a warring mix of incompetents and unassimilables." *See* Exhibit F. Another American Renaissance article, from June 2016, states: "Far-seeing whites should think carefully about arguments against discrimination in principle because discrimination, private and even public, is necessary to our survival. In cases such as *Fisher*, we are drawn to anti-discrimination arguments because the only acceptable, legal targets of public discrimination are ourselves. Such is the astonishing, absurd, and suicidal fix we whites have gotten ourselves into while we are still, for the time being, the majority." *See* Exhibit G.

Submitted with this response are:

- Exhibit A, "About Us", American Renaissance.

- Exhibit B, Full-Time Reporter Posting, American Renaissance (visited February 3, 2021).

- Exhibit C, *American Renaissance*, Southern Poverty Law Center.

- Exhibit D, *Jared Taylor/American Renaissance*, Anti-Defamation League.

SBA000052



- Exhibit E, Jared Taylor, *Race and Crime in America*, American Renaissance (May 24, 2020).

- Exhibit F, Stephen Webster, *Fade to Brown*, American Renaissance (Sept. 30, 2011).

- Exhibit G, Jared Taylor, *Discrimination Against Whites Still Legal*, American Renaissance (June 24, 2016).



**Exhibit A**



HOME    ABOUT US ▾    ARCHIVES ▾    STORE    CONTACT US ▾    DONATE ▾

## About Us

### What We Believe

Race is an important aspect of individual and group identity. Of all the fault lines that divide society — language, religion, class, ideology — it is the most prominent and divisive. Race and racial conflict are at the heart of some of the most serious challenges the Western World faces in the 21st century.

The problems of race cannot be solved without adequate understanding. Attempts to gloss over the significance of race or even to deny its reality only make problems worse. Progress requires the study of all aspects of race, whether historical, cultural, or biological. This approach is known as race realism.

We also believe that whites, like all racial groups, have legitimate interests that must be defended. The defense of those interests is white advocacy. We seek to advance only those interests that we recognize and would defend for all other racial groups. We seek no advantages as whites — only the expression of preferences for our own people and culture that are taken for granted by people of other races but denied to us.

### American Renaissance

*American Renaissance* was published as a monthly print magazine from October 1990 through January 2012. All back issues are available here. AR has had a web presence since 1994, and we consider AmRen.com to be the Internet's premier race-realist site. Every weekday we publish articles, podcasts, videos, and news items from a world-wide race-realist perspective.

### Who We Are

American Renaissance and its website are run by Jared Taylor, Henry Wolff, Chris Roberts, and Gregory Hood. Our mailing address is Box 527, Oakton, VA 22124 and our telephone number is (703) 716-0900.

### Support Us!

American Renaissance cannot continue without help from people like you. There are no monies from corporations, charities, or government to support us. If you believe that a realistic understanding of race is essential to the survival of the West, please send a donation to PO Box 527, Oakton, VA 22124. We also accept cryptocurrency donations (Bitcoin, Litecoin, Monero, Ethereum, and Zcash). For details, please go here. You can also learn how to support American Renaissance through a bequest by clicking here. Unfortunately, due to deplatforming, we are unable to process credit cards at this time.

Donations are tax deductible.

### Privacy and Security

American Renaissance will not sell, transfer or otherwise voluntarily disclose personal information — such as names, postal addresses, or e-mail addresses — submitted by purchasers of American Renaissance products or other users of this site. American Renaissance will disclose such personal information only if required by law and in response to proper legal process.

Credit card data submitted in connection with donations and purchases of products offered by American Renaissance are submitted to an online merchant that protects them from interception by Secure Sockets Layer ("SSL") encryption. American Renaissance will not sell or voluntarily disclose such data to any third party.

Like all websites, American Renaissance is vulnerable to hacking, viruses, denial-of-service attacks and other incidents that can result in corruption or compromise of user-submitted data, though we have made every effort to make our site secure. American Renaissance cannot be held responsible for loss caused by breach of the security of its services or that of any of its contractors.

### Copyright

Articles and essays original to American Renaissance may be used on the Internet free of charge, with proper attribution (author, title, date, American Renaissance, web address). For print reproduction rights, please contact us here. We cannot offer rights to any articles that may appear on this site but that were originally published elsewhere.

#### Blog
Verified Hate: Is Math Racist?
Are These Jared Taylor's Ten Best Videos?
Verified Hate: The End of An Era
Verified Hate: The Meltdown Continues

#### Commentary
Unpleasant and Illuminating Encounters with Non-Whites
Coming to Reality
The West's Fear That Dare Not Speak Its Name
There Is No Vetting

#### Videos
A Time Whose Idea Has Come
The Real Racial Reckoning

#### Podcasts
Black Museum to Defile Lee Statue
Illegals First, Americans Never

#### Follow us










SBA000056

2/3/2021                    Now Hiring: Full-Time Reporter - American Renaissance

**<span style="color:red">Exhibit B</span>**

 

## Now Hiring: Full-Time Reporter

American Renaissance is hiring a full-time reporter to join us in our Northern Virginia office.

Responsibilities include:

- Original reporting
- Some editorial writing
- Some news aggregation
- Uncovering information buried in reports/news releases
- Social media investigation
- On-scene reporting

Skills/traits of the ideal applicant:

- Strong commitment to race realism and white advocacy
- Good news sense
- Strong writer
- Self-starter
- Strong researcher
- Persistent
- Proficiency in basic statistics

Those interested should send a resume, writing sample (optional, but preferred), and cover letter to wolff@amren.com. The cover letter should contain:

- A brief description of applicant's political views and how he came to them

2/3/2021                                    Now Hiring: Full-Time Reporter - American Renaissance

  ○   Why applicant believes he would be a good fit for American Renaissance

  ○   Any other pertinent information

All applications will be kept in strict confidence. Pay is competitive. Serious applicants only. Call us at 703-716-0900 with any questions.

## Blog

**Verified Hate: Invading Vaccine Armies Edition**

**The Libertarian Case Against Open Borders**

**Immigration in the Age of Multiculturalism**

**Letter from a White Mom**

## Commentary

**Who Are the True 'Domestic Terrorists'?**

**Which Way, White Man?**

**The Matter of Tori Rose Smith's Life**

**Biden Is Already Making Your Life Worse**

## Videos

**Is the Problem 'White Supremacy' or White People?**

**DC Braces for Imaginary Army of White Supremacists**

## Podcasts

**Watch Out for That Word 'Equity'**

**'Racism Causes Global Warming'**

## Follow us



SBA000063

<span style="color:red">**Exhibit C**</span>

 

## Now Hiring: Full-Time Reporter

American Renaissance is hiring a full-time reporter to join us in our Northern Virginia office.

Responsibilities include:

- Original reporting
- Some editorial writing
- Some news aggregation
- Uncovering information buried in reports/news releases
- Social media investigation
- On-scene reporting

Skills/traits of the ideal applicant:

- Strong commitment to race realism and white advocacy
- Good news sense
- Strong writer
- Self-starter
- Strong researcher
- Persistent
- Proficiency in basic statistics

Those interested should send a resume, writing sample (optional, but preferred), and cover letter to wolff@amren.com. The cover letter should contain:

- A brief description of applicant's political views and how he came to them

12/13/21, 11:49 AM                    Now Hiring: Full-Time Reporter - American Renaissance

- ○ Why applicant believes he would be a good fit for American Renaissance

- ○ Any other pertinent information

All applications will be kept in strict confidence. Pay is competitive. Serious applicants only. Call us at 703-716-0900 with any questions.

## Blog

**Verified Hate: Is Math Racist?**
**Are These Jared Taylor's Ten Best Videos?**
**Verified Hate: The End of An Era**
**Verified Hate: The Meltdown Continues**

## Commentary

**Unpleasant and Illuminating Encounters with Non-Whites**
**Coming to Reality**
**The West's Fear That Dare Not Speak Its Name**
**There Is No Vetting**

## Videos

**A Time Whose Idea Has Come**
**The Real Racial Reckoning**

## Podcasts

**Black Museum to Defile Lee Statue**
**Illegals First, Americans Never**

## Follow us



SBA000070

<span style="color:red">Exhibit D</span>



# AMERICAN RENAISSANCE

Founded by Jared Taylor in 1990, the New Century Foundation is a self-styled think tank that promotes pseudo-scientific studies and research that purport to show the inferiority of blacks to whites. It is best known for its *American Renaissance* magazine and website.



## EXTREMIST GROUP INFO:

SPLC DESIGNATED HATE GROUP

**Date Founded:** 1990

**Location:** Oakton, Va.

**Ideology:** <u>White Nationalist</u>

## ASSOCIATED EXTREMIST PROFILES



### Jared Taylor
Oakton, Virginia

Founded by <u>Jared Taylor</u> in 1990, the New Century Foundation is a self-styled think tank that promotes pseudo-scientific studies and research that purport to show the inferiority of blacks to whites — although in hifalutin language that avoids open racial slurs and attempts to portray itself as serious scholarship. It is best known for its *American Renaissance* magazine and website, which regularly feature proponents of eugenics and blatant anti-black racists. The foundation also sponsors *American Renaissance* conferences every other year where racist "intellectuals" rub shoulders with Klansmen, neo-Nazis and other white supremacists.

### In Its Own Words

"In fact, blacks and Hispanics are, compared to whites, far more likely to be poor, illiterate, on welfare, or in jail; they are far more likely to have illegitimate children, be addicted to drugs, or have AIDS. By no definition of international

competitiveness can the presence of these populations be anything but a disadvantage."
— "'Who Speaks for Us?' (A Word of Introduction to Our Readers)," *American Renaissance*, 1990

"There is a difference between blacks and whites — analogous to the difference in intelligence — in psychopathic personality considered as a personality trait. ... For psychopathic personality, the mean and distribution are higher among blacks. The effect of this is that there are more black psychopaths and more psychopathic behavior among blacks."
— Richard Lynn, *American Renaissance*, 2002

"Blacks and whites are different. When blacks are left entirely to their own devices, Western civilization — any kind of civilization — disappears."
— Jared Taylor, *American Renaissance*, 2005

## Background

The New Century Foundation is headed by Jared Taylor, who also edits *American Renaissance*, which presents itself as a forum for open-minded thinkers not afraid to take on the racial taboos of the time without stooping to racial epithets and the like. But, regardless of its calm tone and academic look and feel, the magazine openly peddles white nationalism and Taylor supports the idea of America as "a self-consciously European, majority-white nation" which he argues was "the original conception of [the U.S.], and one that was almost universally accepted until the 1960s." In 2002, for instance, *American Renaissance* published an article by race scientist Richard Lynn (see Pioneer Fund) under the title "Race and the Psychopathic Personality" that argued that blacks "are more psychopathic than whites" and suffer from a "personality disorder" characterized by a poverty of feeling, lack of shame, pathological lying and so on. After Hurricane Katrina hit New Orleans in 2005, the magazine ratcheted up its customary attacks on black people, particularly in an error-ridden essay by Taylor that said the hurricane "was an excuse [for blacks] to loot, rob, rape and kill." *American Renaissance*, based at Taylor's home in Oakton, Va., also publishes frequent articles on the discredited field of eugenics, which promotes selective breeding to improve human genetic stock.

The foundation's website, featuring stories on black crime and the like, had risen by 2008 to one of the top 20,000 in the world after a makeover that added a daily feature posting news articles of interest to racists. In recent years, Taylor has added several budding young racist intellectuals to his staff, including Ian Jobling the website editor and E-list moderator until 2006 who now heads his own racist group, Inverted World, and Stephen Webster, assistant editor of *American Renaissance*. New Century Foundation also publishes other works on race, including Taylor's 1992 book, *Paved With Good Intentions*, which argued that because sterilizing welfare mothers would not be publicly accepted, authorities should instead insert into such women "five-year implantable contraceptives."

Since 1994, the New Century Foundation has also played host to *American Renaissance* conferences, suit-and-tie affairs that attract a broad spectrum of participants from the racist right, including neo-Nazis, white supremacists, Ku Klux Klan members, Holocaust deniers and eugenicists. The conferences even have an international presence. In 2002, for instance, speakers included Nick Griffin, leader of the neofascist British National Party, and Bruno Gollnisch, who was then second in command of Jean Marie Le Pen's immigrant-bashing National Front in France.

One issue that has proven problematic for Taylor and his foundation has been anti-Semitism. Taylor, unlike many on the radical right, is known for his lack of anti-Semitism and for including racist Jews in his events. He told MSNBC-TV interviewer Phil Donahue in 2003 that Jews "are fine by me" and "look white to me." At one point, he even banned discussion of the so-called "Jewish question" from *American Renaissance* venues, and, by 1997, he had kicked Holocaust deniers and neo-Nazis off his E-mail list. Despite these efforts, Taylor also has continued to allow people like Don Black, the former Klan leader who runs the neo-Nazi Stormfront.org web forum, and Jamie Kelso, a Stormfront moderator, to attend his biannual American Renaissance Conferences. The problem for Taylor is that many of the most active participants at the American Renaissance Conferences and the most committed members of the American radical right are openly and passionately anti-Semitic. To ban them would devastate Taylor's efforts to make his journal and conferences flagship institutions of American radical right.

Despite Taylor's best efforts to keep the internal peace, this long-smoldering issue finally burst into the open when David Duke, the former Klan leader and author of *Jewish Supremacism*, grabbed the microphone at the 2006 American Renaissance Conference and went on a thinly veiled anti-Semitic rant about "a power in the world that dominates our media, influences

our government and that has led to the internal destruction of our will and spirit." In response, Michael Hart, a Jewish astrophysicist and long-time conference attendee, leaped from his seat and declared, "You f------ Nazi, you've disgraced this meeting." What ensued was a testy back and forth in which Duke supporters, including Black and Kelso, jeered Hart's comments and others, who backed Hart, denounced Duke. This incident set off a months-long battle of words, with each side declaring that the other was undermining the broader efforts of the movement.

"These are the makings of a major schism," wrote Shawn Mercer, co-founder and moderator of *American Renaissance*'s AR List, an E-mail group, just after the conference. "If *American Renaissance* ultimately fails as a result of this donnybrook at the convention, it will be a sad, possibly fatal turn of events for the future of whites." In 2006, Taylor issued what was seen as a weak-kneed statement by his Jewish supporters condemning anti-Semitism but stating clearly that all would be welcome at his conferences regardless of their views and so long as they maintained the proper decorum. That was not enough for many of Taylor's supporters and collaborators, one of whom, Ian Jobling, left to start his own group, Inverted World, which is racist but not anti-Semitic.

Regardless of the dispute, the 2008 *American Renaissance* conference was well attended, missing from its audience ranks only some former Jewish supporters such as Michael Hart.

In 2012, Jobling contacted the SPLC saying he had renounced his racist views. Jobling told the SPLC he had come to see white nationalism as an ideology that leads to genocide.

In 2013, American Renaissance discontinued the publication of its eponymous hardcopy newsletter, deciding to go entirely electronic. The group also moved to a yearly conference from its former biannual format. The 2013 conference, held in Tennessee, was particularly extreme. A topic that kept coming up was the need for the establishment of a white homeland.

Matthew Heimbach, a racist who attended the event, wanted to know how to move forward in creating a white's only homeland. "Where do we create our ethno state?" Heimbach asked Paul Ramsey, one of the speakers that day who is RamZPaul online. Ramsey's answer: "We need to Balkanize and create our own homeland. We have a right to exist." He suggested the Southwest for Latinos and the Southeast for African Americans.

Taylor also took up the white homeland message. He opened his speech saying, "We want a homeland where we are a majority. We almost had one in the United States of America." Taylor worries that by 2060, whites will only make up thirty percent of the population and Latinos will be the majority (The U.S. Census Bureau predicts whites will become a minority in the 2040s and no ethnic or racial group will be the majority). "Our government is permitting a neighboring country [meaning Mexico] to invade our country. We have a government of traitors," Taylor raged. He lamented, "White people who express a desire for a homeland are labeled as haters."

Richard Spencer of the white nationalist National Policy Institute also plugged for a white homeland. Spencer argued for "peaceful ethnic cleansing," a process he did not explain, that would clear parts of North America for Caucasians and suggested that the new state welcome white refugees from Europe. Spencer advocated a "sort of white Zionism" that would infuse whites with the dream of such a homeland just as Zionism helped spur the creation of Israel. "It is perfectly feasible for a white state to be established on the North American continent. Action is the easy part," Spencer opined, adding, "I have a dream."

\* \* \*



Imagine a World Without Hate™

<span style="color:red">Exhibit E</span>

# Jared Taylor/American Renaissance

*This document is an archived copy of an older ADL report and may not reflect the most current facts or developments related to its subject matter.*

## INTRODUCTION

Jared Taylor (also known as Samuel Jared Taylor) founded The New Century Foundation, a self-styled think tank known primarily for *American Renaissance*, a white supremacist journal and companion website. The journal, which Taylor edits, promotes pseudoscientific studies that attempt to demonstrate the intellectual and cultural superiority of whites and publishes articles on the supposed decline of American society because of integrationist social policies. *American Renaissance* generally avoids the crude bigotry and stereotyping characteristic of many other racist publications and Taylor himself personally refrains from anti-Semitism.

### Quick Profile

**Born:** September 1951
**Residence:** Oakton, Virginia
**Organization:** The New Century Foundation
**Publication:** *American Renaissance*
**Education:** B.A. Yale University, 1973;
M.S. Institute of Political Studies, Paris, 1978
**Ideology:** Intellectualized white supremacy
**Books:** Author of *Paved With Good Intentions: The Failure of Race Relations in Contemporary America* (1992) and *Shadow of the Rising Sun: A Critical Review of the Japanese Miracle* (1983); edited or contributed to various other books, including *Essential Writings on Race* by Samuel Francis (2007), *Race and the American Prospect* (2006), *A Race Against Time: Racial Heresies for the 21st Century* (2003) and *The Real American Dilemma: Race, Immigration, and The Future of America* (1998)
**Affiliations:** Taylor is on the editorial advisory board of *Citizens Informer*, the newspaper of the white supremacist Council of Conservative Citizens, has contributed to *The Occidental Quarterly* a racist journal, and has been a member of the Board of Directors of the National Policy Institute, a racist "think tank."

*American Renaissance Website*

Taylor promotes his views by attacking racial, ethnic, and religious diversity, which he calls "one of the most divisive forces on the planet" and therefore "dangerous." Through speeches delivered at the biennial American Renaissance conferences; books, pamphlets, and articles; and public appearances via mainstream venues, including television shows and universities, Taylor promotes the idea that racial segregation is "natural" and society is best organized along racially homogenous lines. He maintains ties to a variety of racist organizations, publications, and individuals, both domestic and international, and many of North

1

©2013 Anti-Defamation League    605 Third Avenue, New York, NY 10158    www.adl.org    contactus@adl.org

SBA000074



Imagine a World Without Hate™

America's leading intellectual racists have written for *American Renaissance* or have addressed the biennial American Renaissance conferences.

On January 8, 2011, after a gunman identified as 22-year-old Jared Loughner allegedly killed six people, including U.S. District Judge John M. Roll, and injured fourteen others, among them U.S. Congresswoman Gabrielle Giffords, a Department of Homeland Security memo reportedly linked Loughner to American Renaissance.

Taylor released a statement rejecting the notion of a connection between Loughner and American Renaissance. "No one by the name of Loughner has ever been a subscriber to American Renaissance," the statement read "or has ever registered for an American Renaissance conference. We have no evidence that he has even visited the AR website." The statement also condemned violence.

### RECENT ACTIVITY

Taylor has used both mainstream and extremist venues, including a cable TV network, universities, radio and conferences, to promote his racist ideas.

Taylor has scheduled the ninth annual American Renaissance conference to be held in Charlotte, North Carolina, February 4-6, 2011. Speakers include a variety of racists from the United States and abroad. As he has with previous conferences, Taylor has invited speakers who focus on the racial divide and race relations and their impact on white culture in the United States, Europe and South Africa.

Last year, Taylor cancelled the 2010 American Renaissance conference, scheduled to be held in Herndon, Virginia, after he claimed the hotels hosting the conference and guests had received threats from anti-racist groups. Taylor later managed to hold a scaled-down version of the conference in Northern Virginia. According to Taylor, around 70 people attended the conference, which was a far cry from the 250-plus people that had reportedly been planning to attend the cancelled conference. One of the speakers was Matthew Tait, a member of the far-right British National Party.

In June 2010, Taylor was one of the keynote speakers at the annual conference of the white supremacist Council of Conservative Citizens in Nashville, Tennessee.

In 2010, Taylor also made multiple appearances on "The Political Cesspool," a white supremacist Internet radio show run by racist James Edwards.

On November 10, 2009, Curtis Sliwa, a talk radio show broadcast on 77 WABC in New York, interviewed Taylor about immigration issues. 77 WABC is owned by Citadel Broadcasting Corporation, the third largest radio station owner in the country. On Sliwa's show, Taylor claimed that health-care legislation proposed by the Obama administration will offer coverage to illegal immigrants because it does not explicitly exclude them. He also said that from 1993 to 2003, at least 60 hospitals were forced to close because they were mandated to provide coverage to the uninsured, "many of whom were illegal immigrants." Taylor sees non-white immigration as a problem in itself, as it undermines the racial homogeneity of American society. For Taylor, racially segregated nations are inherently more peaceful and productive, and he openly advocates for policies that would make the United States a white nation.

2

©2013 Anti-Defamation League        605 Third Avenue, New York, NY 10158        www.adl.org        contactus@adl.org



Imagine a World Without Hate™

 Taylor was the featured speaker at the 2009 annual conference of the Council of Conservative Citizens (CofCC), a white supremacist organization that was the successor to the racist, anti-integrationist White Citizens' Councils active in the South in the 1950s and 1960s. The conference was held on June 26-27 in Jackson, Mississippi. His talk, entitled "The Ties of Kinship," focused on the "genetic similarity theory," an idea that holds that people "naturally" prefer their own race over another. Taylor promotes this theory in his writings.

In May 2009, Taylor bean publishing original articles on the American Renaissance website.  This new tactic may demonstrate an increased focus on promoting online material as opposed to the print version of the *American Renaissance* magazine.  Also that month, he published an article in *Taki's Mag* on a nationally publicized case of white New Haven firefighters who had sued the city after they felt they were unfairly denied promotions because of their race. *Taki's Mag* is an online publication founded by Taki Theodoracopulos, who writes for mainstream conservative publications and co-founded, with Pat Buchanan, *The American Conservative* magazine in 2002.



American Renaissance Website

Taylor (left) debated Professor Peter March in Halifax, Canada, in March 2007.

A year earlier, in March  2008, a reported crowd of more than 150 students, faculty, and staff members attended a speech delivered by Taylor at the College of William and Mary in Williamsburg, Virginia. Press accounts of the event noted that the speech focused on the idea that diversity is a negative for society. According to *The Flat Hat*, a student newspaper at the school, Taylor was invited to speak by a student acting independently of any organized group. The event received extensive coverage in the local media.

From February 22-24, 2008, Taylor convened the eighth biennial American Renaissance conference in Herndon, Virginia. The event, which is named after the print and online white supremacist journal and website that Taylor runs, brought together various speakers from the United States and Europe to present speeches on race-related topics. Approximately 300 people attended the event, including well-known extremists such as

- Don Black, who runs the white supremacist Website Stormfront.org;

- Gordon Baum, head of the, CofCC, a white supremacist organization;

- Mark Weber, head of the Institute for Historical Review, a Holocaust denial organization;

- William Regnery, a funder of racist organizations and publications, including *The Occidental Quarterly*, a racist journal whose articles often focus on race and intelligence.

Speakers at the conference included:

- J. Philippe Rushton, mentioned above, who promotes eugenics and an alleged link between race and intelligence;

3

©2013 Anti-Defamation League      605 Third Avenue, New York, NY 10158      www.adl.org      contactus@adl.org

SBA000076



Imagine a World Without Hate™

- Bruno Gollnisch, a member of the National Front, a far-right French political party, who lamented the existence of the European Union for what he saw as its un-democratic nature and assault on national sovereignty;

- Jared Taylor, who discussed why the vast majority of whites do not accept "race realism," the idea that racial differences are real and that it is natural and healthy for groups to segregate along racial lines.

Other talks covered a range of topics, from an "insider" look at Mexicans to "a modest proposal" advocating for a white "racial state."

Taylor received mainstream press coverage in several venues related to protests of the event, which were staged on the conference's second day, February 23. According to media accounts, various anti-racist groups organized the protests.

In December 2007, the Jewish Defense Organization, a militant Jewish group, had also announced plans to protest the conference. A *Washington Post* article in connection with that story quoted Taylor as saying that genetics account for differences in intelligence between the races and for inferior test scores by blacks compared with whites, and by whites compared with Asians.

On November 19, 2007, Taylor spoke about his racist views on The Political Cesspool, a Tennessee-based radio program on which neo-Nazis, Holocaust deniers, and white supremacists made regular appearances. He had appeared on the show at least 10 times. In June 2007, he was a featured speaker at a conference of the CofCC. Taylor is also on the editorial advisory board of *Citizens Informer*, the CofCC's newspaper.

In April 2007, Taylor delivered a lecture entitled, "Multiculturalism and Racial Diversity: Strength or Weakness?" at Clemson University in South Carolina. A student group, the Clemson Conservatives, had invited him and he spoke to a group of students, faculty, and members of the public. During the lecture, Taylor implied that international hostility directed at the United States is due to the country's current racial diversity. He also said, "It is a mistake to assume it is wrong to prefer the company of people similar to oneself... It is universal, and I think there's every reason to believe there are innate biological reasons... In [the] United States, this kind of preference... is recognized and encouraged and institutionalized so long as the people who are expressing this preference are not white."

Perhaps Taylor's most notable public appearances of recent years occurred in January and March 2007, in Halifax, Nova Scotia, a large island off Canada's Atlantic coast. In November 2006, Professor David Divine, the chair of the black Canadian studies department at Dalhousie University in Halifax, agreed to debate Taylor on the merits of racial diversity, an event originally scheduled for January 15, 2007, Martin Luther King, Jr. Day that year. In December, Divine rescinded Taylor's invitation to the debate. Taylor nevertheless reserved a room at a hotel in Halifax to deliver a speech on January 16, 2007, and advertised the event with flyers on the campus of Dalhousie University. The event garnered widespread publicity in Nova Scotia when Taylor was physically removed from the room at the hotel by protesters, some of them masked. A television reporter present at the event recorded the protestors' actions on video.

4

©2013 Anti-Defamation League     605 Third Avenue, New York, NY 10158     www.adl.org     contactus@adl.org



Imagine a World Without Hate™

CTV, a Canadian television station, interviewed Taylor the following day as part of their coverage of the story. Then, in March 2007, Taylor returned to Halifax to debate philosophy professor Peter March on the radio, as Saint Mary's University, March's host institution, declined to sponsor an on-campus debate. The events created a flurry of opinion pieces in Canadian newspapers debating the merits of allowing Taylor to speak and the treatment he had received from the protesters.

Taylor's greatest exposure on mainstream American media was on CNN, where he was part of a guest panel debating race on the *Paula Zahn Now* show on December 12, 2006. The panel also included Michael Eric Dyson, a well-known professor of African-American studies at Georgetown University. During the show, Taylor repeated his oft-stated position that he believes in "complete freedom of association" and thinks it "natural" for races to segregate themselves from one another.

Taylor also appeared at the University of Texas, Arlington on April 28, 2006, to debate professor Jose Angel Gutierrez. The College Republicans sponsored the debate, whose topic was "Hispanicization: Good or Bad for America?" During the debate, Taylor said that 23% of "Hispanics" are poor, that they are three times more likely to commit a "violent crime" than whites, and that "youth gangs are... becoming overwhelmingly a Hispanic problem." Reportedly, nearly 400 people attended the on campus event, which received mainstream press coverage.  The writer of the *American Renaissance* article about the event concluded, "My only complaint about the debate was that the audience was not ten times larger."

A particularly eventful meeting of the biennial American Renaissance conference took place earlier that year, on the weekend of February 24 – 26, 2006, in Herndon, Virginia. The gathering attracted around 300 people, all of them white and nearly all of them male. Speakers included J. Philippe Rushton; Nick Griffin, head of the far-right British National Party; and Gordon Baum.

Tensions between anti-Semites and Jews who attended the conference came to a head when well-known racist and anti-Semite David Duke, who was not a scheduled presenter, accused Jews of being a "power... that has led to the internal destruction of our will and spirit" during a question-and-answer session. Some members of the audience responded enthusiastically to his comments, which led a Jewish attendee to rebuke Duke. Taylor addressed the incident in the May 2006 issue of *American Renaissance*, writing that while Jews are "equal participants," American Renaissance "has taken no explicit position on Jewish matters." He also upheld "the role of Jews in a society" as a subject for debate on par with homosexuality and foreign policy but noted that an American Renaissance conference was not an "appropriate" venue for that debate.

## IDEOLOGY

Taylor calls his views "race realism" and himself a believer in "complete freedom of association." He advocates voluntary segregation as a "natural" expression of racial solidarity and denies that his views constitute white supremacism or white separatism. Viewing world conflicts and societal problems as derivative of racial, religious, and ethnic diversity, Taylor upholds racial homogeneity as the key to fostering peaceful coexistence. He sees Japan, where he lived until he was 16 years old with his missionary parents, as an exemplar of a racially homogenous society. He views Asians generally as genetically superior in intelligence to whites who he, in turn, sees as genetically superior in intelligence to blacks.

5

©2013 Anti-Defamation League        605 Third Avenue, New York, NY 10158        www.adl.org        contactus@adl.org

Imagine a World Without Hate™

ADL
Anti-Defamation League®



Taylor's publication, *American Renaissance*, features articles that attack integration and promote racial segregation.

Taylor generally promotes his views through articles published in *American Renaissance*, the white supremacist journal he edits. In the articles, he often argues that racial diversity is a negative for society, as in "Integration Has Failed," the lead article in the February 2008 issue of the publication. His recent writings have promoted such themes as a genetic basis for differences in intelligence between races; the alleged benefits of racial homogeneity; a propensity among blacks to commit crimes at higher levels than whites, and an alleged *reconquista* (or re-conquest) of the American Southwest by Mexicans.

Being careful to couch his language research and academic jargon, he often roots his findings in what he describes as predetermined factors, including a lower IQ and higher blood testosterone in blacks. During one of his at least ten appearances on *The Political Cesspool*, a Tennessee-based radio show that often gave a platform to anti-Semites and white supremacists, Taylor said, "Nature has dealt blacks an unfortunate hand when it comes to crime." Blacks, he argued in his 1999 pamphlet "The Color of Crime," are more prone to criminal activity than whites, a position from which he justifies the use of racial profiling in community policing. Taylor also views whites as the lone racial group in America unable to proclaim racial solidarity and calls Latinos more dedicated to "race and homeland" than the United States of America. As expressed in his appearance on CNN's *Paula Zahn Now* in December 2006, Taylor sees whites as singularly oppressed in contemporary American society and claims that they cannot use the "n-word" in public for fear of losing their jobs and reputations.

Taylor eschews anti-Semitism. Seeing Jews as white, greatly influential and the "conscience of society," Taylor rather seeks to partner with Jews who share his views on race and racial diversity. Four out of the 10 speakers at the initial American Renaissance conference in 1994 were Jews, including Michael Levin, a racist professor at the City University of New York and author of *Why Race Matters*, and Rabbi Mayer Shiller, then head of the Yeshiva University High School for Boys in New York. Jews have been speakers and/or participants at all eight American Renaissance conferences.

During the 2006 American Renaissance conference David Duke, who was not a scheduled presenter, accused Jews of being a "power… that has led to the internal destruction of our will and spirit" during a question-and-answer session. Taylor attempted to "clear the air" regarding Jewish participation in American Renaissance conferences with a piece in the May 2006 edition of the *American Renaissance* journal in which he wrote, "Jews have, from the outset, been equal participants in our efforts." However, he also compared the question of "the roles of Jews in society" to questions over homosexuality, foreign policy, and abortion and said that these issues should be openly debated in a "free society."

6

©2013 Anti-Defamation League     605 Third Avenue, New York, NY 10158     www.adl.org     contactus@adl.org





## AFFILIATIONS

Jared Taylor maintains ties to a variety of racists and extremists, both domestically and internationally. He is on the editorial advisory board of *Citizens Informer*, the newspaper of the racist Council of Conservative Citizens (CofCC), and has contributed writings to *The Occidental Quarterly* a racist journal.  He has also been a member of the Board of Directors of the National Policy Institute, a self-styled racist think-tank funded by William H. Regnery, an heir to the Regnery publishing fortune and funder of racist organizations and publications. Taylor also received monetary compensation from the institute in 2005. Gordon Baum, the head of the CofCC, and J. Philippe Rushton, the president of the Pioneer Fund, which promotes eugenics and race-based science, have both been presenters at conferences hosted by Taylor's publication, *American Renaissance*. Taylor's conferences attract a wide range of extremists; recent attendees have included well-known racist and anti-Semite David Duke; Don Black, operator of Stormfront, a white supremacist online forum; Mark Weber, head of the Institute for Historical Review, a Holocaust denial organization; and members of various neo-Nazi groups.



Council of Conservative Citizens Website

Taylor is on the editorial advisory board of a newspaper published by the white supremacist Council of Conservative Citizens.

The American Renaissance Website also promotes the work of other white supremacists by selling video and audio tapes of presentations from speakers at past American Renaissance conferences, including lectures by Gordon Baum and Sam Francis, a well-known racist who died in 2005.

Taylor also has ties to European racists, including members of the British National Party (BNP), a racist, far-right political party in England and the National Front, a racist, far-right French political party. Nick Griffin, the head of the BNP, has been a speaker at two American Renaissance conferences, including the one held in 2006. Frédéric Legrand, a member of the National Front, is a frequent contributor to *American Renaissance.*

Taylor's portrayal of his racist views as intellectual inquiry enables him to maintain a position as a respectable academic source for racists, many of whom frequently cite his work. He and his admirers often cite his educational background, including a Yale undergraduate degree and mastery of Japanese and French, in order to grant his and their ideas a veneer of credibility. David Duke has posted articles written by Taylor and a review of one of Taylor's books to his website. The Institute for Historical Review reprinted Taylor's article, "The Challenge of 'Multiculturalism'," in the Summer 1992 issue of its publication, *The Journal of Historical Review*. European Americans United, a neo-Nazi group, has posted Taylor's articles to its news website. The racist website VDare maintains a section of Taylor's articles, and the CofCC's website designates the website of *American Renaissance* as one of two "Top Websites."

## TACTICS

Taylor promotes his white supremacist ideas primarily through the print publication *American Renaissance,* its companion website and the biennial American Renaissance conferences. Taylor serves as the editor of *American Renaissance* and frequently contributes lengthy articles and book reviews to its

7

©2013 Anti-Defamation League          605 Third Avenue, New York, NY 10158          www.adl.org          contactus@adl.org



Imagine a World Without Hate™

pages. Many issues appear to be little more than his personal reflections on the state of race relations in contemporary America.

The American Renaissance website consists mostly of links to daily news items with terse headlines that reflect the site's racist sensibility. The site also posts articles describing attacks by blacks against whites, generally involving rape, murder or both, and sells video and audio tapes of presentations from past American Renaissance conferences. The website also promotes a variety of books extolling racist views.

Taylor's ties to a variety of racist organizations and individuals serve as an additional vehicle for him to promote his views. For example, he is on the editorial advisory board of *Citizens Informer*, the newspaper of the racist Council of Conservative Citizens and has contributed writings to *The Occidental Quarterly*, a racist journal.

Taylor has had some success in his efforts to gain exposure in mainstream media and universities. In these outlets, as in others, he presents himself as a legitimate scholar and has been abetted in this regard by hosts who have introduced him only as the editor of *American Renaissance* without providing any background on the publication or its contents. His appearance as a guest commentator on CNN's *Paula Zahn Now* in December 2006 is one example; he was also on *The Queen Latifah Show* in December 2000.

In 2007, Taylor generated significant publicity in the Canadian media through a canceled debate on racial diversity with David Divine, a professor of black Canadian studies at Dalhousie University in Halifax, Nova Scotia, and he also spoke at Clemson University in South Carolina at the invitation of the Clemson Conservatives, a student group.

## BACKGROUND

Taylor was born in Japan to missionary parents in 1951. He lived there until the age of 16 and attended Japanese public school until he was 12, gaining native fluency in Japanese. He attended Yale, graduating in 1973, and earned a Master's degree in International Economics at the Institute of Political Studies in Paris in 1978. His online résumé indicates that he has also worked as an international lending officer for Manufacturer's Hanover Trust, has consulted for American companies seeking to do business in Japan, and was West Coast Editor for *PC Magazine* from 1983 to 1988. He has also taught Japanese at the Harvard Summer School and worked as a courtroom translator.

In 1983, Taylor drew on his upbringing to write *Shadows of the Rising Sun: A Critical View of the Japanese Miracle*, a study of Japanese culture published by William Morrow. The book received generally good reviews and presages the themes that Taylor would pursue more extensively with his current organization, the New Century Foundation--in particular the idea that a nation needs a uniform culture and racial heritage to prosper.

Taylor continued to refine his ideas about race and national identity during the next few years, gathering information he believed supported the idea that the United States faced a dangerous period of economic and cultural decline because it had rejected its white Anglo-Saxon heritage in the name of racial and gender equality. He eventually argued that social welfare programs and affirmative action sustained a largely minority underclass that sapped the nation's will and health. To promote this message, he began publishing the *American Renaissance* journal in November 1990.

8

©2013 Anti-Defamation League        605 Third Avenue, New York, NY 10158        www.adl.org        contactus@adl.org

SBA000081



## AMERICAN RENAISSANCE

The stated purpose of *American Renaissance*, from the outset, was to create "a literate, undeceived journal of race, immigration and the decline of civility." It held that "for a nation to be a nation - and not just a crowd - it must consist of people that share the same culture, language, history and aspirations." Under Taylor's stewardship, *American Renaissance* has largely avoided the use of crude racial stereotypes. Instead, its authors rely on using pseudoscientific, sociological and philosophical arguments to demonstrate the purported superiority of the white race and the threat nonwhite minorities pose to American society.

The magazine remained largely unknown outside extremist circles until late 1992 when Carroll & Graf, a small mainstream publisher, released Taylor's book, *Paved With Good Intentions: The Failure of Race Relations in Contemporary America.* A variety of publications reviewed the book and some mainstream conservatives praised it. *The Wall Street Journal* called the book "easily the most comprehensive indictment of the race-conscious civil rights policies of the last three decades," but also criticized Taylor's dismissal of the impact of racism on the black community, saying that he "does little to improve understanding or breach the [racial] gap." Peter Brimelow, who has since created the racist Website VDare, was less equivocal in the *National Review,* declaring the book "the most important to be published on the subject for many years." *Commentary* concluded that *Paved With Good Intentions* "accurately reflects the indignation shared by many who believe that the way America is dealing with its racial difficulties is unfair and self-defeating."

Taylor's book, *Paved With Good Intentions,* received mainstream attention.

The relative success of the book helped to raise interest in both *American Renaissance* and its message, and Taylor did his best to capitalize on his newfound notoriety. He convened the first of what became biennial conferences conducted under the banner of the New Century Foundation (and later, American Renaissance) in May 1994. These gatherings soon became the centerpiece of his efforts, featuring well-known intellectual racists speaking in ostensibly academic seminars, lectures and panel discussions.

9

©2013 Anti-Defamation League     605 Third Avenue, New York, NY 10158     www.adl.org     contactus@adl.org



**Exhibit F**

HOME    ABOUT US ▾    ARCHIVES ▾    STORE    CONTACT US ▾    DONATE ▾

Posted on December 3, 2021

## The Battle Lines Grow Clearer

*Jared Taylor, American Renaissance, December 3, 2021*



*This is adapted from remarks given at the 18th American Renaissance conference on November 13, 2021.*

Ladies and gentlemen, we're here today because our country is dying. It's hard to say exactly when it fell sick. Was it in the 1960s? Maybe the 1860s? Was it infected from the start?

One thing is certain: On May 25 last year, the patient took a serious turn for the worse. A white man kept his knee on the neck of a black man for just a few minutes too long, and the country went insane. Of course, if a single act could set off the worst looting and arson in American history, it means anything could have set it off. The madness was already deeply embedded in our circumstances.

These were a new kind of riot. Blacks didn't just burn down their own neighborhoods as they always have. They sacked the most fashionable retail districts in the country: The Magnificent Mile in Chicago, Rodeo Drive in Beverly Hills, Fifth Avenue in New York.



August 10, 2020, Chicago: Shattered windows by looters at Timberland at Michigan Avenue. Hundreds of people swept through the Magnificent Mile and other parts of downtown Chicago smashing windows, looting stores. At least 13 police officers were injured, 2 people shot and more than 100 arrested. (Credit Image: © Antonio Perez/TNS via ZUMA Wire)

And never has mob violence been so richly rewarded. American corporations — many of them victims themselves of millions of dollars from looting and arson — poured billions of dollars into BLM organizations. Countless rioters had charges dropped. It was as if the January 6 rioters had got blanket amnesty, an apology, and Donald Trump got a second term.

Almost everything about the George Floyd riots was wrong or vicious or stupid, but the most ominous was the apparently widespread belief that black anger should be appeased by taking down statues of Christopher Columbus. Thirty statues and memorials were either torn down by mobs or taken away by terrified city fathers who were afraid their darlings might get hurt if they tried to tear them down themselves.

What on earth did Columbus have to do with what happened in Minneapolis on May 25? At the time of the race riots of '60s, no one — and I mean no one — would have dreamed of a connection between Columbus and black mayhem. But in the half century since then, many people began to believe that every single white person is personally, individually, and forever responsible for every form of black or brown failure and degeneracy. That's what the slogan white silence is violence means. Every moment you aren't bellowing "Black Lives Matter," you are committing violence. Even in your sleep, so far as I can gather.

All whites are guilty. Of what? Of being white. And Columbus is the origin of this evil because he was the first to bring this plague of whiteness to the entire Western Hemisphere. And that is why everything we have done since 1492 to this very day is a list of crimes for which each one of us is guilty.



Blog

Verified Hate: Is Math Racist?

Are These Jared Taylor's Ten Best Videos?

Verified Hate: The End of An Era

Verified Hate: The Meltdown Continues

Commentary

Unpleasant and Illuminating Encounters with Non-Whites

Coming to Reality

The West's Fear That Dare Not Speak Its Name

There Is No Vetting

Videos

A Time Whose Idea Has Come

The Real Racial Reckoning

Podcasts

Black Museum to Defile Lee Statue

Illegals First, Americans Never

Follow us













"Landing of Columbus" by John Vanderlyn, 1847.





Those riots — and the indulgent, even loving way they were treated by the media — were the outward manifestation of something that had been building for decades: The conviction that the only thing really wrong with the United States — is white people.

It is true that even in the 1960s, there were some very far-sighted people, who already had us pegged. In 1967, the author Susan Sontag wrote that "the white race is the cancer of human history." She was way ahead of her time. And she was considered a freak. Today, we must honor her as a prophet. And because she was a prophet, her vicious little idea — that ugly duckling — grew up into the beautiful swan of Critical Race Theory. And so it is that today, everyone from white fourth graders and white corporate executives are made to stand up in front of everyone and confess — almost in so many words — that they are the cancer of human history. That they are the inherent and hereditary oppressors of blacks, Indians, women, homosexuals, handicapped people, fat people, homely people, foreigners, Muslims, BIPOCs of all kinds, transsexuals — and in case I have left anyone out, that while they're oppressing every other human being on earth, they are also raping the planet. Calling us cancer is an insult to leukemia and myeloma.

The same people who revile us also tell us we are swathed in countless downy layers of undeserved privilege and live in a country structurally designed to waft us effortlessly to the top. The school district of Edina, Minnesota — a city that is 88 percent white — puts its white bus drivers and janitors through anti-racism training with a simple mathematical formula: White Privilege plus White Supremacy = Whiteness. It's as simple as 2+2=4. As they drive a bus or mop the floors, they are spreading the venom of white supremacy.

We all know the story of the emperor's new clothes. The emperor falls into the hands of flimflam artists — probably direct ancestors of Susan Sontag and Robin DiAngelo — who claim they can weave him beautiful clothes that are visible only to intelligent people. They present him with these magnificent — and of course imaginary — new clothes and he parades through town, proud as peacock, dressed in his drawers. Everyone goes along with the foolishness until a child blurts out, "Hey. He's in his underwear." The spell is broken, and everyone comes to his senses.





Robin DiAngelo (Credit Image: Unitarian Universalist Association via Wikimedia)



If only it were that easy! Our entire ruling class is walking around in underwear. Some of them are buck naked. You can shout yourself hoarse — but it makes no difference. You point out one huge mound of baloney, and they'll feed you an even bigger mound. You explain patiently, data in hand, that blacks and Hispanics don't do as well as whites or Asians because there is this little problem of race differences in IQ, and our rulers — glorying in their nakedness — shoot back: "There's no such thing as race." What? If there's no such thing as race, how do we know who has white privilege? How do we know whom to hire so we can increase diversity? And they come back with: "People don't have race. They are racialized." And then you know it: You're dealing with madmen. This stuff is so crazy and wrong that only white people could possibly have come up with it. Can you imagine any black person telling the Black Legislative Caucus, "Calm down fellas. Race is a myth."



Or some guy running around in his underwear rages about the terrible racism of assigning so many police officers to the black part of town. And you patiently explain that it's because that is where there is the most crime. He then tells you you've got it completely backward. Black people commit crime because the police officers we send in bewitch black people and make them break the law, and the solution is to abolish the police. You have to credit them with imagination.

We like to think of ourselves as a rational race, but the truth is, white people are old hands at crazy, crazy stuff. Catholics and Protestants used to slaughter each other. The church burned heretics and astronomers. We had the French revolution — and the Russian revolution. We even gave 18-year-olds the vote. But none of these absurdities was a war against us, declared by us, because we are us.



This is new-fangled, potentially fatal stuff. We have set forces in motion that — unless we stop them — guarantee oblivion for us. And the worst of the racial craziness started right here in the United States. All the nutty ideas that have culminated in what I call The Adoration of the Negro were made in the USA. Other white people all around the world

and Protestants used to slaughter each other. The church burned heretics and astronomers. We had the French revolution — and the Russian revolution. We even gave 18-year-olds the vote. But none of these absurdities was a war against us, declared by us, because we are us.

This is new-fangled, potentially fatal stuff. We have set forces in motion that — unless we stop them — guarantee oblivion for us. And the worst of the racial craziness started right here in the United States. All the nutty ideas that have culminated in what I call The Adoration of the Negro were made in the USA. Other white people all around the world have lapped up these poisons, but we were the first to brew them in industrial strength and by the boatload.



Credit Image: Steven Depolo via Wikimedia

Historically, it is not what you would expect. Our country got off to a good start, and not all that long ago we were the admiration of the world. That's ending quickly. There are still plenty of people who want our handouts, to suckle at the American teat, but admire us? Ha.

As for how we got started, just compare the way the United States began to what happened in Latin America. If George Washington had ended up like Simón Bolívar, he would have had to put down a rebel army led by Alexander Hamilton. So Georgia and Massachusetts would have immediately left the union, he would have been driven out of office after three assassination attempts, banished from his native Virginia, and died in poverty. Unlike Washington, at the end of his life, Bolívar thought everything he had done was folly. Some of his last words are said to have been: "The three greatest fools of history have been Jesus Christ, Don Quixote — and I!" He also said, "All who have served the Revolution have plowed the sea." How sad and how unlike our Founders, who went to their graves honored, beloved, and with a sense of achievement and duty well done. Ours was a blessed beginning.

We also had the good sense to start out with the best possible citizenship policy. When the United States was brand new, at the time of the very first Congress, it had to decide who was going to be American. For the Founders it was simple: Only free white persons of good character could become Americans. Imagine a United States that had remained faithful to the Founders' ideals.

How did we go wrong? There are many answers to that question, but the race problem was always there. Of course, there were Indians here from the beginning. And, falling prey, as the white man always seems to do, to the temptation of what he *thinks* is going to be cheap labor — we imported a completely insane and avoidable second race problem by bringing in Africans. And not content with two race problems, in 1965, we completely upended our immigration policies and imported every possible race problem on earth.



Slave sale, Charleston, South Carolina, 1856

And, the story of America changed.

The story used to be that we discovered the continent, tamed it, built a nation, gave it is institutions, and made it great. We built monuments to our heroes and felt pretty good about ourselves. And then — generously and foolishly — we let in people from all over the world to a successful country they could never have built. And the story today? The complete opposite of what it was. We're the only problem. All our heroes were actually criminals. And every white man, woman, child, and newborn baby is a criminal. From birth.

What's more, the country we thought was great and that attracted people from everywhere was actually a pest hole. We were too stupid to know it, but America was a cesspool of xenophobia, male chauvinism, homophobia, and racism. So now, when we think of all the Third-Worlders who poured in by the millions, we weren't doing them a favor. They did us a favor. We were choking to death on our own miserable, bigoted homogeneity until they brought us diversity. They brought us America's greatest strength. And the more alien, incomprehensible, and unassimilable they are, the greater the strength they bring. They rescued us from that horrible almost-all-white country our ancestors had built.

Now, I bet some you would have a little trouble finding Bhutan on the map, but the Bhutanese can sure find you. We now have 100,000 of them. In Clarkston, in Dekalb County, Georgia, Bhutanese are 12 percent of the population. What in heaven's name are Bhutanese doing there?

I'll tell you what they're doing. And if any of them have been to college — no doubt on scholarship — they'll tell you what they're doing. They bring the fruits of diversity. Which means it's fine if they can't speak English, don't have jobs, and

Document title: The Battle Lines Grow Clearer - American Renaissance
Capture URL: https://www.amren.com/features/2021/12/the-battle-lines-grow-clearer/
File: Capital_One_Response_to_SBA_loan_review_request.pdf    [2021/12/14 21:24:52]

the strength they bring. They rescued us from that horrible almost-all-white country our ancestors had built.

Now, I bet some you would have a little trouble finding Bhutan on the map, but the Bhutanese can sure find you. We now have 100,000 of them. In Clarkston, in Dekalb County, Georgia, Bhutanese are 12 percent of the population. What in heaven's name are Bhutanese doing there?

I'll tell you what they're doing. And if any of them have been to college — no doubt on scholarship — they'll tell you what they're doing. They bring the fruits of diversity. Which means it's fine if they can't speak English, don't have jobs, and live on welfare. They are saving us from the suffocating sameness that makes being in this very room so horrible.

There's not much that makes me angrier than when some immigrant from India tells me how glad we white people should be because people like him showed up! They act as if we should get on our knees and kiss their feet gratitude. "Thank you, thank you for diversity."



Can you imagine going to China and telling the Chinese: "Not a bad country you've got here. But you know what's wrong with it? Too damn many Chinese. You need to liven the place up with — well, really — anything but you lot. Africans, Muslims, Zapotec Indians, Eskimos, New Guineans with feathers in their hair. They'll really get this place going. Can you imagine? But that is what we encourage the whole world to tell us.

We haven't gone horribly wrong only on race. Every ancient distinction that gives life meaning is now a vile prejudice. Men and women are interchangeable. Every religion is equally true, every culture is equally beautiful, and every child can become a physicist. Disagree, and you're a bigot.

One of the distinctions that has been smashed, of course, is the distinction of being American. One of the greatest insults is that anyone can be an American because this is a proposition nation and being American is just an idea. No less an authority than Joe Biden assures us that this is so.

Well, if that's so, what is that idea? Seriously. What is the idea that makes you an American? If it's just an idea, a Mongolian in his yurt who's never been here can be just as American as anyone in this room. All he needs is the right idea.

I'm sure you've seen pictures of naturalization ceremonies. All those people from all over the world with their little American flags that the goofy Daughters of the American Revolution put into their hands. What do they think America means? It means a place where they can live better than back home in Bhutan or Haiti. And what fun it must be to learn that it's a place where you can get ahead by spitting on the people who built the country. That the natives are like beaten dogs; the harder you kick them the harder they wag their tails.

Do these newcomers love America? How can they possibly love a country where the natives themselves tell them it's been a criminal enterprise since the beginning?

Now we have the spectacle of people from Somalia or Palestine, or Puerto Rico getting themselves elected to Congress and telling us what it means to be American. One, in particular, distinguished herself by saying that people trying to hop the border are more American than anyone who wants them to stay home.



Credit Image: © Michael Brochstein/ZUMA Wire

Well, some of us are more American than others. And she has the nerve to tell me I'm supposed to think that a Guatemalan climbing the fence is more American than I am?

We are supposed to believe incredible things: Anyone can be American, women can be men and vice versa, diversity is a strength, and that way out there at the end of the rainbow, is a beautiful, multi-colored not full of 160-IO black and

SBA000086

Credit Image: © Michael Brochstein/ZUMA Wire

Well, some of us are more American than others. And she has the nerve to tell me I'm supposed to think that a Guatemalan climbing the fence is more American than I am?

We are supposed to believe incredible things: Anyone can be American, women can be men and vice versa, diversity is a strength, and that way out there at the end of the rainbow, is a beautiful, multi-colored pot full of 160-IQ black and brown people. And at the dark end — you know a rainbow has a dark end, don't you? — there is a huge black pot full of diabolical white supremacists who secretly run the country.

So, what should America mean to us? It gives me no pleasure to say this, but the Potomac Regime, as Greg Hood calls it, has become the greatest enemy of white people anywhere in the world. The first Taylor came to North America in 1635. We fought in every war, voted in every election. This land is stuffed with our bones, drenched in our blood. But the regime doesn't speak for me. It doesn't speak for any of us. Our president appointed a black woman as Ambassador to the United Nations to go tell the General Assembly that in America racism is — in her words — a cancer, a scourge. That we're the problem.

Our government opposes any person, organization, or even sovereign nation that explicitly — or even implicitly — defends the interests of the race that built the United States.

And who even dares to defend those interests?

Our country prides itself on freedom of speech. The First Amendment. The marketplace of ideas. What a colossal joke!

Do any of you remember when Tony Wang, a Twitter general manager said: "Our general council and CEO like to say that we are the free speech wing of the free speech party." That was in 2012, just nine years ago. It took only a few years for free speech to become, well, intolerable. The free speech wing must have gone lame. Your servant — along with many others — was silenced.



Twitter UK General Manager Tony Wang, delivers his speech during the opening of the conferences 'Talking About Twitter', at the Sciences Park in Granada, southern Spain, 20 June 2013. (Credit Image: © Miguel Ángel Molina / EFE / ZUMAPRESS.com)

If you go all the way back 2010, Amazon refused to remove a book called *The Pedophile's Guide to Love and Pleasure*. Preying on underage children is still a crime in every state, by the way, but Amazon said that banning the book would be censorship and it refused to be a censor. Well, Amazon, you've come a long way, baby. My books were banned in 2019.

Facebook banned me years ago. Just last year YouTube blew up our channel and its 130,000 subscribers.

I have just one question for these people: What are they afraid of? If what we say is so stupid and wrong, surely any C-average high school kid can see right through.

I guess not. All those brainy people on the Left, all those millionaires in Silicon Valley — not even they can figure out how to explain why we're wrong. Why can't they? Because we're right. And so, we have to be smothered.

All we want is something everyone should have. A place of our own, where we can be ourselves. I guess that idea is so immensely hateful it can't be refuted.

Speaking of hateful ideas, you probably heard about Brittney Cooper, a professor of Africana studies at Rutgers University. Last month she got a flicker of attention — though certainly not from NPR or the *New York Times* — when she attended an on-line conference put on by the black website, "The Root." Its motto is: "The blacker the content, the sweeter the truth." Professor Cooper was talking about how awful white people are and she said — let me make sure I'm quoting her precisely — she said, "We need to take those motherfuckers out." Extermination.



Document title: The Battle Lines Grow Clearer - American Renaissance
Capture URL: https://www.amren.com/features/2021/12/the-battle-lines-grow-clearer/
File: Capital_OpenResponse2_to_SBA_loan_review_request.pdf    [2021/12/14 21:24:52]



Brittney Cooper (Credit Image: New America via Wikimedia)

Nothing so strange here, really. What I want to emphasize instead is that in the entire blacker-the-content lineup up speakers, there was one lonely white man. But not just any white man. It was the president of the United States.

He apologized for 400 years of systemic racism, bragged that he had worked racial equity into every government policy, and said, "The work that happens at the Root is so important because it reminds us that black culture is American culture, black history is American history, and black stories are the core of the ongoing story of America."

What did Root readers think of the President blessing their conference? Were they happy? I read all the online comments. Here is the kindest one: "Thank you Joe Biden, for a lot of the same shit that Trump was doing but with nice words instead of mean ones." One was in Ebonics, apparently: "Fuck that raselot." And another, "He gives nero fucks about Black people." And another, "Of course, he gives zero fucks about black people." And, naturally, just plain, "Fuck Joe Biden." And, finally: "I'm really disappointed The Root is not calling him out on this hypocrisy but making space for his party azz." Clever stuff.

You see, when Brittney says they have to take us white motherfuckers out, her fans are not making an exception for Joe Biden and his pasty ass. Brittney Cooper is wise in ways that whites are not, and I thank her for expressing herself so clearly. We're white, and that's what matters. Non-white people understand race. White people have done everything possible not to understand it at all. Blacks draw clear, bright lines. The lines they draw are so bright they should dazzle even whites who are deliberately blind.

And so, our job, ladies and gentlemen, is to open the eyes of our brothers and sisters. This multiracial experiment has failed. We separate or face oblivion. Or worse. As Bishop Talbert Swan, graduate of Harvard Divinity School, tells his congregation of thousands, "Black people deserve reparations. White people deserve repercussions." This is really a declaration of war. We don't want war. But we cannot come to terms with these people. We must go our own way.



Bishop Talbert Swan (Credit Image: Mjones3927 via Wikimedia)

And yet, it is an enormous struggle simply to assert the right to go our own way, much less actually do so.

And I am not exaggerating when I tell you that this mission we have chosen is more noble and more worthy than the vast majority of causes for which white men have *laid down their lives.*

White men have willingly — too willingly — died in countless wars killing each other. And when we look back and ask: For what? That answer, so often, is, "For vanity." I won't even talk about the Peloponnesian wars that destroyed Greece, or the terrible 30 Years War or the Napoleonic Wars that slaughtered millions. What about our own wars, brass bands playing, men marching proudly? The War of 1812, the Spanish-American War, First World War? For what? Not to mention our absurd wars in Southeast Asia and the Middle East. Mountains of dead — for what?

Now, I do not doubt the bravery or the faithfulness or the sacrifice of these soldiers, but I tell you, ladies and gentlemen, our cause, to prevail in this silent, life-and-death struggle for the survival of our people is more noble and worthy.

And yet, white people, who have marched time and again into the mouth of the cannon, refuse to rise to a cause that truly matters. Why? Partly, it is because they refuse to see the lines that Brittney Cooper has drawn so clearly. Partly, because the fight is not with weapons but with words and ideas. And partly — and this is the great, agonizing tragedy of our struggle — because so many who oppose us are our own brothers and sisters. White people easily have the power to take their destiny back into their own hands and choose to live rather than die.

our cause, to prevail in this silent, life-and-death struggle for the survival of our people is more noble and worthy.

And yet, white people, who have marched time and again into the mouth of the cannon, refuse to rise to a cause that truly matters. Why? Partly, it is because they refuse to see the lines that Brittney Cooper has drawn so clearly. Partly, because the fight is not with weapons but with words and ideas. And partly — and this is the great, agonizing tragedy of our struggle — because so many who oppose us are our own brothers and sisters. White people easily have the power to take their destiny back into their own hands and choose to live rather than die.

They lack understanding. They lack resolve. We will give them understanding and we will show them resolve.

Ladies and gentlemen, you live in a wonderful time. It is wonderful to live at a time when you see the gigantic forces contending for the future of our people and to be among those who see what is at stake, and to know where your duty lies. Few people in history have the opportunity you do, to be part of a cause that is not only just and moral but crucial to the survival of everything we love. Why can't I be 40 years younger so I can fight 40 years longer? In this struggle, some will be great. Choose to be great!

Choose to be like the countless white heroes who have laid down their lives in glorious causes. The Greeks who fought the Persians at Thermopylae. The Franks who crushed the Moors at Poitiers. Jan Sobieski and his men who saved Europe at the gates of Vienna. The Boers who fought at Blood River. Those men died for us.

You — every one of you — have the blood of those heroes in your veins. Just as they fought, so do we fight. It is my honor to fight at your side, and like our courageous ancestors, we will be victorious.

___

⊡ Topics: _Featured_, _Racial Conflict_, _Racial Suicide_, _White Racial Consciousness_

___

**About Jared Taylor**                                    VIEW ALL POSTS BY JARED TAYLOR

 Jared Taylor is the editor of American Renaissance and the author of _Paved With Good Intentions_, _White Identity_, and _If We Do Nothing_.

**You Might Also Like**



44-Year Old Woman Loses 63lbs Effortlessly By Eating This

Learn More



These 2 Veggies May Enhance Your Weight Loss

Learn More



Document title: The Battle Lines Grow Clearer - American Renaissance





beautiful and modern before they fell to the third world. Boston and NYC gave us the
underground electric trains in 1896-8. Wupertal Germany had a skytrain in 1901. Look at the old
films from that era. They were amazing. We had those modern wonders before Asia. I like Asia
very much though and I respect their accomplishments. Please spare me your false racism
accusations.

12 ∧ | ∨ · Reply · Share ·


**JohnEngelman** → blatkz · 9 days ago
Whites invented the modern world, not Asians. You NEVER address that. Your answer is:

————

This is my answer written by the man who deserves to be called "The Dean of Race Realism." He
spoke at six American Renaissance Conferences.

RACE, EVOLUTION AND BEHAVIOR, by Professor J. Philippe Rushton
University of Western Ontario
London, Ontario, Canada N6A 5C2

The Whites who explored China were just as racist as those who explored Africa, but their
descriptions were different from what they and the Arabs had written about Africans. In 1275
Marco Polo arrived in China from his native Italy to open trade with the Mongol Empire. He
found that the Chinese had well built roads, bridges, cities connected by canals, census takers,
markets, standardized weights and measures, and not only coins, but paper money as well. Even
a postal system was in existence. All of these made him marvel when he compared the Chinese to
what he saw in Europe and the Middle East. Even though he was an Italian, proud of his people
and well aware of the greatness of Ancient Rome, Marco Polo wrote: "Surely there is no more

see more

3 ∧ | ∨ 3 · Reply · Share ·


**Sgt F** → JohnEngelman · 9 days ago · edited
Yet with all this Chinese accomplishments you stated, 50 million Chinese starved to death in
the 50's. Without US and European trade, and companies fleeing to China, they would continue
to starve. China is very dependent on us. Trump was right using that leverage.
My experience with East Asian, Orientals, they are a hard working, low violent crime people.
Though a World War 2 vet told me when I was young, never trust yellow people.
7 ∧ | ∨ · Reply · Share ·


**Marka** → Sgt F · 8 days ago · edited
Violent crime is very high in Asian communities. Gang violence. An Asian youth is 7X more likely
to be a gang member than a white youth. --Jared Taylor, the Color of Crime. I don't trust anyone,
including whites lol!
1 ∧ | ∨ · Reply · Share ·


**Sgt F** → Marka · 8 days ago
Could be different now. My experience was when I was a school age boy into my teens, mid 50's,
60's, early 70's. Almost half the city I grew up in were Japanese.
∧ | ∨ · Reply · Share ·


**Amy38** → Marka · 6 days ago
Correct. The Southeast Asians are much more likely to commit crimes than whites. Vietnamese
gangs are know for their violence and criminality.
2 ∧ | ∨ · Reply · Share ·


**Marka** → Amy38 · 6 days ago
Chinese as well. Even Japan has organized crime.
2 ∧ | ∨ · Reply · Share ·


**Marka** → JohnEngelman · 8 days ago
This is irrelevant and you keep deflecting. I was talking about the modern world. Ancient Chinese
accomplishments are fine, but simplistic compared to automobiles and space travel. Now China is
a polluted third world country that utilizes slave labor...but they are vastly superior to whites
somehow. You never addressed the question.
4 ∧ | ∨ · Reply · Share ·


**Amy38** → JohnEngelman · 6 days ago · edited
Hand cannons were invented by the Chinese in the 13th century and they had to be lit manually
from the outside. Guns were invented by Europeans. The double barreled wheellock pistol was
invented by German gunsmith Peter Peck for Charles V in 1540. The matchlock mechanism was
introduced to China by the Portugese. The flintlock ignition for muskets was invented by Marin le
Bourgeoyp of France in the early 17th century. It was used by the French navy in 1717.
1 ∧ | ∨ · Reply · Share ·


**S.D. in X** → JohnEngelman · 9 days ago
It still begs the question, why do so many have to come here to succeed?
9 ∧ | ∨ · Reply · Share ·


**Marka** → S.D. in X · 9 days ago
No answer, he's gone.
2 ∧ | ∨ · Reply · Share ·


**JohnEngelman** → S.D. in X · 9 days ago
For the same reason your ancestors had to come here from Europe.
1 ∧ | ∨ 3 · Reply · Share ·


**Marka** → JohnEngelman · 8 days ago · edited
Europeans came to the New World to expand and build Western civilization. Other races came
here to because our society is much more appealing than theirs.
5 ∧ | ∨ · Reply · Share ·


**Will Kane** → Marka · 7 days ago
And there was no welfare state.
2 ∧ | ∨ · Reply · Share ·


**S.D. in X** → JohnEngelman · 7 days ago
I can only think of Chinese who may be oppressed. What about the rest?

Many Europeans came here to escape poverty. They were able to succeed with little to no help
from the U.S. govt. Orientals meanwhile receive plenty simply by being other than white. They
are an AMERICAN success story because America handed them most of it.
3 ∧ | ∨ · Reply · Share ·

**Amy38** → S.D. in X · 6 days ago · edited
There are some extremely successful entrepreneurs in Asia. There are one hundred Indian
billionaires in India. China has over three hundred billionaires and five million millionaires. Most



Could be different now. My experience was when I was a school age boy into my teens, mid 50's, 60's, early 70's. Almost half the city I grew up in were Japanese.

**Amy38** → Marks · 6 days ago
Correct. The Southeast Asians are much more likely to commit crimes than whites. Vietnamese gangs are know for their violence and criminality.

**Marka** → Amy38 · 6 days ago
Chinese as well. Even Japan has organized crime.

**Marka** → JohnEngelman · 6 days ago · edited
This is irrelevant and you keep deflecting. I was talking about the modern world. Ancient Chinese accomplishments were fine, but simplistic compared to automobiles and space travel. Now China is a polluted third world country that utilizes slave labor...but they are vastly superior to whites somehow. You never addressed the question.

**Amy38** → JohnEngelman · 6 days ago · edited
Hand cannons were invented by the Chinese in the 13th century and they had to be lit manually from the outside. Guns were invented by Europeans. The double barreled wheellock pistol was invented by German gunsmith Peter Peck for Charles V in 1540. The matchlock mechanism was introduced to China by the Portugese. The flintlock ignition for muskets was invented by Marin le Bourgeoyce of France in the early 17th century. It was used by the French navy in 1717.

**S.D. in X** → JohnEngelman · 6 days ago
It still begs the question, why do so many have to come here to succeed?

**Marka** → S.D. in X · 6 days ago
No answer, he's gone.

**JohnEngelman** → S.D. in X · 6 days ago
For the same reason your ancestors had to come here from Europe.

**Marka** → JohnEngelman · 6 days ago · edited
Europeans came to the New World to expand and build Western civilization. Other races came here to because our society is much more appealing than theirs.

**Will Kane** → Marka · 7 days ago
And there was no welfare state.

**S.D. in X** → JohnEngelman · 7 days ago
I can only think of Chinese who may be oppressed. What about the rest?

Many Europeans came here to escape poverty. They were able to succeed with little to no help from the U.S. govt. Orientals meanwhile receive plenty simply by being other than white. They are an AMERICAN success story because America handed them most of it.

**Amy38** → S.D. in X · 6 days ago · edited
There are some extremely successful entrepeneurs in Asia. There are one hundred Indian billionaires in India. China has over three hundred billionaires and five million millionaires. Most of the people who come here are the ones who couldn't cut it in their own homeland. We have a lot about the brain drain from these nations. Other than a few top researchers, scientists, and academics, these countries are not sending their best and brightest.

**Travis** → Marka · 7 days ago
clinton sold a lot of it to them

**The Jomsviking** → JohnEngelman · 9 days ago
I don't understand you. You've just read a thousand-word essay, the sole topic being that Whites are under attack in our own country and its time to fight back. And in your comment you felt the need to bring up Orientals. What do they have to do with anything? What is at issue is *our* people. *Our* race. It doesn't matter if we're the most humane people on the planet, or the least humane. We still deserve the right to live our lives as we see fit. Just like everyone else.

**S.D. in X** → The Jomsviking · 9 days ago
I have very little interest in Orientals but I guess we could at least live in peace with them on this planet. Other than that, ....

Load more comments



Subscribe     Add Disqus to your site     Do Not Sell My Data     DISQUS

**Quick Links**                          **AR Archives**

News                                      Articles
Commentary                                Print Back Issues
Features                                  Conferences
Store                                     Interviews & Appearances
                                          Video Archive

The contents of this website are copyright © 1990-2021 New Century Foundation.

SBA000094

3/15/2021                                    Fade to Brown - American Renaissance

 **Exhibit G**



Posted on September 30, 2011

# Fade to Brown

*Stephen Webster, American Renaissance, April 2003*



The signing of the 1965 Immigration Act.

Of all the unfortunate legislation to emerge from the so-called Civil Rights Era, none has been more harmful than the 1965 Immigration Act (technically, the amendments to the Immigration and Nationality Act of 1952, or the Hart-Celler Act of 1965). In 1960, whites were approximately 90 percent of a population of 178.5 million. By 2000, they were only 69.1 percent of a population of 281.4 million, and if current immigration trends continue, by 2050 or 2060 they will be a minority of a population of 430 million or more. This will be a decline from overwhelming majority to minority in little more than a lifetime. Thanks to the 1965 Act, which brought about a

radical departure from traditional patterns of immigration, white children born today will enter middle age as minorities in their own country.

## Early Immigration Policies

The post-1965 changes would shock the architects of America's earlier immigration policies, which were intended to keep America white and culturally cohesive. The young nation's very first naturalization law, passed in 1790, required that new citizens be "free white persons." Most immigrants coming to the United States during the republic's first 60 years were Northwestern European Protestants, mainly from Britain and Germany. They differed very little — ethnically or religiously — from the pioneers who settled colonial America, and they helped establish traditional American culture.

The first substantial change to that pattern was the result of the Irish potato famine of 1845 and political turmoil in Europe around 1848, which fueled a rapid influx of Irish and continental Catholics. The first immigration reform movement, the so-called Know-Nothings or members of the secret Order of the Star-Spangled Banner, was established in 1849 in response to these new immigrants. The Know-Nothings — who got their nickname because they were pledged to say they "knew nothing" if asked about the order by outsiders — were cultural nationalists who thought Catholicism was incompatible with America's liberal, democratic political values. They wanted to bar the foreign-born from voting or holding public office, and called for a 21-year residency requirement for citizenship and the establishment of mandatory public schools to mold newcomers into proper Americans.

The order soon gave rise to a mass movement known as the American Party, which won hundreds of local, state and federal elections. The Congress that met in 1855 had no fewer than 43 avowed Know-Nothing members, and the American Party even ran former president Millard Fillmore in a bid for the White House in 1856, in which he won 21.5 percent of the popular vote. Its growing success was stopped short when the party split over slavery. As the Civil War approached, many northern Know-Nothings joined the new Republican Party, while Southerners defected to the Democrats. The movement faded, but its insistence that immigrants should assimilate became part of the American identity and is its lasting legacy.

SBA000096

3/15/2021                                    Fade to Brown - American Renaissance



Millard Fillmore

Some states took immigration policy into their own hands. In 1855, California levied a fine of $55 per person on Chinese immigrants. Three years later, when it was clear the fine had not stopped the flow, the state passed an outright ban on all people of "Mongolian" descent, except in cases of shipwreck or accident. Survivors were expelled as soon as they recovered. The city of San Francisco passed its own laws, taxing Chinese laundries and door-to-door vegetable peddlers. Perhaps most imaginative was a "queue" ordinance, which required a mandatory haircut for anyone convicted of a crime. This was aimed at Chinese, for whom it was a great disgrace to lose the pigtail.

From 1854 to 1874, Chinese could not testify against whites in California courts. The legislature declared that Chinese "have never adapted themselves to our habits, modes of dress, or our educational system . . . Impregnable to all the influences of our Anglo-Saxon life, they remain the same stolid Asiatics that have floated on the rivers and slaved in the fields of China for thirty centuries of time."

In 1875 the US Supreme Court declared immigration a federal, not a state responsibility, but the US government picked up where California and other states left off. Beginning in 1882, it passed a series of laws barring Asians. The first Chinese exclusion act, in force for 10 years, was renewed in 1892 and 1902. In 1904 Congress made the ban permanent, and it was in effect until 1943, when China was our ally in the war against Japan, and a total ban seemed unfriendly.

Japanese and Koreans tried to immigrate later than the Chinese, but got the same treatment. The Japanese and Korean Exclusion League, founded in 1905 in San Francisco, whipped up so much anti-Asian sentiment that Teddy Roosevelt persuaded the Japanese government in 1907 to withhold passports from anyone who wanted to emigrate to America — the so-called Gentleman's Agreement. The Immigration Act of 1917 created an "Asiatic Barred Zone" that virtually eliminated all Asian immigration, and also required literacy tests for European immigrants.

During this period, there was another round of European immigration, known as the Great Wave. Unlike earlier European arrivals, Great Wave immigrants were mostly from Southern and Eastern Europe, and differed far more significantly — culturally, religiously, linguistically and ethnically — from native stock than had the Irish and German Catholic immigrants of the 1840s. It was a far larger wave, which peaked in 1907 with 1.3 million foreigners, but continued to roll along until the First World War. In the decade between 1900 and 1910, nearly nine million immigrants arrived, a number not exceeded until the 1990s.

Immigration resumed after the war. More than 800,000 came in 1920 alone, and the Commissioner of Immigration predicted the number would soon rise to two million a year. Worried that this flood threatened the Anglo-Saxon majority, Congress acted in 1921 to protect the demographic balance.

Albert Johnson, chairman of the House Committee on Immigration and Naturalization and who gave his name to the new law, put it this way: "The United States of America, a nation great in all things, is ours today. To whom will it belong tomorrow? . . . The United States is our land. If it was not the land of our fathers, at least it may be, and it should be, the land of our children. We intend to maintain it so. The day of unalloyed welcome to all people, the day of indiscriminate acceptance of all races, has definitely ended."

The Johnson Quota Act of 1921 was the first to put numerical restrictions on immigrants. It set an annual ceiling of 357,000 Eastern Hemisphere immigrants — this meant Europeans — but there was no limit on Western Hemisphere immigration because aside from a few white Canadians, no one was coming from the Americas. The law also established an annual quota for all national groups of three percent of its representation in the 1910 census — a provision clearly intended to

SBA000098

keep the ethnic balance exactly as it was. The 1921 Quota Act was provisional, and was replaced in 1924 by the Johnson-Reid Immigration Act, which further reduced immigration. It cut Eastern Hemisphere arrivals to just over 160,000, and lowered the quota for different nationalities to *two* percent of that nationality's representation in the earlier census of 1890.

By using population figures from before the massive post-1900 immigration surge, the drafters of the act tried to undo some of the demographic change wrought by the Great Wave. The quotas ensured that 70 percent of all immigrants would be from Great Britain and Germany — the countries that provided nearly all of the founding stock — and Ireland. Business leaders had opposed the quotas, and wanted to import crowds of cheap foreign workers, but when Calvin Coolidge signed the 1924 act, he noted that maintaining a common national culture was more important then whatever economic benefits more immigrants might bring.

This meant an unmistakable preference for the old Americans over Italians, Czechs, Poles, etc. and even at the time there was much complaining about "discrimination." Colorado Congressman William N. Vaile replied to these charges during the debate on the 1924 Quota Act: "That people from Southern and Eastern Europe did not begin to come in large numbers until after 1890 certainly proves that those who came before them had built up a country desirable enough to attract these latecomers. Shall the countries which furnished these earlier arrivals be discriminated against for the very reason, forsooth, that they are represented here by from 2 to 10 generations of American citizens, whereas the others are represented by people who have not been here long enough to become citizens? If there is a charge of 'discrimination,' the charge necessarily involves the idea that the proposed quota varies from some standard which is supposed to be not 'discriminatory.' What is that standard?"

Already we see the signs of eventual capitulation. Congressman Vaile was suggesting that the quotas were not discriminatory, or if they were, it was because they violated an impossible standard. Vaile would have served subsequent generations better if he had been more straightforward: Certainly the quotas were discriminatory, but Old Americans had every right to discriminate in favor of themselves, and in favor of cultural and ethnic continuity. To concede that discrimination was wrong, but that national quotas were somehow not discriminatory was to concede a moral position that could only lead to defeat.

Already in 1927, immigrants from Eastern Europe succeeded in getting Congress to change the quota baseline from the 1890 to the 1920 census, thereby opening up more slots for themselves. In exchange, Congress slightly reduced the annual Eastern Hemisphere quota to 154,227 — a figure that remained in effect until 1965. There was still no quota on immigration from the Americas, because no quota was needed.

SBA000099

The next major change in immigration law was the Immigration and Nationality Act of 1952 (the McCarran-Walter Act). This act eliminated the ban on Asians — each Asian country was allotted a token 100 immigrant visas — and established a preference system within the national origin quotas favoring immigrants with special skills or family ties to citizens. The act did not alter either the basic quota system or the annual ceiling on immigration from the Eastern Hemisphere.

The immigration reforms of the 1920s were a great success. They ended Great Wave immigration (from 1930 to 1970, annual net immigration averaged 185,000), and gave non-traditional immigrants time to assimilate. America in 1960 was still the white nation its founders intended, but by then, the racial and cultural consensus that produced the quota system had begun to break down.

## Quota Opponents

There were opponents to McCarran-Walter, including President Harry Truman. The law had to be passed over his veto, and he complained about "the cruelty of carrying over into this year of 1952 the isolationist limitations of our 1924 law." "In no other realm of our national life," he added "are we so hampered and stultified by the dead hand of the past, as we are in this field of immigration." Truman was hardly a multi-racialist. He was a firm segregationist (despite integrating the army), and once wrote, "I am strongly of the opinion Negroes ought to be in Africa, yellow men in Asia and white men in Europe and America." His real objection to national quotas was that they gave the Soviet Union a reason to tell Third World people America was "racist." Despite the Cold War, the quota system was overwhelmingly popular. The House of Representatives voted 278-113 to override the veto, and the Senate voted 57-26.



Note decline during the First World War, and the success of the restrictions of the 1920s. The spike in 1991-2 is due to IRCA

amnesties.

Truman was not alone, however, in worrying that immigration quotas were a liability in the Cold War. Novelist Pat Frank, in *Alas, Babylon!,* a story of nuclear war between the Soviet Union and the United States published in 1959, has the lead character, a Southern liberal, lament that "nativists" were "losing" Asia. This belief is one of the main reasons McCarran-Walter set up token quotas for Asians. President Dwight Eisenhower wanted to double immigration at the very least, and to bring in thousands of East European and Asian refugees from Communism, but Congress stood firm.

Popular opposition to quotas came mainly from people who thought the system discriminated against their group. After the Second World War, quotas from Britain and Germany largely went unfilled, and there was no provision to let other countries take their slots. In 1965, 250,000 Italians competed for 5,666 quota slots. Italian ethnic lobbyists and Southern and Eastern Europeans desperately wanted to change the quotas, but did not have enough political power.

Most ethnics worked only to get more of their own people into the country, but Jews consistently lobbied for more immigration from everywhere. American Jews have always favored liberal immigration policies, in the belief that Jews are more secure in a culturally diverse country without a strong racial, cultural, or religious identity. Throughout the 19th century, American Jews fought all exclusionary immigration laws, even those aimed at Asians. They were particularly opposed to the quota acts, which they saw as an anti-Semitic reaction to the recent arrival of large numbers of Jewish immigrants.

Groups like the American Jewish Committee funded and directed much of the anti-restrictionist activity. During the 1930s when Jewish refugees fleeing Hitler were barred from entry, Jews were almost the only segment of American society pressing for more immigration, and Jewish organizations poured enormous amounts of money and effort into helping pass the 1965 Immigration Act.

However, if there is one man who can take the most credit for the 1965 act, it is John F. Kennedy. Kennedy seems to have inherited the resentment his father Joseph felt as an outsider in Boston's WASP aristocracy. He voted against the McCarran-Walter Act of 1952, and supported various refugee acts throughout the 1950s. In 1958 he wrote a book, *A Nation of Immigrants,* which attacked the quota system as illogical and without purpose, and the book served as Kennedy's blueprint for immigration reform after he became president in 1960.

In the summer of 1963, Kennedy sent Congress a proposal calling for the elimination of the national origins quota system. He wanted immigrants admitted on the basis of family

3/15/2021                                    Fade to Brown - American Renaissance

reunification and needed skills, without regard to national origin. After his assassination in November, his brother Robert took up the cause of immigration reform, calling it JFK's legacy. In the forward to a revised edition of *A Nation of Immigrants,* issued in 1964 to gain support for the new law, he wrote, "I know of no cause which President Kennedy championed more warmly than the improvement of our immigration policies." Sold as a memorial to JFK, there was very little opposition to what became known as the Immigration Act of 1965.



## Immigration as a Civil Right

The historical context of the bill was very important. Writer Lawrence Auster describes the Immigration Act of 1965 as a "civil rights bill applied to the world at large," because although it was billed as a tribute to a fallen president, it was very much a part of the revolution in race relations of the 1960s. Congress passed it at the same time as the 1964 Civil Rights Act and the 1965 Voting Rights Act, and its purpose was to end the discrimination of national origins quotas. Indeed, its supporters often invoked the domestic "civil rights" bills in calling for support.

As Rep. Phillip Burton of California put it: "Just as we sought to eliminate discrimination in our land through the Civil Rights Act, today we seek by phasing out the national origins quota system to eliminate discrimination in immigration to this nation composed of the descendants of immigrants." Another Democratic congressman, Robert Sweeney of Ohio, said: "I would consider the amendments to the Immigration and Nationality Act to be as important as the landmark legislation of this Congress relating to the Civil Rights Act. The central purpose of the administration's immigration bill is to once again undo discrimination and to revise the standards by which we choose potential Americans in order to be fairer to them and which will certainly be more beneficial to us." Immigration reform was a moral crusade, and like so many other moral crusades, it was sold on the pretense that it would actually be "more beneficial to us."

SBA000102

Supporters of the 1965 Immigration Act made another questionable argument: that it was really only a symbolic gesture that would not produce much real change. At the signing ceremony, President Johnson declared, "This bill we sign today is not a revolutionary bill. It does not affect the lives of millions. It will not restructure the shape of our daily lives."

Senator Edward Kennedy, who guided the bill through Congress, reassured Americans that "our cities will not be flooded with a million immigrants annually. Under the proposed bill, the present level of immigration remains substantially the same . . . Secondly, the ethnic mix of this country will not be upset . . . Contrary to the charges in some quarters, [the bill] will not inundate America with immigrants from any one country or area, or the most populated and deprived nations of Africa and Asia . . . In the final analysis, the ethnic pattern of immigration under the proposed measure is not expected to change as sharply as the critics seem to think."

Illinois Democratic Congressman Sidney Yates added, "I am aware that this bill is more concerned with the equality of immigrants than with their numbers. It is obvious in any event that the great days of immigration have long since run their course."

Rhode Island Democratic Senator Claiborne Pell agreed: "Contrary to the opinions of some of the misinformed, this legislation does not open the floodgates."

Some saw writing on the wall. Barry Goldwater's running mate in the 1964 presidential campaign, Rep. William Miller of New York, warned "We estimate that if the President gets his way, and the current immigration laws are repealed, the number of immigrants next year will increase threefold and in subsequent years will increase even more . . .

During debate on the act, Florida Democratic Senator Spessard Holland told his colleagues, "What I object to is imposing no limitation insofar as areas of the earth are concerned, but saying that we are throwing the doors open and equally inviting people from the Orient, from the islands of the Pacific, from the subcontinent of Asia, from the Near East, from all of Africa, all of Europe, and all of the Western Hemisphere on exactly the same basis. I am inviting attention to the fact that this is a complete and radical departure from what have always heretofore been regarded as sound principles of immigration."

As "conservatives" almost always do, opponents of the 1965 act could not bring themselves to defend their positions honestly and clearly. Senator Holland evoked "sound principles of immigration" but did not explain *why* they were sound. There is no record in the congressional debate of anyone pointing out that European civilization can be carried forward only by Europeans, that Third-World immigrants bring the Third-World with them, and that whites have every right to keep their country white. These arguments would not necessarily have prevailed,

File: Capital_One_Response_to_SBA_loan_review_request.pdf    [2021/12/14 21:24:52]                93 of 179

but they would have been straightforward, coherent statements of racial common sense rather than wooly appeals to "what have always heretofore been regarded as sound principles."

On Oct. 3, 1965, President Lyndon Johnson signed the act at a ceremony at the base of the Statue of Liberty. What were its provisions? Most significantly, it abolished the national origins quota system and gave all foreigners an equal chance. It slightly increased the quota for the Eastern Hemisphere — which now meant not just Europe but Asia and Africa as well — to 170,000, and established a ceiling of 120,000 for Western Hemisphere immigrants.

Just as significant was an important shift in preferences. Before 1965, skilled professionals were at the top of the list, and family unification got little emphasis. The new law reversed this, meaning that the Third-Worlders who could now come were not being chosen for what they could do but because they were related to someone who was already here.

Until 1965, people admitted to the country legally had no automatic right to bring their families; skilled professionals came before wives and children. The new law gave the top preference to unmarried adult children of US citizens but the very next preference category was spouses, minor children and unmarried adult children of *immigrants*. This was a huge change. Under the old law, only *citizens* had the right to sponsor immigrants. Now, as soon as he got here, any newcomer could send for his family. This is what produced the chain migration that has emptied entire Mexican villages.

The allocation of hemispheric quotas was another dangerous precedent. No country in the Eastern Hemisphere could send more than 20,000 people a year, but the 120,000 Western Hemisphere quota had no per-country limits at all. This set the stage for a single country — Mexico — to dominate immigration.

SBA000104



And, indeed, the 1965 Immigration Act and its sequelae *have* restructured the shape of our daily lives. Our cities *are* being flooded with a million immigrants annually, and the ethnic mix of our country *has* been upset. The year after the 1965 act, 323,040 immigrants arrived. During the 1970s, the numbers averaged 450,000 a year. In the 1980s the average yearly intake rose to 740,000, and by the 1990s, the figures reached 900,000. These were only the legal immigrants, and we now have an estimated seven to thirteen million illegals living among us — the equivalent of eight to fourteen years worth of legal immigration. Some 350,000 to 500,000 break into the country every year.

If illegals are included, between 1970 and 1980, the number of foreigners living in the US rose by 47 percent (4.5 million). Between 1980 and 1990, the number rose by another 40 percent (5.7 million), and during the 1990s, increased by a staggering 57 percent (11.3 million, the largest single-decade increase ever). This meant that in 2002, 33.1 million immigrants were living in America — 11.5 percent of the total population. Immigration drives US population growth. Since 1965, immigration and the children of immigrants have accounted for 70 percent of the increase, giving the United States population growth rates like those of Third-World countries.

Nearly 90 percent of recent immigrants are non-whites, and most are from Latin America or Asia. Pace Senator Kennedy, we are indeed being inundated with immigrants from one country — Mexico. There are now no fewer than 20.6 million Mexicans in this country, of whom 9.7 million are first-generation immigrants. Mexico alone accounts for 29.8 percent of all current legal immigrants and the majority of illegals.

Whites have been largely pushed out of the immigrant stream. Seventy percent of foreign-born residents come from Latin America, the Caribbean, and East Asia. Of the top ten countries sending immigrants to the US, only one — Canada at number nine — has a majority white population, and probably for not much longer. America's traditional sources of immigrants are far down the list. Germany ranks 11th and Britain is 12th. Ireland is not even in the top 25. Whites are a majority in only six of the top 25 source countries, and by no means all of the immigrants they send are white.

Bad as it was, the 1965 act cannot take all the blame for the rising tide of color. That law could theoretically have held immigration at 300,000 every year. Since then, Congress has yanked up the quotas while doing little to screen immigrants for useful skills. In 2000, for example, the country accepted 849,807 immigrants, nearly three times as many as envisaged in 1965. Of that number, 41 percent were immediate family members of US citizens and 28 percent were relatives of non-citizens, meaning that no fewer than 69 percent were let in because of family ties. Another eight percent were refugees — this is how we get Somalis, Nicaraguans, etc. — 13 percent received employment preferences, six percent came on "diversity" visas chosen by lottery for people who don't have family connections, and four percent got into the country one way or another and had their status adjusted to get permanent residency.

Of course, one of the most breathtakingly stupid things Congress did — and this includes the 1965 act — was the Immigration Reform and Control Act (IRCA). This was a law passed in 1986 that granted amnesty to illegals who had been in the country since before 1982 and had kept their noses reasonably clean. This was supposed to be a once-and-for-all, never-again amnesty to be combined with tough policies to keep out any more illegals. The Border Patrol was supposed to be beefed up, and there was to be fierce punishment for employers who hired any more illegals that came in. In the end, no fewer than 2.6 million law-breakers got amnesty, very few of them white, and the illegals just kept on coming. "Employer sanctions" were a joke, and the IRS soon gave up anything but token enforcement. It was back to business as usual: Anyone who could make it across the border had little to fear from *la Migra*.

The surge in immigration initiated by the 1965 act shows no sign of slowing. Neither the foundering economy nor the Sept. 11 terrorist attacks have discouraged newcomers: More than 3.3 million legal and illegal immigrants have arrived since 2000. Immigration boosters say this is a natural phenomenon over which we have no control, a byproduct of the global economy. Of course, it is no more uncontrollable than the Great Wave of the late 19th and early 20th centuries, which was stopped by the quota acts of the 1920s.

SBA000106

Now that immigration is destroying the unity and cultural coherence of the country, it has become fashionable to describe vice as a virtue, to claim that ethnic enclaves, schools full of children who speak no English, increasing racial conflict, voodoo cults, bilingual ballots, Mexican irredentism, interpreters in hospitals and courtrooms, and countless "discrimination" cases are all evidence of wonderful enrichment and "diversity." No one can point to just how diversity is actually benefiting the country but everyone is convinced it is a great thing.



Jews, in particular, continue to think they are better off in a rag-bag country with no majority. As Charles Silberman has written, "American Jews are committed to cultural tolerance because of their belief — one firmly rooted in history — that Jews are safe only in a society acceptant of a wide range of attitudes and behaviors, as well as a diversity of religious and ethnic groups." The Hebrew Immigration Aid Society (HAIS) has traditionally worked to increase Jewish immigration to the United States, but now that fewer Jews are coming, it has opened an office in Nairobi, of all places — explicitly to encourage non-Jewish immigration. As HAIS president Leonard Glickman recently explained to the Jewish paper *Forward*, "The more diverse American society is the safer [Jews] are." Earl Raab, president of Brandeis University, has argued that only when whites are reduced to a minority will the United States no longer be capable of establishing an anti-Semitic, Nazi-like regime.

Recently a few Jews have begun to wonder if massive Third-World immigration is not quite so good for them after all. Stephen Steinlight, a former executive of the American Jewish Committee wrote a paper in 2001 in which he argued that Hispanics and Asians are not sufficiently sensitive to Jewish interests, and that Muslim immigrants are a clear threat. Some individual Jews have spoken out strongly against Third-World immigration, but Jewish organizations overwhelmingly favor it. Gentile whites generally resist "diversity" arguments, and large majorities consistently tell pollsters they want fewer immigrants.

3/15/2021                           Fade to Brown - American Renaissance

The arguments of the supporters of the quota system — that it was necessary to maintain cultural cohesion — are now more obviously true than ever. In the 1920s and as late as the 1950s, whites still had enough unspoken racial consciousness to pass laws in their own interests. They failed, however, to put the case in clear, racial terms, and as racial consciousness diminished, whites in the 1960s were even less capable of making racial arguments, and found themselves disarmed in the face of appeals to "equality" and "non-discrimination."

Our nation achieved character and greatness precisely because of discrimination. Our ancestors understood that people and races are not interchangeable, and that failure to discriminate would produce a warring mix of incompetents and unassimilables. If we are not to lose our country, it is up to us once again to make racial principles an explicit part of the national debate. Unless "conservatism" is rescued from the capitulationist spirit of compromise piled on top of compromise, our grandchildren will not have a country worth conserving. If our generation fails to save the country it will be too late.

*Original Article*

---

Topics: *American History*, *Asian Immigrants*, *Classics*, *Hispanic Immigrants*, *Immigration*, *Immigration Law*, *Multiculturalism and Diversity*, *Pandering Politicians*, *Terrorism*, *the Demographic Transformation*

---

## About AR Staff

*VIEW ALL POSTS BY AR STAFF*

AmRen is America's foremost white advocacy publication. To keep up with our latest, follow us on Telegram, Gab, and BitChute.

## You Might Also Like



SBA000111

3/15/2021                                   Fade to Brown - American Renaissance



Throwback: Raye Boyce On How To Pull Off '80s Pop Style (Video)

Glam



Big Drone Companies Disrupted by This Extremely Cheap Alternative

Ads by ad·style

< **CHILDHOOD POVERTY AMONG HISPANICS SETS RECORD, LEADS NATION**

**GIRL, 16, GETS COURT TO HALT MARRIAGE** >

## 6 responses to "Fade to Brown"

1.

*Anonymous* says:

September 30, 2011 at 6:55 pm

This article sort of points out the fallacy of the Conservatives thinking we MUST win the next election and oust Obama. What difference is it going to make in the long run? We whites are well on our way to losing the demographic battle, and our country. Sigh.

2.

*Jason Robertson* says:

October 1, 2011 at 6:24 am

Excellent analysis.

Regarding changes in Jewish perceptions, which require careful and nuanced interpretation, not from "fear" of reactions but from the perspective of a more peaceful western world free from Asiatic, Arab and Latino demographic explosions and incursions, see the article on "Britain's Sick Society" (August 17) in JewishJournal.com – you might be surprised by the author.

3.

*La Santa Hermandad* says:

October 1, 2011 at 2:31 pm

It would appear that the Portuguese are doing a great job of diluting themselves out of existence. Check this article about the Black NJ fugitive who can't be extradited because he is now Portuguese and is now married to Maria do Rosario Valente who, I assume is White.

https://goo.gl/PAexF

4.

*john* says:

October 2, 2011 at 1:27 pm

The so-called white race is not endangered by East Asians or Indians. They can and do live among us in relative harmony. They, like whites, invent, produce, create, and do not lay waste to the creations of others. They and we can and do become friends and good neighbors.

We're endangered by black Africans and mestizos, particularly the former. They have no history of invention, creation (unless one considers rap art), cultural innovation, or wealth accumulation. Their primary identifying characteristic is an unvarying propensity for destruction, criminal behavior, and violence.

We're going to have to deal with these members of our society at some point, and deal with them forcefully.

5.

Anonymous says:

October 3, 2011 at 4:07 pm

"However, if there is one man who can take the most credit for the 1965 act, it is John F. Kennedy. Kennedy seems to have inherited the resentment his father Joseph felt as an outsider in Boston's WASP aristocracy. He voted against the McCarran-Walter Act of 1952, and supported various refugee acts throughout the 1950s. In 1958 he wrote a book, A Nation of Immigrants, which attacked the quota system as illogical and without purpose, and the book served as Kennedy's blueprint for immigration reform after he became president in 1960."

The Kennedys blamed their rejection by haute society on anti Catholic prejudice. They were rejected by haute Catholic society as much as they were rejected by haute Protestants.

Note that although there were numerous debutante balls for Catholics only and mixed Catholic Protestant debutante balls none of the Kennedy daughers were invited to make their debuts.

The Kennedys were never invited to join any country clubs, Catholic, Protestant, Jewish whatever. Rose and her daughters were excluded from the numerous charities, fundraisers and clubs for rich Catholic women.

The reason for this was simple. Old Joe was well known as a bootlegger, a stock market manipulator who joined with the other crooks to bring on the great depression, and a basic slimeball.

Another reason why his wife and daughters were shunned by the haute Catholics of New York where he raised his children is that he was a well known molester of teen age girls. The Kennedy's left Boston for New York when the oldest children were still in school.

The Kennedy girls extended many invitations to Catholic girls with whom they went to school, but Old Joe's predatory sexual habits were so well known in Catholic circles that other girls were not allowed to visit the Kennedy home.

The Kennedy's claim to have have been shuned by the Protestants because of their religion is a lie. They were shunned by Catholic and Protestant alike because Old Joe was an organized crime criminal and sexual predator of high school girls.

Ethel, Jackie and Joan's families were as Catholic as the Kennedy's. They had no problem being accepted by haute Protestant WASP society. They all made debuts (very important in those days) and their families all belonged to haute Protestant clubs. Shriver was a true American aristocrat from an old Maryland Catholic dynasty. His family was accepted everywhere.

The Catholic Ford, Dupont, Mcknight Skakel and other rich Catholic families were welcomed into haute society without any trouble. The problem with the Kennedy's wasn't their religion. It was Old Joe's criminality.

John and Edward Kennedy must have been bribed and blackmailed to support hart-Cellar. There was plenty with which to blackmail the Kennedys, including John's drug addiction and physical disabilities.

The physical disabilities alone prevented him from being an effective President or normal preformance at any job. Add the drug addiction to the disabilites and you have a President who was nothing but a figure head with a glamourous wife.

According to State Department records, Kruschev took one look at the drug addicted, disabled weakling at the Vienna summit, realized that Kennedy was a pushover and ordered the erection of the Berlin wall and sent nuclear missiles to Cuba. He also gave Castro enormous help with the communist advance in S. America once he realized he was dealing with an incapacitated American President.

6.

*ghw* says:

October 3, 2011 at 9:59 pm

*"The Catholic Ford, Dupont, Mcknight, Skakel and other rich Catholic families were welcomed into haute society without any trouble. The problem with the Kennedy's wasn't their religion. It was Old Joe's criminality."*

.......................

Thank you for an excellent, factual, informative post!

Those mentioned above were among the richest of the rich. To that Catholic list, one could add the Donoghues (Woolworth fortune), and the Boston Forbes (Johh Kerry's first wife). They too had no problem being accepted.

Maturally, it was more convenient for the Kennedys to ascribe their social rejection to being Catholic than to admit being affiliated with gangsters and being enriched with sleazy money.

## Blog

**I Felt Total Joy as I Saw Him Die**

**Murder in America**

**Photos: Minneapolis Braces for the Trial of Derek Chauvin**

**I'm an Academic — and a Race Realist**

## Commentary

**Why Europe Should Speak Latin**

**The Wussification of the West: Will We Ban Shakespeare for Othello and Shylock?**

3/15/2021                                        Fade to Brown - American Renaissance

**When Integration Means Ruination**

**The Emerging Existential Crisis at the Border**

## Videos

**Joe Biden: Already Hard at Work Wrecking the Country**

**The Terrible Cost of Willful Ignorance**

## Podcasts

**Here They Come — Dreamers to Be**

**Terror at the Capitol!**

## Follow us

   



SBA000120

3/15/2021                                    Fade to Brown - American Renaissance

*The contents of this website are copyright © 1990-2021 New Century Foundation.*



**Exhibit H**





Posted on June 24, 2016

# Discrimination Against Whites Still Legal

*Jared Taylor, American Renaissance, June 24, 2016*

The US Supreme Court has handed down what is surely the final decision in the case of *Fisher v. University of Texas*. It's official: discrimination in college admissions against white people (and sometimes Asians) is legal. It just can't be done openly in ways people understand. It must be done in incomprehensible, opaque ways, but we can trust the wise people who run the universities to do it right and to *stop* doing it when it's no longer needed.

Samuel Alito wrote a 51-page dissent, in which he roared like a wounded lion, but he was roaring from inside a cage he helped build. In 2013, he was part of the majority that wrote that discrimination is fine, so long as it is dressed up with the right legal mumbo jumbo. All his roaring amounts to nothing more than saying that UT should have used more mumbo and less jumbo.

The case has a sordid history that goes back to 1996. Until then, the University of Texas at Austin–the campus all the cool Texans want to attend–was merrily discriminating against white people as much as it pleased. It got a shock when the Fifth Circuit Court of Appeals ruled in *Hopwood v. Texas* that racial discrimination had to stop. Then-university president Robert Berdahl predicted this would mean "the virtual resegregation of higher education"–essentially admitting that blacks and Hispanics didn't have what it takes to be admitted.

Two things saved UT from "resegregation." The university immediately invented a new, "holistic" way to evaluate applicants, which piously ignored race but gave extra points for growing up without a father, being poor, not speaking English at home, etc. It was a transparent attempt to smuggle race into admissions decisions, but it didn't work very well; an annoying number of whites were poor and fatherless and therefore got the leg up UT wanted to reserve for non-whites.

In 1997, the year after *Hopwood*, the state legislature–distressed at the prospect of "resegregation"–smuggled race in legally with its Top Ten Percent Law. This required UT to accept anyone in the top 10 percent of every high school in Texas. This was a cynical way to make the most of something UT and the legislature officially loathe and despise: segregation. There are plenty of public high schools with hardly any whites, so the top 10 percent are the very blacks and Hispanics UT couldn't admit without racial preferences.

As plenty of people pointed out, this is a strong incentive for non-white schools to stay that way. No black principal wants whites in his school if it means fewer blacks gliding into UT on the 10 percent plan. Whites could theoretically transfer to ghetto schools to make sure they were in the top 10 percent, but this appears to be too high a price to pay even to get into the state's best public university.

The scheme had other problems. One of the many blessings of "diversity" is supposed to be the destruction of stereotypes, but, as the university admitted, some of the rough trade that showed up under the 10 percent plan "reinforced" "stereotypical assumptions." This is a delicate way of saying that in some Texas schools it doesn't take much to get into the top 10 percent and that surly blacks were not contributing to the effect UT was trying to achieve.

This scheme limped along for five years, with UT relieved to have fought off outright "resegregation," but unhappy it couldn't discriminate openly in favor its preferred minorities. Things changed in 2003, with the Supreme Court's two simultaneous decisions on racial preferences at University of Michigan and its law school.

UM had a simple system (though it was a secret that had to be pried out of the university through litigation). The university rated applicants on a scale of zero to 103, and all blacks, Hispanics, and American Indians got an automatic 20 extra points. The Supreme Court decided that was *bad*. Too mechanical. Too blatant. Too quota-like. In the companion ruling, *Grutter v. Bollinger*, the justices decided they liked the law school's more mysterious system better. It was secret too, but it reportedly involved prayerful consideration of the "whole" applicant–earnest weighing and balancing–and race was said to tip the balance in favor of only the most lovable and promising unqualified candidates. Both admissions methods brought in *almost exactly the same percentage* of favored minorities, but in their Olympian wisdom the justices decided that opaque, incomprehensible discrimination is Constitutional but straightforward discrimination is not.

The justices also harrumphed importantly about how discrimination is potentially dangerous, even for noble purposes, and should be used sparingly. Justice Sandra Day O'Connor famously wrote that she expected preferences would no longer be necessary in 25 years. Does she realize

we're more than half-way there, and blacks and Hispanics aren't one bit better qualified than they were in 2003?

In any case, the very day *Grutter* set aside the *Hopwood* decision, UT whooped with joy and the president announced an immediate return to explicit racial discrimination. For form's sake it then spent a year cooking up a 39-page "Proposal to Consider Race and Ethnicity in Admissions." Needless to say, the proposal was accepted.

The university also got the legislature to cap the number of admissions under the "10 percent plan" to 75 percent of the freshman class. This meant that only the top *7 or 8* percent got automatic admission, and left 25 percent of the class open for mysterious, *Grutter*-style race preferences for blacks and Hispanic.

That was the situation when Abigail Fisher, the plaintiff in the UT cases, applied for admission in 2008. She wasn't in the top 7 or 8 percent of her class, so she had to compete for one of the slots in the remaining 25 percent of the class. She was bumped while less qualified non-whites got the nod. Both the trial court and the Fifth Circuit found that UT had just the right mix of mumbo and jumbo in its admissions policies, which meant that Miss Fisher's rights had not been violated. The Supreme Court decided to take a look, and ruled in 2013.

In what is now called *Fisher I*, the justices said that the Fifth Circuit had not given UT's race preferences "strict scrutiny" to see if they were "narrowly tailored" to achieve the "compelling need" of campus diversity. They said that the appeals court had given too much deference to UT's assurances that diversity was an essential aspect of education and to its claims that the school was achieving it with the perfect combination of mystery and good will.

All the "conservatives" on the Court, along with Justices Breyer, Kennedy, and Sotomayor agreed. Justices Scalia wrote separately that although he didn't like race preferences of any kind, the only question before the court was whether UT had been subject to "strict scrutiny" and he decided it hadn't. Only the sole black justice, Clarence Thomas, wrote that all this learned jabber about "strict scrutiny" was baloney, and that universities should be barred from considering race *at all*.

The case went back to the Fifth Circuit, where the judges sniffed at UT's race preferences a little harder than before and, *of course*, liked what they smelled. The Supreme Court decided it wanted another sniff, too, and that's why we now have *Fisher II*.

This case therefore never was about the *principle* of racial discrimination or whether "diversity" is a good enough reason to practice it. The "conservatives"–except for Justice Thomas–had already sold out on that, so the arguments are technical and not very interesting.

SBA000124

There are some funny lines, though. In confirming the constitutionality of racial discrimination against whites, the affirming justices Kennedy, Sotomayor, Ginsberg, and Breyer wrote that there was only a teeny, tiny bit of it. Quoting UT, they claimed that "there is no dispute that race is but a 'factor of a factor of a factor' in the holistic-review calculus." (In his dissent, Justice Alito wanted to know why this nearly irrelevant factor–race–was the only one that was stamped *right on the cover* of every admissions folder.)

But the best line from the affirming decision is this: "As the Defendants [UT] point out, the consideration of race, within the full context of the entire application, may be beneficial to any UT Austin applicant–including whites and Asian-Americans." How can the university have made that claim with a straight face? It's not possible to imagine an application being saved from the reject pile because someone piped up, "But didn't you notice? The candidate is *white*. We've just *got* to admit one more *white* English major."

So what did the Miss Fisher's lawyers argue? They said UT had failed to show that campus diversity is a "compelling need" that is *so* compelling it justifies the legal equivalent of nuclear war, that is, official racial discrimination. To which the court replied:

> The University explains that it strives to provide an "academic environment" that offers a "robust exchange of ideas, exposure to differing cultures, preparation for the challenges of an increasingly diverse workforce, and acquisition of competencies required of future leaders." . . .

> As this Court has said, enrolling a diverse student body "promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races."

Astonishingly, the court required *no evidence* that "diversity" actually produces these wonders. If UT says so it must be so.

The plaintiff also complained that UT had never defined a numerical goal for "diversity." Without a clear goal, we will never know if it has been reached or whether the means to reach it are "narrowly tailored" as the law requires. The Court replied that diversity is not "a goal that can or should be reduced to pure numbers," and that quotas and straight racial balancing are unconstitutional anyway. We must defer to the university's judgment.

Justice Alito was having none of this:

On remand, [when the case was sent back to the appeals court] UT failed to do what our prior decision demanded. The University has still not identified with any degree of specificity the interests that its use of race and ethnicity is supposed to serve. Its primary argument is that merely invoking "the educational benefits of diversity" is sufficient and that it need not identify any metric that would allow a court to determine whether its plan is needed to serve, or is actually serving, those interests. This is nothing less than the plea for deference that we emphatically rejected.

Justice Alito praised the university for wanting to fight stereotypes, etc. However:

[H]ow will a court ever be able to determine whether stereotypes have been adequately destroyed? Or whether cross-racial understanding has been adequately achieved? If a university can justify racial discrimination simply by having a few employees opine that racial preferences are necessary to accomplish these nebulous goals . . . then the narrow tailoring inquiry is meaningless.

Justice Alito summarized all of UT's blather about the mystic joys of diversity and how to achieve in one sentence: "In other words: Trust us," adding, "This is a plea for deference—indeed, for blind deference—the very thing that the Court rejected in *Fisher I*."

The plaintiff also pointed out that the law requires that UT's race preferences be the last resort; if it can get diversity by some method that *seems* racially neutral—like the 10 percent plan to bootleg non-whites onto the campus—then racial discrimination is illegal. The university says it tried and tried. It "opened new regional admissions centers, increased its recruitment budget by half-a-million dollars, and organized over 1,000 recruitment events"—just to get more non-whites to apply. It just didn't work so it resorted gently to race as a "factor of a factor of a factor" in its beautifully holistic admissions process. The plaintiff wanted to know how we would know if all this recruitment was working or not, but UT again refused to sully the process by "reducing it to pure numbers."

The plaintiff argued that the entire freshman class could have been filled with the 10 percent plan, and that would have achieved diversity without overt discrimination. The university replied—and the Court agreed—that you can't get all the splendor of diversity from class rank alone:

That approach would sacrifice all other aspects of diversity in pursuit of enrolling a higher number of minority students. A system that selected every student through class rank alone would exclude the star athlete or musician whose grades suffered because of daily practices and training. It would exclude a talented young biologist

who struggled to maintain above-average grades in humanities classes. And it would exclude a student whose freshman-year grades were poor because of a family crisis but who got herself back on track in her last three years of school, only to find herself just outside of the top decile of her class.

Those liberal justices know how to lay it on thick, don't they? And they really laid it on in their conclusion. The university:

> should remain mindful that diversity takes many forms. Formalistic racial classifications may sometimes fail to capture diversity in all of its dimensions and, when used in a divisive manner, could undermine the educational benefits the University values. . . . [T]he University must tailor its approach in light of changing circumstances, ensuring that race plays no greater role than is necessary to meet its compelling interest.

Justice Alito, for one, can't imagine the admissions committee agonizing over whether race preferences have become "divisive." As he noted in his dissent, the university "has generally employed race and ethnicity in the most aggressive manner permitted under controlling precedent," and that the moment the *Grutter* decision was announced, "UT leapt at the opportunity to reinsert race into the process."

He also pointed out that at various points in the litigation the university has offered several other reasons to justify racial preferences: diversity in specific classrooms, making sure there are enough blacks and Hispanics so they won't feel lonely, and making sure UT reflects the racial mix of the state. None of these, he pointed out, is necessarily a "compelling interest," nor were they presented as clear enough goals so that their achievement by "narrowly tailored" means could even be measured.

Justice Alito also noted that although UT refuses to divulge the numbers that would reflect that happy day when diversity finally comes, it is happy to cite figures to show it hasn't been achieved. For example, it produced a study of certain classes of five students or more that:

> indicated that 52% of these classes had no African-Americans, 16% had no Asian-Americans, and 12% had no Hispanics. . . . Based on this study, UT concluded that it had a "compelling educational interest" in employing racial preferences to ensure that it did not "have large numbers of classes in which there are no students–or only a single student–of a given underrepresented race or ethnicity."

No non-whites in a class is bad because all those benighted white people will miss their dose of diversity. Only one non-white is no good either, because he might feel "isolated" or think he had to be a "spokesperson" for his race. So at various points in the litigation UT proposed a "critical mass" theory of diversity that would spread its benefits to as many classes as possible and also make sure non-whites aren't lonely.

Justice Alito saw through this. *Never*, he pointed out, had UT ever played the race-preferences game to get more non-whites into specific classes (Physics? Astronomy? Organic Chemistry?) where blacks and Hispanics were scarce. The object was always simply to bring in more "underrepresented minorities," who were welcome to all clump together in Sociology of Sports or Racism in America. Also, as Justice Alito pointed out, there are *fewer* Asians on campus than Hispanics—but Asians are both way overrepresented compared to their population in the state and *victims* of race preferences, just like whites. If you want a "critical mass" of Asians, Justice Alito wrote, it would be easy to get it, but UT seems to think that Asians just don't bear the same gifts of diversity that blacks and Hispanics do. Apparently they don't get lonely, either. (In 2008, for example, UT enrolled 1,338 Hispanic freshmen and 1,249 Asian freshmen. The state as a whole was 39.6 percent Hispanic and 3.8 percent Asian.)

Justice Alito pointed out that UT's briefs mention Asians so rarely it's almost as if they don't exist. Of course, this is because Asian achievement refutes all of UT's buncombe about how diversity can't be achieved without racial discrimination.

Justice Alito put up a good fight, but he shouldn't have been surprised at the outcome. He should have known that anything short of an outright ban on race preferences will guarantee entrenched discrimination against whites. The Supreme Court can intone all it wants about "strict scrutiny" and "narrow tailoring." *Any* exception will be ruthlessly exploited, and Justice Alito should have known that.

I predict no more "affirmative action" Supreme Court cases for years to come. The Court has spoken: Discrimination against is whites is legal under certain circumstances, and if you shop around for the right judge, those circumstances can be pretty broad. At least discrimination against whites is not yet mandatory. If Democrats continue to appoint the justices, the next big "affirmative action" case could be whether universities should be *required* to discriminate against whites.

In *Fisher II*, as usual, Justice Clarence Thomas was the only one on the bench who was thinking straight. He agreed with Justice Alito's dissent, but wasted no time of his own on the finer points

3/15/2021                    Discrimination Against Whites Still Legal - American Renaissance

of when discrimination is illegal and when it is sufficiently opaque. In a simple, one-page dissent, he wrote that if it were up to him, he would overturn *Grutter* and ban all discrimination.

Of course, it is only in our insane, topsy-turvy world that Justice Thomas sounds like a hero. In a properly race-conscious world, individuals and at least private organizations would discriminate entirely as they saw fit. Far-seeing whites should think carefully about arguments against discrimination *in principle* because discrimination, private and even public, is necessary to our survival. In cases such as *Fisher*, we are drawn to anti-discrimination arguments because the only acceptable, legal targets of public discrimination are *ourselves*. Such is the astonishing, absurd, and suicidal fix we whites have gotten ourselves into while we are still, for the time being, the majority.

---

Topics: <u>Featured</u>, <u>Race and Universities</u>, <u>Racial Preferences in Education</u>

---

## About Jared Taylor

*VIEW ALL POSTS BY JARED TAYLOR*

Jared Taylor is the editor of American Renaissance and the author of <u>Paved With Good Intentions</u>, <u>White Identity</u>, and <u>If We Do Nothing</u>.

## You Might Also Like



SBA000133

3/15/2021                    Discrimination Against Whites Still Legal - American Renaissance

## American Renaissance Comment Policy

Strict Comment Policy: no links, videos, images, or commenting as a guest. Some posts deleted automatically.

Please read our Comment Policy before commenting.



Comments for this thread are now closed                                                    ✕

**151 Comments**      **American Renaissance**      🔒 **Disqus' Privacy Policy**          🔴 **Login** ▾

♡ **Recommend**  4          🐦 Tweet          f Share                              Sort by Oldest ▾

Load more comments



✉ Subscribe      ⊙ Add Disqus to your siteAdd DisqusAdd      ⚠ Do Not Sell My Data

## Blog

**I Felt Total Joy as I Saw Him Die**

**Murder in America**

**Photos: Minneapolis Braces for the Trial of Derek Chauvin**

**I'm an Academic — and a Race Realist**

## Commentary

**Why Europe Should Speak Latin**

**The Wussification of the West: Will We Ban Shakespeare for Othello and Shylock?**

**When Integration Means Ruination**

**The Emerging Existential Crisis at the Border**

## Videos

**Joe Biden: Already Hard at Work Wrecking the Country**

**The Terrible Cost of Willful Ignorance**

SBA000134

3/15/2021                    Discrimination Against Whites Still Legal - American Renaissance

## Podcasts

**Here They Come — Dreamers to Be**

**Terror at the Capitol!**

## Follow us

   







SBA000164

<hr>

**The Kennedy Privacy Law Firm**

<hr>

1050 30th Street, NW
Washington, DC 20007
www.kennedyonprivacy.com

Charles H. Kennedy
Phone: (202) 250-3704
Mobile: (202) 450-0708
ckennedy@kennedyonprivacy.com

November 5, 2021

VIA UPS

Richard D. Fairbank, Chairman and CEO
Capital One Financial Corp.
16800 Capital One Drive
McLean, VA   22102-3491

Dear Mr. Fairbank:

I am writing to bring to your attention a recent, arbitrary and unlawful decision by your bank, in the hope that it can be speedily corrected.

My client in this matter is New Century Foundation ("NCF"), an IRS-recognized 501(c)(3) non-profit educational organization. NCF received a Payment Protection Plan loan through Capital One Bank (Capital One Loan number 117900115361). My client complied with all the terms of the Small Business Administration ("SBA") program and applied – once again through Capital One – for loan forgiveness. On November 1, 2021, NCF received the following notice from your bank:

> Capital One believes the borrower is in violation of the Civil Rights requirement listed in SBA Form 2483, requiring compliance with 13 CFR Parts 112, 113, and 117, and that borrower was ineligible for its PPP loan.

The cited sections of the Code of Federal Regulations prohibit acts of discrimination on the basis of race, sex, national origin, and other forbidden grounds by any SBA loan or grant recipient in carrying out its activities. In denying loan forgiveness, Capital One did not cite a single instance of such discrimination by NCF, and in fact there has never been such discrimination.

As you must know, a lender's decisions under the Paycheck Protection Program must be made in good faith. Failure to act in good faith removes a lender's immunity from enforcement actions and regulatory penalties related to the lender's participation in the program. (PPP Interim Final Rule, 13 CFR Parts 113, 120 and 121, III.A.) Capital One's denial of loan forgiveness on the

SBA000165

Richard D. Fairbank
November 5, 2021

basis of its asserted "belief," unsubstantiated by reference to any fact, that NCF has engaged in unlawful discrimination belies your bank's claim to have conducted a "good faith review" of NCF's loan forgiveness application. Instead, Capital One appears to have made a statement to my client and the SBA with, at best, indifference as to that statement's truth or falsity. This constitutes a bad-faith failure to carry out your bank's responsibilities under the program.

Also, in the absence of any support for your stated "belief" that NCF engaged in acts of discrimination, my client can only conclude that your bank's denial of loan forgiveness is based upon your disagreement with viewpoints expressed in NCF's publications and elsewhere. You should consider that lenders participate in the PPP under authority delegated to them by the SBA, and that a government agency may not delegate to a private party the authority to take any action that the agency, itself, is not permitted to take. (PPP Interim Final Rule, 13 CFR Parts 113, 120 and 121, III.A and p. 63 of Interim Rule as published by the SBA.) In the case of your denial of loan forgiveness to NCF, you not only have exceeded your delegated authority, but you have implicated the SBA in an unlawful denial of rights guaranteed by the First Amendment to the United States Constitution.

Unless you can come forward with evidence that NCF, at any time and in any fashion, has violated the Civil Rights laws of the United States, we insist that you grant NCF's loan forgiveness application and withdraw the false Denial Justification you furnished to the SBA.

Sincerely yours,

Charles H. Kennedy

cc: Matt Cooper, General Counsel, Capital One

File: NCF_Letter_to_Capital_One.pdf    [2021/12/15 15:15:45]    156 of 179



**SMALL BUSINESS
ADMINISTRATION
WASHINGTON, DC 20416**

11/08/2021

VIA Forgiveness Platform

Priscilla Smith

Capital One, National Association

Re: Notification of Paycheck Protection Program Loan Review
    Borrower: New Century Foundation
    SBA Loan No. 2075417809
    Loan Approval Amount: $51,600.00
    Loan Approval Date: 05/22/2020
    Lender Forgiveness Decision Submission Date: 11/02/2021

*Dear: Priscilla Smith*

The U.S. Small Business Administration (SBA) is reviewing the above referenced Paycheck Protection Program (PPP) loan. As detailed below, you must respond to this request within 15 business days of the date of this letter. The documentation listed below is necessary and critical to SBA's ability to decision forgiveness. If SBA does not receive a response within 15 days of the date of this letter, or any other requested documentation is still outstanding, SBA will make a decision based on available information. Such a decision may include denial of forgiveness, referral to the Office of Credit Risk Management, and/or transfer of this matter (borrower and lender) to the Inspector General.

Within five business days of receipt of this notification, you must notify the borrower in writing that SBA has undertaken this review and transmit electronic copies of the following documents to SBA via the Forgiveness Platform.  If any of the following documents were not already provided by the borrower, you must request them from the borrower. Borrowers should respond to the Lender's request for documents within five business days of receipt.

    1. The Borrower Application Form (SBA Form 2483 or Lender's equivalent form) and all supporting documentation submitted by the borrower with the loan application, including 2019 or 2020 payroll documents that demonstrate qualifying average monthly payroll costs.

2. All supporting documentation that the borrower was required to submit to you with its Loan Forgiveness Application, including payroll documentation*, non-payroll documentation, and full-time equivalent employee documentation, if applicable ("Documents that Each Borrower Must Submit with its PPP Loan Forgiveness Application"). You must also request "Documents that Each Borrower Must Maintain but is Not Required to Submit" from the borrower, if the borrower has not already provided these documents.

*For all loans, the 2019 or 2020 IRS Form 1040, Schedule C or F that the borrower provided at the time of the PPP loan application must be used to determine the amount of net profit or proprietor expenses allocated to the owner for the covered period. Therefore, single-employee Schedule C or F borrowers do not have to resubmit this documentation if it was provided with the loan application.*

3. A signed and certified transcript of account (SBA Form 1149 or lender equivalent).

4. A copy of the executed note evidencing the PPP loan.
5. Any memorandum or other analysis that the lender prepared in making its decision on borrower's Loan Forgiveness Application.

SBA may, in the future, request additional information directly from the borrower or require you to contact the borrower in writing to request additional information. The borrower should respond to all requests within five business days of receipt.

As noted above, you must respond to this request within 15 business days from the date of this letter. If the SBA does not receive a response within 15 business days of the date of this letter, or any other requested documentation is still outstanding, the SBA will take further action as indicated above.

Thank you for your anticipated cooperation.

Sincerely,

Office of Financial Program Operations
U.S. Small Business Administration



**SMALL BUSINESS
ADMINISTRATION
WASHINGTON, DC 20416**

11/26/2021

VIA Forgiveness Platform

Priscilla Smith

Capital One, National Association

Re: PPP Request for Production of Documents and Information
    Borrower: New Century Foundation
    SBA Loan No. 2075417809
    Loan Approval Amount: $51,600.00
    Loan Approval Date: 05/22/2020
    Lender Forgiveness Decision Submission Date: 11/02/2021

*Dear: Priscilla Smith*

The U.S. Small Business Administration (SBA) is requesting additional documents or information for its review of the above-referenced Paycheck Protection Program (PPP) loan.

This request is in addition to the documentation requested in the Notification of Paycheck Protection Program Loan Review.

As detailed below, you must respond to this request within 15 business days of the date of this letter. If SBA does not receive a response within 15 business days of the date of this letter, or any other requested documentation is still outstanding, SBA will make a decision based on available information. Such a decision may include denial of forgiveness, referral to the Office of Credit Risk Management, and/or transfer of this matter (borrower and lender) to the Inspector General.

You must notify the borrower in writing to request the additional documents or information listed below within five business days of your receipt of this request. The borrower should respond to these requests within ten business days of receipt. You must submit the documents and information provided by the borrower to SBA via the Forgiveness Platform within five business days of receipt from the borrower.

---

SBA requests the following documents or information from the borrower:

**We are doing a thorough review of all documentation provided for the above referenced PPP loan forgiveness application.  Based on our preliminary findings of the review, we are considering recommending a Full Denial. Please understand our recommendation is preliminary and will undergo more processing before reaching a final decision. We are considering this recommendation for the following reason(s):**

- **Ineligible business per SBA guidelines**

**If you have additional information to address the issues mentioned above, please respond to this message In the PPP platform as soon as possible with the ADDITIONAL information.**

**Or if you do not have information to address the issues mentioned above, PLEASE ASK THE BORROWER FOR THIS INFORMATION GIVING THEM TEN (10) BUSINESS DAYS TO RESPOND.**

**We would like to have all information before making a recommendation and forwarding for further processing. If this new information alters our current proposed recommendation, you will be notified of the change.**

**If you have no additional information to provide and the borrower has not responded within the required ten business days, please respond in the PPP platform that you do not have additional information. We have sent this same message through the platform.**

As noted above, you must respond to this request within 15 business days from the date of this letter. If the SBA does not receive a response within 15

SBA000176

business days of the date of this letter, or any other requested documentation is still outstanding, the SBA will take further action as indicated above. Further, the SBA may, in the future, request additional information directly from the borrower or require you to contact the borrower in writing to request additional information.

Thank you for your cooperation.

Sincerely,

Office of Financial Program Operations
U.S. Small Business Administration

SBA000177



**SMALL BUSINESS
ADMINISTRATION
WASHINGTON, DC 20416**

12/15/2021

VIA Forgiveness Platform

Priscilla Smith

Capital One, National Association

Re: PPP Request for Production of Documents and Information
    Borrower: New Century Foundation
    SBA Loan No. 2075417809
    Loan Approval Amount: $51,600.00
    Loan Approval Date: 05/22/2020
    Lender Forgiveness Decision Submission Date: 11/02/2021

*Dear: Priscilla Smith*

The U.S. Small Business Administration (SBA) is requesting additional documents or information for its review of the above-referenced Paycheck Protection Program (PPP) loan.

This request is in addition to the documentation requested in the Notification of Paycheck Protection Program Loan Review.

As detailed below, you must respond to this request within 20 business days of the date of this letter. If SBA does not receive a response within the stated period , or any other requested documentation is still outstanding, SBA will make a decision based on available information. Such a decision may include denial of forgiveness, referral to the Office of Credit Risk Management, and/or transfer of this matter (borrower and lender) to the Inspector General.

If any of the following documents were not already provided by the borrower, you must request them from the borrower. The borrower should respond to these requests within 10 business days of receipt. You must submit the documents and information provided by the borrower to SBA via the Forgiveness Platform.

SBA requests the following documents or information from the borrower:

**Reopening for documentation uploads per lender request to platform inbox, 12/15.**

As noted above, if the SBA does not receive a response within 20 business days of the date of this letter, or any other requested documentation is still outstanding, the SBA will take further action as indicated above. Further, the SBA may, in the future, request additional information directly from the borrower or require you to contact the borrower in writing to request additional information.

Thank you for your cooperation.

Sincerely,

Office of Financial Program Operations
U.S. Small Business Administration

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180


THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net



### Paycheck Protection Program
### Borrower Application Form

OMB Control No.: 3245-0407
Expiration Date: 09/30/2020

| Check One: | ☐ Sole proprietor ☐ Partnership ☐ C-Corp ☐ S-Corp ☐ LLC ☐ Independent contractor ☐ Eligible self-employed individual ☒ 501(c)(3) nonprofit ☐ 501(c)(19) veterans organization ☐ Tribal business (sec. 31(b)(2)(C) of Small Business Act) ☐ Other | DBA or Tradename if Applicable |
|---|---|---|
| | | American Renaissance |

| Business Legal Name |
|---|
| New Century Foundation |

| Business Address | Business TIN (EIN, SSN) | Business Phone |
|---|---|---|
| PO Box 527 | 616212159 | (703)7160900 |
| Oakton                                VA    22124 | **Primary Contact** SAMUEL  TAYLOR | **Email Address** wolff@nc-f.org |

| Average Monthly Payroll: | $ 20679.48 | x 2.5 + EIDL, Net of Advance (if Applicable) Equals Loan Request: | $ 51,600 | Number of Employees: 5 |
|---|---|---|---|---|

| Purpose of the loan (select more than one): | ☒ Payroll ☐ Lease / Mortgage Interest ☐ Utilities ☐ Other (explain): |
|---|---|

### Applicant Ownership

List all owners of 20% or more of the equity of the Applicant. Attach a separate sheet if necessary.

| Owner Name | Title | Ownership % | TIN (EIN, SSN) | Address |
|---|---|---|---|---|
| | | | | |
| | | | | |

*If questions (1) or (2) below are answered "Yes," the loan will not be approved.*

| Question | Yes | No |
|---|---|---|
| 1. Is the Applicant or any owner of the Applicant presently suspended, debarred, proposed for debarment, declared ineligible, voluntarily excluded from participation in this transaction by any Federal department or agency, or presently involved in any bankruptcy? | ☐ | ☒ |
| 2. Has the Applicant, any owner of the Applicant, or any business owned or controlled by any of them, ever obtained a direct or guaranteed loan from SBA or any other Federal agency that is currently delinquent or has defaulted in the last 7 years and caused a loss to the government? | ☐ | ☒ |
| 3. Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business? If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A. | ☐ | ☒ |
| 4. Has the Applicant received an SBA Economic Injury Disaster Loan between January 31, 2020 and April 3, 2020? If yes, provide details on a separate sheet identified as addendum B. | ☐ | ☒ |

*If questions (5) or (6) are answered "Yes," the loan will not be approved.*

| Question | Yes | No |
|---|---|---|
| 5. Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, or on probation or parole? | ☐ | ☒ |
| Initial here to confirm your response to question 5 → *ST* | | |
| 6. Within the last 5 years, for any felony, has the Applicant (if an individual) or any owner of the Applicant 1) been convicted; 2) pleaded guilty; 3) pleaded nolo contendere; 4) been placed on pretrial diversion; or 5) been placed on any form of parole or probation (including probation before judgment)? | ☐ | ☒ |
| Initial here to confirm your response to question 6 → *ST* | | |
| 7. Is the United States the principal place of residence for all employees of the Applicant included in the Applicant's payroll calculation above? | ☒ | ☐ |
| 8. Is the Applicant a franchise that is listed in the SBA's Franchise Directory? | ☐ | ☒ |

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

**THIS IS A COPY**
The Authoritative Copy of this record is held at na2.docusign.net



**Paycheck Protection Program**
**Borrower Application Form**

## By Signing Below, You Make the Following Representations, Authorizations, and Certifications

CERTIFICATIONS AND AUTHORIZATIONS

I certify that:

- I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them.
- The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule).
- The Applicant (1) is an independent contractor, eligible self-employed individual, or sole proprietor or (2) employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry.
- I will comply, whenever applicable, with the civil rights and other limitations in this form.
- All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule.
- To the extent feasible, I will purchase only American-made equipment and products.
- The Applicant is not engaged in any activity that is illegal under federal, state or local law.
- Any loan received by the Applicant under Section 7(b)(2) of the Small Business Act between January 31, 2020 and April 3, 2020 was for a purpose other than paying payroll costs and other allowable uses loans under the Paycheck Protection Program Rule.

For Applicants who are individuals: I authorize the SBA to request criminal record information about me from criminal justice agencies for the purpose of determining my eligibility for programs authorized by the Small Business Act, as amended.

CERTIFICATIONS

The authorized representative of the Applicant must certify in good faith to all of the below by **initialing** next to each one:

*ST*    The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.

*ST*    Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

*ST*    The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

*ST*    The Applicant will provide to the Lender documentation verifying the number of full-time equivalent employees on the Applicant's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan.

*ST*    I understand that loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the forgiven amount may be for non-payroll costs.

*ST*    During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program.

*ST*    I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

*ST*    I acknowledge that the lender will confirm the eligible loan amount using required documents submitted. I understand, acknowledge and agree that the Lender can share any tax information that I have provided with SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of compliance with SBA Loan Program Requirements and all SBA reviews.

DocuSigned by:

*Samuel Taylor*
_____
Signature of Authorized Representative of Applicant

6/10/2020
_____
Date

SAMUEL TAYLOR
_____
Print Name

President
_____
Title

SBA000181

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net



**Paycheck Protection Program**
**Borrower Application Form**

**Purpose of this form:**

This form is to be completed by the authorized representative of the Applicant and ***submitted to your SBA Participating Lender***. Submission of the requested information is required to make a determination regarding eligibility for financial assistance. Failure to submit the information would affect thatdetermination.

**Instructions for completing this form:**

With respect to "purpose of the loan," payroll costs consist of compensation to employees (whose principal place of residence is the United States) in the form of salary, wages, commissions, or similar compensation; cash tips or the equivalent (based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums, and retirement; payment of state and local taxes assessed on compensation of employees; and for an independent contractor or sole proprietor, wage, commissions, income, or net earnings from self-employment or similar compensation.

For purposes of calculating "Average Monthly Payroll," most Applicants will use the average monthly payroll for 2019, excluding costs over $100,000 on an annualized basis for each employee. For seasonal businesses, the Applicant may elect to instead use average monthly payroll for the time period between February 15, 2019 and June 30, 2019, excluding costs over $100,000 on an annualized basis for each employee. For new businesses, average monthly payroll may be calculated using the time period from January 1, 2020 to February 29, 2020, excluding costs over $100,000 on an annualized basis for each employee.

If Applicant is refinancing an Economic Injury Disaster Loan (EIDL): Add the outstanding amount of an EIDL made between January 31, 2020 and April 3, 2020, less the amount of any "advance" under an EIDL COVID-19 loan, to Loan Request as indicated on the form.

All parties listed below are considered owners of the Applicant as defined in 13 CFR § 120.10, as well as "principals":

- For a sole proprietorship, the sole proprietor;

- For a partnership, all general partners, and all limited partners owning 20% or more of the equity of the firm;

- For a corporation, all owners of 20% or more of the corporation;

- For limited liability companies, all members owning 20% or more of the company; and

- Any Trustor (if the Applicant is owned by a trust).

**Paperwork Reduction Act** – You are not required to respond to this collection of information unless it displays a currently valid OMB Control Number. The estimated time for completing this application, including gathering data needed, is 8 minutes.  Comments about this time or the information requested should be sent to : Small  Business Administration, Director, Records Management Division, 409 3rd St., SW, Washington DC 20416., and/or SBA Desk Officer, Office of Management and Budget, New Executive Office Building, Washington DC 20503.

**Privacy Act (5 U.S.C. 552a)** – Under the provisions of the Privacy Act, you are not required to provide your social security number. Failure to provide your social security number may not affect any right, benefit or privilege to which you are entitled. (But see Debt Collection Notice regarding taxpayer identification number below.) Disclosures of name and other personal identifiers are required to provide SBA with sufficient information to make a character determination.  When evaluating character, SBA considers the person's integrity, candor, and disposition toward criminal actions. Additionally, SBA is specifically authorized to verify your criminal history, or lack thereof, pursuant to section 7(a)(1)(B), 15 USC Section 636(a)(1)(B) of the Small Business Act (the Act).

**Disclosure of Information** – Requests for information about another party may be denied unless SBA has the written permission of the individual to release the information to the requestor or unless the information is subject to disclosure under the Freedom of Information Act. The Privacy Act authorizes SBA to make certain "routine uses" of information protected by that Act. One such routine use is the disclosure of information maintained in SBA's system of records when this information indicates a violation or potential violation of law, whether civil, criminal, or administrative in nature. Specifically, SBA may refer the information to the appropriate agency, whether Federal, State, local or foreign, charged with responsibility for, or otherwise involved in investigation, prosecution, enforcement or prevention of such violations. Another routine use is disclosure to other Federal agencies conducting background checks but only to the extent the information is relevant to the requesting agencies' function. See, 74 F.R. 14890 (2009), and as amended from time to time for additional background and other routine uses. In addition, the CARES Act, requires SBA to register every loan made under the Paycheck Protection Act using the Taxpayer Identification Number (TIN) assigned to the borrower.

**Debt Collection Act of 1982, Deficit Reduction Act of 1984 (31 U.S.C. 3701 et seq. and other titles)** – SBA must obtain your taxpayer identification number when you apply for a loan. If you receive a loan, and do not make payments as they come due, SBA may: (1) report the status of your  loan(s) to credit bureaus, (2) hire a collection agency to collect your loan, (3) offset your income tax refund or other amounts due to you from the Federal Government, (4) suspend or debar you or your company from doing business with the Federal Government, (5) refer your loan to the Department of Justice, or (6) foreclose on collateral or take other action permitted in the loan instruments.

**Right to Financial Privacy Act of 1978 (12 U.S.C. 3401)** – The Right to Financial Privacy Act of 1978, grants  SBA access rights to financial records held by financial institutions that are or have been doing business with you or your business including any financial

SBA000182

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net



**Paycheck Protection Program**
**Borrower Application Form**

institutions participating in a loan or loan guaranty. SBA is only required provide a certificate of its compliance with the Act to a financial institution in connection with its first request for access to your financial records. SBA's access rights continue for the term of any approved loan guaranty agreement. SBA is also authorized to transfer to another Government authority any financial records concerning an approved loan or loan guarantee, as necessary to process, service or foreclose on a loan guaranty or collect on a defaulted loan guaranty.

**Freedom of Information Act (5 U.S.C. 552)** – Subject to certain exceptions, SBA must supply information reflected in agency files and records to a person requesting it. Information about approved loans that will be automatically released includes, among other things, statistics on our loan programs (individual borrowers are not identified in the statistics) and other information such as the names of the borrowers (and their officers, directors, stockholders or partners), the collateral pledged to secure the loan, the amount of the loan, its purpose in general terms and the maturity. Proprietary data on a borrower would not routinely be made available to third parties. All requests under this Act are to be addressed to the nearest SBA office and be identified as a Freedom of Information request.

**Occupational Safety and Health Act (15 U.S.C. 651 et seq.)** – The Occupational Safety and Health Administration (OSHA) can require businesses to modify facilities and procedures to protect employees. Businesses that do not comply may be fined, forced to cease operations, or prevented from starting operations. Signing this form is certification that the applicant, to the best of its knowledge, is in compliance with the applicable OSHA requirements, and will remain in compliance during the life of the loan.

**Civil Rights (13 C.F.R. 112, 113, 117)** – All businesses receiving SBA financial assistance must agree not to discriminate in any business practice, including employment practices and services to the public on the basis of categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations. All borrowers must display the "Equal Employment Opportunity Poster" prescribed by SBA.

**Equal Credit Opportunity Act (15 U.S.C. 1691)** – Creditors are prohibited from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status or age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.

**Debarment and Suspension Executive Order 12549; (2 CFR Part 180 and Part 2700)** – By submitting this loan application, you certify that neither the Applicant or any owner of the Applicant have within the past three years been: (a) debarred, suspended, declared ineligible or voluntarily excluded from participation in a transaction by any Federal Agency; (b) formally proposed for debarment, with a final determination still pending; (c) indicted, convicted, or had a civil judgment rendered against you for any of the offenses listed in the regulations or (d) delinquent on any amounts owed to the U.S. Government or its instrumentalities as of the date of execution of this certification.



4

SBA000183

DocuSign Envelope ID: F5A8F600-918B-41B5-B2A4-685C21772180

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.net

**(Optional)**
**Additional Applicant Ownership Details**

(Continued from the table above in the event of more than two owners with 20% or more of equity)

List all owners of 20% or more of the equity of the Applicant. Attach a separate sheet if necessary.

| Owner Name | Title | Ownership % | TIN (EIN, SSN) | Address |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |



COPY VIEW

SBA000184

SBA000185

OMB NO: 3245-0132
Expiration Date: 05/31/2024

## U.S. Small Business Administration
### Lender's Transcript of Account

| Name of Borrower | | Loan Number |
|---|---|---|
| New Century Foundation | | 2075417809 |

| Name of Lender | Amount of Loan | Int. Day Basis |
|---|---|---|
| Capital One | $51,600.00 | Actual/360 |

**Repayment Terms as Stated in the Note**

NOTE DATED: 06/10/2020, MATURITY DATE: 06/10/2022, INTEREST RATE: 1.00%, PRINCIPAL AND INTEREST PAYABLE: MIN PAYMENT: $25,832.61, PAYOFF AS OF: 11/10/2021: $52,339.59, PRINCIPAL: $51,600.00, INTEREST: $739.59

**Approved Deferment Periods:** 06/10/2020 - 05/10/2022

**Default Date (Next Payment Due Date):** N/A

| Date | Amount Disbursed | Amount Repaid | Deferment | Application of Payment | | Int. Rate | Interest Paid | | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Principal | Interest | | From | To | |
| 06/10/2020 | $51,600.00 | | B: 06/10/2020 E: 05/10/2022 | | | 1.00% | | | $51,600.00 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

I Certify This to be a True Copy of Transcript of Account

*Joseph French*
Signature

Authorized Representative for Capital One
Title

Date
11/10/2021

SBA Form 1149 (5-21) REF SOP 50-57 Previous Editions Obsolete    **See Reverse Side for Instructions**
(This form is a necessary part of the SBA GUARANTY PURCHASE package.)

INSTRUCTIONS FOR COMPLETION
OF TRANSCRIPT OF ACCOUNT

SBA uses this information to assist in determining the date the loan went into default and to assess how much interest is payable to the lender. The information is also used to determine whether the loan was properly disbursed and serviced, and whether payments were applied to principal and interest in compliance with the Loan Guaranty Agreement, and the terms and conditions of the loan authorization.

1. <u>NAME OF BORROWER:</u> Enter the trade name of the borrower or the name of the borrower if a trade name is not used.

2. <u>LOAN NUMBER:</u> Enter the ten-digit SBA loan number.

3. <u>NAME OF LENDER:</u> Enter the name of the lender.

4. <u>AMOUNT OF LOAN:</u> Enter the total approved amount of the loan.

5. <u>INTEREST DAY BASIS:</u> Enter the method used for the interest computation, such as 30/365 or actual/365.

6. <u>REPAYMENT TERMS:</u> Enter the payment terms provided in the Note.

   Note dated _____ Maturity Date_____ Interest Rate_____ Principal and

   Interest_____ Payable_____ or Principal_____ plus Interest payable_____

7. <u>DATE:</u> Enter the date of each transaction on the loan account.

8. <u>AMOUNT DISBURSED:</u> Enter the amount of each loan disbursement.

9. <u>AMOUNT REPAID:</u> Enter the amount of each repayment made by the borrower.

10. <u>DEFERMENT:</u> For start of deferment enter "B" (for "Begin") in this column plus the date in the Date column. For end of deferment enter "E" (for "End") in this column and the date in the Date column.

11. <u>APPLICATION OF PAYMENT:</u> Enter the amounts applied to principal and interest for each repayment made by the borrower.

12. <u>INTEREST RATE:</u> Enter the interest rate in effect at the time the payment was applied on the loan account.

13. <u>INTEREST PAID:</u> Enter the "from" and "to" dates used in computing the interest paid on the loan. These dates should be in consecutive order.

14. <u>PRINCIPAL BALANCE:</u> Enter the principal balance after each transaction.

15. <u>SIGNATURE AND TITLE:</u> Certification of official representative of the lender that the transcript of account is correct and shows the principal balance due on the loan and that interest has been paid to the date shown on the transcript.

16. <u>DATE:</u> Enter the date of the certification.

17. <u>SUBMISSION:</u> Submit the original copy (or scanned copy of the original) to the SBA servicing center handling the account along with the purchase request. Retain a copy for your files. The servicing centers are the National Guaranty Purchase Center located at 1145 Herndon Parkway, Suite 135, Herndon, VA 20170, fax: 202-481-4674, email: SBApurchase@sba.gov; the SBA Commercial Loan Service Center East located at 2120 Riverfront Drive, Suite 100, Little Rock, AR 72202, fax: 202-292-3878, email: LRSC.expresspurchase@sba.gov; and the SBA Commercial Loan Servicing Center West located at 801 R Street, Suite 101, Fresno, CA 93721, fax: 202-481-0663, email: FSC.purchasing@sba.gov.

**PLEASE NOTE:** The estimated burden for completing this form is 2 hours per response. You are not required to respond to any collection of information unless it displays a currently valid OMB approval number (3245-0132). Questions or comments on the burden should be sent to U.S. Small Business Administration, Director, Records Management Division, 409 3rd St., S.W., Washington D. C. 20416 and Desk Officer for the Small Business Administration, Office of Management and Budget, New Executive Office Building, Room 10202, Washington, DC 20503. **PLEASE DO NOT SEND FORMS TO OMB.**

SBA Form 1149 (5-21)

**Gogo, Lorena L. (Contractor)**

| | |
|---|---|
| **From:** | Gogo, Lorena L. (Contractor) |
| **Sent:** | Friday, November 26, 2021 10:27 AM |
| **To:** | yesim.ozalindesousa@capitalone.com; renu.sharma@capitalone.com; leslie.lindsey@capitalone.com; katherine.coelho@capitalone.com; mary.brooks@capitalone.com; swathi.thota@capitalone.com; joseph.french@capitalone.com; priscilla.smith@capitalone.com |
| **Subject:** | New Century Foundation SBA#2075417809 - Full Denial Recommendation for Forgiveness Amount |

Subject:   SBA LOAN NAME: New Century Foundation
SBA LOAN NUMBER:   2075417809
Considering Full Denial Recommendation for Forgiveness Amount

We are doing a thorough review of all documentation provided for the above referenced PPP loan forgiveness application.  Based on our preliminary findings of the review, we are considering recommending a Full Denial.  **Please understand our recommendation is preliminary and will undergo more processing before reaching a final decision.** We are considering this recommendation for the following reason(s):

- **Ineligible business per SBA guidelines**

If you have additional information to address the issues mentioned above, **PLEASE RESPOND TO THIS MESSAGE IN THE PPP PLATFORM AS SOON AS POSSIBLE WITH THE ADDITIONAL INFORMATION**.

Or if you do not have information to address the issues mentioned above, **PLEASE ASK THE BORROWER FOR THIS INFORMATION GIVING THEM TEN (10) BUSINESS DAYS TO RESPOND.**

We would like to have all information before making a recommendation and forwarding for further processing. If this new information alters our current proposed recommendation, you will be notified of the change.

If you have no additional information to provide and the borrower has not responded within the required ten business days, **PLEASE RESPOND IN THE PPP PLATFORM THAT YOU DO NOT HAVE ADDITIONAL INFORMATION. We have sent this same message through the platform.**

Sincerely,

Lorena Gogo
Loan Specialist
Little Rock Commercial Loan Servicing Center
**U.S. Small Business Administration**
lorena.gogo@sba.gov



Home Page | Twitter | Instagram | Facebook | YouTube | LinkedIn | Email Alerts

1

SBA000188

**How are we doing? Please click here to give us your feedback!**

DISCLAIMER:
The information being provided above is derived solely from Agency records that are submitted by the Agency's participant lenders engaged in making SBA loans. This information is collected by the lenders from SBA loan applicants who provide it on a voluntary basis. It is then forwarded by the lenders to SBA. Since the information is provided by the loan applicants on a voluntary basis, it is not necessarily inclusive of all SBA borrowers, nor can its accuracy be verified by the Agency. Accordingly, SBA cannot make any representation as to the completeness or accuracy of the information provided.

# UNITED STATES SMALL BUSINESS ADMINISTRATON
# Office of Hearings and Appeals

PAYCHECK PROTECTION PROGRAM
APPEAL OF:

NEW CENTURY FOUNDATION

      Appellant

Appealed from
SBA PPP Loan No. 2075417809

Issued:  June 16, 2022

Decision No. 2075417809

## APPEARANCES

Samuel Taylor, Borrower/Appellant, 2705 Green Holly Springs Ct., Oakton, VA 22124

## DECISION

On January 02, 2022, the U.S. Small Business Administration (SBA) Office of Capital Access issued a final Paycheck Protection Program (PPP) loan review decision finding New Century Foundation ineligible for the full PPP Forgiveness loan amount.

On January 28, 2022, Appellant filed the instant appeal from that final SBA loan review decision. Appellant argues that the Final SBA Loan Review Decision is clearly erroneous, and requests that OHA reverse it, and find Appellant is eligible for PPP loan forgiveness.

For the reasons discussed *infra*, I find Appellant is ineligible for the amount PPP loan received due to discrimination despite certifying on the Form 2483 its business agreed not to discriminate in any business practice, including employment practices and services to the public on the basis of categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA regulations, rules, policy, federal statutes and case law.

## 1.  JURISDICTION

In March 2020, in response to the Covid-19 pandemic and the resulting economic upheaval, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. 116-136, 134 Stat. 281 (2020). See *Nat'l Assn of Home Builders v. U.S. SBA*, No. 20-11780, 2021 WL 4458660, at *1 (E.D. Mich. Sept. 28, 2021), appeal docketed, No. 21-1765 (6th Cir. Nov. 30, 2021). Section 1102 of the Act established the Paycheck Protection Program (the Program), which was "intended to help businesses cover expenses and make payroll for their workers to keep them employed during the pandemic" by loaning money to eligible small businesses. *Nat'l Assn.* 2021 WL 4458660, at *1. Importantly, "if the loaned funds are used for

SBA000190

2075417809

specified expenses," the borrowing business could receive forgiveness of its loan. *In re Gateway Radiology Consultants, P.A.,* 983 F.3d 1239, 1247 (11th Cir. 2020).3 Congress first authorized $349 billion in loans. CARES Act § 1102(b)(1). One month later, it upped this figure to $659 billion.4 Paycheck Protection and Health Care Enhancement Act, Pub. L. No. 116-139, § 101(a)(1), 134 Stat. 620 (2020).

The CARES Act, provides that, "[e]xcept as otherwise provided," "the [SBA] Administrator may guarantee" PPP loans "under the same terms, conditions, and processes" as other Section 7(a) loans. See CARES Act § 1102, 134 Stat. at 287 (codified at 15 U.S.C. § 636(a)(36)(B). Congress authorized SBA to issue implementing regulations. CARES Act § 1114 (codified at 15 U.S.C. § 9012). Shortly thereafter SBA implemented and issued several interim final rules under the Program

Congress placed the Program under Section 7(a) of the Small Business Act, making the SBA the agency entrusted to administer the Program. See CARES Act § 1102(a) Paragraph (36) to 15 U.S.C. § 636(a)). Section 7(a) loans are the SBA's main program for helping small businesses. Gateway, *supra.* 983 F.3d at 1248.

OHA conducts Paycheck Protection Program (PPP) appeals under the authority of 13 C.F.R. part 134 Subpart L.

## II. Background

On June 01, 2020, Appellant signed its PPP loan note application through its Lender, Capital One, National Association, in the amount of $51,600.00 at 1% interest per annum fixed rate (AR 15).

New Century Foundation, a Non-Profit Organization, DBA /Trade Name as American Renaissance list its principal place of business as Box 527, Oakton, VA 22124-0527 (AR 12, 28).
Appellant is an IRS-recognized 501©(3) non-profit educational organization (AR 155).

New Century Foundation list Samuel Taylor, President signed its PPP note loan amount for its business. (AR 16).

Appellant lists 5 employees at time of loan application and 4 employees at time of Forgiveness application (AR 3).

Its NAICS CODE is 813319, designated as Other Social Advocacy Organizations (AR 2).

### Final SBA Loan Review Decision

On January 02, 2022, SBA issued its final loan review decision finding that Appellant was ineligible for full Forgiveness of the PPP loan amount received.

The Appellant received a PPP loan of $51,600.00 and received zero Forgiveness.

SBA has determined that the borrower was ineligible for the PPP loan. The reason(s) for

SBA000191

2075417809

SBA's decision is as follows:

After a review of the documentation provided, the SBA concludes that the borrower's business activities are ineligible per SBA guidelines. To be eligible for a Paycheck Protection Program loan, each Borrower must certify on the Form 2483 that businesses must agree not to discriminate in any business practice, including employment practices and services to the public on the basis of categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations.

Based on the above stated reason(s), SBA has determined that forgiveness in the amount of $0.00 is appropriate.

## B. <u>Appeal</u>

<u>Appellant argues:</u>

On January 28, 2022, Samuel Taylor, President of New Century Foundation (NCF) filed the following appeal document into its appeal case portal (DKT# 2):

Since SBA did not cite examples of discrimination, requiring an appeal amounts to a demand that NCF prove a negative. This is a logical impossibility. It is instead incumbent upon the SBA to submit factual accusations that can be rebutted. SBA cannot make such factual accusations because NCF has never violated 13 C.F.R., Parts, 112, 113, and 117 of SBA Regulations.

In a letter addressed to SBA dated December 14, 2021, the lender, Capital One made specific accusations. If those are the bases for SBA's denial of loan forgiveness — and we can only speculate because SBA itself makes no specific accusations — they are groundless. NCF is a 501(c)3 non-profit educational organization whose primary activities are publishing articles, videos, and podcasts, and hosting conferences.

Its mission is to educate the public on matters of race, race relations, and immigration. NCF is small. It has never had more than five employees, and now has four. In its hiring decisions, NCF considers only the job-related qualifications of the candidate and whether the candidate has knowledge and beliefs consistent with the organization's mission.

In its letter, Capital One cites an online NCF job posting NCF did not even know was still on its website. The last time NCF solicited job applications was in 2017. NCF has had male and female employees, and to its knowledge has never received a job application from anyone belonging to protected categories other than sex, so it would have been impossible to discriminate against anyone in those other categories.

To the extent SBA relied upon the job listing cited by Capital One in reaching its adverse decision, it is punishing speech protected by the First Amendment to the United States Constitution. The job listing did not specify race, gender, or other protected characteristics as a requirement for job applicants; it stated only that candidate for employment should agree with NCF's mission.

An applicant of any race might agree with NCF's mission, and there is no evidence that NCF has or would reject a candidate based on race.

SBA000192

2075417809

This conclusion would be uncontroversial if an organization advertised for employees who agreed with advocacy on behalf of black people, Hispanics, Native Americans, or other people of color. We strongly suspect that neither the SBA nor any other government agency would construe such an advertisement as a civil rights violation, so long as the organization did not use race as a basis for a hiring decision.

Unless SBA can demonstrate that its decision is based upon NCF's conduct, rather than its beliefs, SBA is engaged in unlawful viewpoint discrimination that will be subject to strict scrutiny by a court. NCF engage in forbidden discrimination in its business practices or services to the public. When NCF publishes articles, videos, and podcasts, they are made available publicly on the internet, so it is impossible to discriminate against anyone in any protected class.

NCF has published articles written by people of many backgrounds, including racial minorities. It has published videos and podcasts featuring people of many backgrounds, including racial minorities. Similarly, when NCF hosts conferences, it never discriminates against potential attendees based on any categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations.

It is a matter of public record that people of many backgrounds attend NCF's conferences, including racial minorities. It is also of public record that NCF has had people of many backgrounds speak at its conferences, including racial minorities. It is true that NCF has published articles pointing out that choice is an essential part of freedom. It has published articles arguing that private entities should have the right to choose employees and clients on whatever grounds they see fit.

This constitutionally protected speech does not mean that NCF has ever discriminated against a member of a protected class. Indeed, NCF has never wished to do so, nor has it ever had an opportunity to do so. In sum, SBA claims NCF is ineligible for PPP loan forgiveness because NCF engaged in forbidden discrimination. SBA cited no instances of such discrimination, and there has been none. If SBA believes there has been discrimination, let it offer examples so NCF can respond to them. Otherwise, NCF requests SBA's decision be overturned and NCF's request for PPP loan forgiveness be approved.

In support of NCF's position, a letter dated November 05, 2021,sent to Appellant's Lender, Capital One Financial Corp., The Kennedy Privacy Law Firm alleged that the Lender violated the Civil rights laws of the United States and that its decision to deny NCF of its Forgiveness loan is arbitrary and an unlawful decision.

It accuses the Lender of bad-faith failure to carry out its responsibilities and exceeding its delegated authority under the PPP program. In denying Forgiveness of NCF's loan, The Kennedy Privacy Law Firm contends that the Lender did not cite a single instance of such discrimination by NCF and in fact there has never been such discrimination (AR 155-56).

<u>SBA argues:</u>

On November 26, 2021, SBA requested information from Lender considering a full denial due to Borrower's business ineligibility. SBA's letter stated the following: (AR 41-43).

SBA000193
2075417809

New Century Foundation has violated the civil rights requirements that apply to recipients of PPP loans, including 13 C.F.R. 112 and 113. In its SBA Form 2483 applying for PPP loan, New Century Foundation certified that it would "comply, whenever applicable, with the civil rights and other limitations in this form."  The SBA Form 2438 provides that "[a]ll businesses receiving SBA financial assistance must agree not to discriminate in any business practice, including employment practices and services to the public on the basis of categories cited in 13 C.F.R., Parts 112,113, and 117 of SBA Regulations."

After receiving its PPP loan, New Century Foundation maintained an online job posting for a full-time reporter for its monthly online magazine, American Renaissance, which promotes "race-realism" and describes itself as a "white advocacy" organization. See Exhibit A. The job posting seeks applicants with a "[s]trong commitment to race realism and white advocacy." See Exhibit B. The job posting also requests that applicants submit a cover letter with "[a] brief description of applicant's political views and how he came to them" and "why the applicant believes he would be a good fit for American Renaissance."

This job posting seeking applicants with a "[s]trong commitment to race realism and white advocacy" appears to be a discriminatory employment practice that violates SBA's civil rights requirements. See 13 C.F.R. 112.4 (prohibiting employment discrimination); 13 C.F.R. 112.7 (prohibiting action that subjects an individual to discrimination on the ground of race, color, or national origin, "in any employment practice, including recruitment or recruitment advertising"); 13 C.F.R. 113.3(b) (prohibiting discrimination with regard to employment practices and prohibiting the "use of employment tests or criteria that discriminate on the basis of race, color, …or national origin').

New Century Foundation also appears to be ineligible for a PPP loan because it restricts patronage for any reason other than capacity. See 13 C.F.R. 120.110(i); SOP 50 10 5(K) (effective April 1, 2019). The SOP cross-references SBA's civil rights regulations, including 13 C.F.R. 113.3(a), which prohibits discrimination "with regards to goods, services, or accommodations offered or provided by the aided business or enterprise, whether or not operated for profit, because of race, color, religion, sex, handicap, or national origin."  The SOP indicates, as an example, that a fitness center that markets to one gender would be ineligible absent evidence that the business is in fact open to both men and women, such as "documented membership demographics."

New Century Foundation, which operates American Renaissance and sponsors annual conferences, appears to broadly promote the exclusion of and discrimination against non-white persons. This is supported by the publicly available reports we reviewed by the Southern Poverty Law Center and the Anti-Defamation League, both of which analyzed American Renaissance publications and outlined considerable evidence of New Century Foundation's statements and activities in pursuit of discrimination against non-white perrons. See Exhibit C, Exhibit D.

Additionally, a range of publicly available statements shows New Century Foundation's discriminatory approach. For example, an American Renaissance article posted in May 2020 states that. "[s]o long as blacks and whites continue to live together, whites will pay the high price of sharing their society  with an  inveterately violent racial  minority." See Exhibit E,  A September 2011 article titled "Fade to Brown" states that "[o]ur nation achieved character and

- 5 -

2075417809

greatness precisely because of discrimination," and that "[o]ur ancestors understood that people and races are not interchangeable, and that failure to discriminate would produce a warring mix of incompetents and unassimilable"  See Exhibit F.

Another American Renaissance article, from June 2016, states; "Far-seeing whites should think carefully about arguments against discrimination in principle because discrimination, private and even public, is necessary to our survival. In cases such as *Fisher*, we are drawn  to anti-discrimination arguments because the only acceptable, legal targets of public discrimination are ourselves. Such is the astonishing, absurd, and suicidal fix we whites have gotten ourselves into while we are still, for the time being, the majority."  *See Exhibit G.* Submitted are Exhibits A thru G (AR 42-129).

III.  Discussion

A.  Standard of Review

Appellant has the burden of proving all elements of the appeal. Specifically, Appellant must prove that the SBA final loan review decision is based upon a clear error of fact or law. 13 C.F.R. § 134.1210.

B.  The Statutory Background

The Coronavirus Aid, Relief, And Economic Security Act (CARES Act) (Public Law 116-36) (enacted March 27, 2020), Small Business Act (15 United States Code (USC), Chapter 14A, Section 631 *et seq*)[1], and Administrative Procedure Act (APA) (5 USC, Chapter 5, Section 500 *et seq*) contain the controlling statutes; Title 13 of the Code of Federal Regulations (CFR), Interim Final Rule (IFR) #1 (*Federal Register*, Vol. 85, No. 73, Pages 20811-20817) (effective April 15, 2020), IFR #15 (*Federal Register*, Vol. 85, No. 105, Pages 33010-33015) (effective May 28, 2020), and IFR #20 (*Federal Register*, Vol. 85, No. 124, Pages 38304-38312) (effective March 27, 2020) contain the controlling regulations; SBA Standard Operating Procedure, *Lender and Development Company Loan Programs,* (SOP 50 10 5(K)) (effective April 1, 2019) contains applicable policy.

Pursuant to the CARES Act, SBA promulgated several regulations concerning PPP eligibility, including the First IFR. See Paycheck Protection Program, 85 Fed. Reg. at 20811 (posted on the SBA and Treasury websites on April 2, 2020, and effective April 15, 2020); CARES Act § 1102, 134 Stat. at 287 (codified 15 U.S.C. § 636(a)(36)(B)). The First IFR, which was available at the time of Appellant's PPP loan application, advised all PPP lenders and applicants of the basic PPP eligibility criteria, including the incorporation of 13 C.F.R. § 120.110.

Congress placed the Payroll Protection Program (PPP) under Section 7(a) and gave the SBA's Administrator the discretion to "guarantee covered loans under the same terms, conditions, and processes as … loan[s] made under" Section 7(a). See Cares Act § 1102(a)(2) (codified at 15 U.S.C. § 636(a)(36)(B)).

---

[1] The portion(s) of the CARES Act not amending other laws/acts is codified at **15 USC, Chapter 116, Section 9001 et seq.**

SBA000195

2075417809

SBA pertinent regulations to discrimination include 13 C.F.R. 112.4 (prohibiting employment discrimination); 13 C.F.R. 112.7 (prohibiting action that subjects an individual to discrimination on the ground of race, color, or national origin, "in any employment practice, including recruitment or recruitment advertising"); 13 C.F.R. 113.3(b) (prohibiting discrimination with regard to employment practices and prohibiting the "use of employment tests or criteria that discriminate on the basis of race, color, …or national origin').

Congress was aware of the SBA's existing regulations when it gave the Administrator the discretion to "*guarantee covered loans under the same terms, conditions, and processes as … loan[s] made under" Section 7(a). Cares Act § 1102(a)(2) (codified at 15 U.S.C. § 636(a)(36)(B))* (emphasis added); *see Fitzgerald v. Dep't of Homeland Sec*., 837 F.3d 1346, 1355 (Fed. Cir. 2016) (discussing the presumption that Congress is "aware of applicable regulations when enacting pertinent legislation"). And those terms and conditions included the ineligibility of loans for entities which engaged in discrimination practices and recruitment employment advertising, *supra.*

Congress granted SBA broad authority to make rules and regulations, to take actions that "are necessary or desirable in making . . . loans," 15 U.S.C. § 634(b)(6)-(7), and to establish general policies to "govern the granting and denial of applications for financial assistance by the Administration," 15 U.S.C. § 633(d). This authority extends to the PPP lending program. Additionally, the CARES Act expressly provides the PPP lending program as being a part of SBA's 7(a) Loan Program. Congress made the decision not to enact the PPP as a freestanding program, but to utilize the pre-existing infrastructure of SBA's Section 7(a) Loan Program. See 85 Fed. Reg. at 20811 (recognizing the CARES Act "temporarily adds a new product, titled the 'Paycheck Protection Program,' to [SBA's] 7(a) Loan Program").

Congress placed the PPP lending program within the Section 7(a) lending program by specifying that "[e]xcept as otherwise provided", the Administrator may guarantee PPP loans "under the same terms, conditions, and processes" as a loan made under Section 7(a). 15 U.S.C. § 636(a)(36)(B). This subjects the PPP lending program to the policies and regulations applicable to SBA's 7(a) Loan Program.

SBA has retained the application of 13 C.F.R. § 120.110 and the SOP throughout the duration of the PPP. See Paycheck Protection Program as Amended by Economic Aid Act, 86 Fed. Reg. 3692, 3698, 3705–3706, 3708–3709, (January 12, 2021) (consolidates and restates multiple PPP Interim Final Rules regarding loan program requirements, including incorporation of 13 C.F.R. § 120.110, its related SOP provisions, and the borrower certification requirement of the First Interim Rule); Paycheck Protection Program-Loan Forgiveness Requirements and Loan Review Procedures as Amended by Economic Aid Act, 86 Fed. Reg. 8283, 8296 (February 3, Docket No. 9716822710 Page 10 of 13 2021) (consolidates and restates multiple PPP Interim Final Rules regarding forgiveness requirements, including requirement that ineligible borrowers will not receive loan forgiveness); 86 Fed. Reg. 15083 (among other things, revises the PPP rules to incorporate the American Rescue Plan Act's amendments to the PPP)

## B. Analysis

**ISSUE:** Can the CARES ACT, PPP legislation/ statutes, rules, and regulations promulgated by Congress and implemented by the Small Business Administration (SBA) exclude, restrict, or

SBA000196

2075417809

otherwise deem ineligible certain businesses or activities to receive PPP loans and/or Forgiveness?

The general rule is that "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Rust v. Sullivan*, 500 U.S. 173,194, 111 S. Ct, 1759, 114 L. Ed. 2d 233 (1991).

However, the government does not violate a plaintiff's rights "by declining to subsidize its First Amendment activities." *Regan,* 461 U.S. at 548. "The Court has never held that Congress must grant a benefit . . . to a person who wishes to exercise a constitutional right." Id. at 545. Likewise, there is no indication that the restriction here "was intended to suppress" protected conduct or speech of Appellant, New Century Foundation. The Appellant can continue to espouse its opinions, beliefs, and mission, but when it is engaged and involved with discrimination in its employment practices, that is not protected.

"The case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to aim at the suppression of dangerous ideas."  And while a funding restriction might also be unconstitutional if it regulates a recipient's speech outside of the government program, *see FCC v. League of Women Voters of Cal., 468 U.S. 364, 399-400, 104 S. Ct. 3106, 82 L. Ed. 2d 278 (1984).*

The government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech. It may not compel as a condition of federal funding the affirmation of a belief that by its nature cannot be confined within the scope of the Government program. *Agency for Int'l Dev. V. All For Open Soc'y Int'l, Inc.* 570 U.S. 205,214, 133 S. Ct. 2321, 186 L. Ed. 2d 398 (2013).

The government may set funding terms and conditions that "specify the activities Congress wants to subsidize" unless those terms and conditions "seek to leverage funding to regulate speech outside the contours of the program itself." Id. at 214-15; Rust, 500 U.S. at 197 (rejecting challenge to subsidy program that did not "effectively prohibit [the recipient[s] from engaging in the protected conduct outside the scope of the federally funded program").

The government's decision not to subsidize certain activities need only "bear a rational relation to a legitimate government purpose." Regan, 461 U.S. at 547 (applying rational-basis review to, as here, a challenge to a selective subsidy under both the Free Speech and Equal Protection Clauses,); *accord Boy Scouts of Am. V. Wyman, 335 F. 3d 80, 91-92, 97 ( 2d Cir. 2003).*

The Spending Clause grants Congress broad discretion to fund private programs or activities for the "general Welfare," Art. 1.§8, cl. 1, including authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends.

The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens. *Griggs v. Duke Power Co., 401 U.S. 424, 429 (1971).*

SBA000197

2075417809

> *The following is the text of Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352) (Title VII), as amended, as it appears in volume 42 of the United States Code, beginning at section 2000e. Title VII prohibits employment discrimination based on race, color, religion, sex, and national origin. The Civil Rights Act of 1991 (Pub. L. 102-166) (CRA) and the Lily Ledbetter Fair Pay Act of 2009 (Pub. L. 111-2) amend several sections of Title VII. In addition, section 102 of the CRA (which is printed elsewhere in this publication) amends the Revised Statutes by adding a new section following section 1977 (42 U.S.C. 1981), to provide for the recovery of compensatory and punitive damages in cases of intentional violations of Title VII, the Americans with Disabilities Act of 1990, and section 501 of the Rehabilitation Act of 1973.*

## UNLAWFUL EMPLOYMENT PRACTICES

SEC. 2000e-2. *[Section 703]*

(a) Employer practices

It shall be an unlawful employment practice for an employer -

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

(b) Employment agency practices

It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.

(c) Labor organization practices

It shall be an unlawful employment practice for a labor organization-

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin.

(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

SBA000198
2075417809

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

SEC. 2000e-3. *[Section 704]*

It shall be an unlawful employment practice for an employer, labor organization, employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to print or publish or cause to be printed or published any notice or advertisement relating to employment by such an employer or membership in or any classification or referral for employment by such a labor organization, or relating to any classification or referral for employment by such an employment agency, or relating to admission to, or employment in, any program established to provide apprenticeship or other training by such a joint labor-management committee, indicating any preference, limitation, specification, or discrimination, based on race, color, religion, sex, or national origin, except that such a notice or advertisement may indicate a preference, limitation, specification, or discrimination based on religion, sex, or national origin when religion, sex, or national origin is a bona fide occupational qualification for employment.

Title VI of the Civil Rights Act of 1964 42 U.S.C.S. § 2000d of the Civil Rights Act of 1964, 42 U.S.C.S. §§ 2000d-2000d-6, forbids any person or institution which receives federal funds to discriminate based on race, color, or national origin. The purpose of Title VI is twofold: 1) to avoid the use of federal funds to support discriminatory practices, and 2) to provide individual citizens effective protection against these practices. The first purpose is fulfilled by the statutory procedures found under Title VI for the termination of federal funds due to intentional engagement in discriminatory practices. 42 U.S.C.S. § 2000d-1; 45 C.F.R. §§ 80.1-80.13 and apps. A & B (1979). These procedures are highly structured and provide a great number of preconditions before such funding can be terminated.

Title VI of the Civil Rights Act of 1964 seeks to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices. In essence, the statute conditions an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of the funds, and it provides an administrative mechanism for terminating federal financial support for institutions engaged in prohibited discrimination.

Congress has excluded many other categories of businesses: banks, lenders, finance companies, and some pawn shops; life insurance companies; businesses located in foreign countries; pyramid sale distribution plans; businesses engaged in any illegal activity; private clubs; government-owned businesses; loan packagers; businesses with an "Associate" who is in prison, on probation, on parole, or who has been indicted for a felony or crime of moral turpitude; and businesses that have previously defaulted on SBA or other federally assisted loans. See 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa), incorporating 13 C.F.R. § 120.110.

There are societal as well as personal interests on both sides of this equation. The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy

SBA000199

2075417809

workmanship assured through fair and racially neutral employment and personnel decisions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).

In the implementation of such decisions, it is abundantly clear that Title VII tolerates no racial discrimination subtle or otherwise. *McDonnell Douglas Corp. v. Green*, *supra.*

New Century Foundation maintained an online job posting for a full-time reporter for its monthly online magazine, American Renaissance, which promotes "race-realism" and describes itself as a "white advocacy" organization. See Exhibit A. The job posting seeks applicants with a "[s]trong commitment to race realism and white advocacy." See Exhibit B. The job posting also requests that applicants submit a cover letter with "[a] brief description of applicant's political views and how he came to them" and "why the applicant believes he would be a good fit for American Renaissance."

This job posting seeking applicants with a "[s]trong commitment to race realism and white advocacy" appears to be a discriminatory employment practice that violates SBA's civil rights requirements. See 13 C.F.R. 112.4 (prohibiting employment discrimination); 13 C.F.R. 112.7 (prohibiting action that subjects an individual to discrimination on the ground of race, color, or national origin, "in any employment practice, including recruitment or recruitment advertising"); 13 C.F.R. 113.3(b) (prohibiting discrimination about employment practices and prohibiting the "use of employment tests or criteria that discriminate on the basis of race, color, …or national origin').

NCF job announcement NCF describes itself as a "white advocacy" organization. It has published articles arguing that private entities should have the right to choose employees and clients on whatever grounds they see fit. NCF hires based on whether the candidate has knowledge and beliefs consistent with the organization's mission.

NCF requested that applicants submit a cover letter with "[a] brief description of applicant's political views and how he came to them" and "why the applicant believes he would be a good fit for American Renaissance."

NCF espouses "[o]ur ancestors understood that people and races are not interchangeable, and that failure to discriminate would produce a warring mix of incompetents and unassimilable"

NFC supports discrimination as its mission is clear, "Far-seeing whites should think carefully about arguments against discrimination in principle because discrimination, private and even public, is necessary to our survival.

The "intent of the employer is irrelevant, since Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, *supra.* NCF engaged in hiring practices of petitioner that were racially motivated and supported by its own practices . *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (May 14, 1973).

NCF if not by direct evidence , clearly has engaged in discriminatory employment practices. NCF's posting of its employment job and practices clearly aligned itself with the

SBA000200

2075417809

knowledge and beliefs consistent with the organization's mission, "race-realism" and "white advocacy"

Appellant's attempt to obscure its true intentions and purpose to discriminate against non-white persons in its business is overridden by the government's authority to exclude certain businesses and activity that are not in the public or government interest to support.

Circumstantial evidence, also known as indirect evidence, requires the fact finder to make an inference or presumption. *Hamilton v. Southland Christian Sch., Inc*., 680 F.3d 1316, 1320 (11th Cir. 2012).

"Circumstantial evidence can include suspicious timing, inappropriate remarks, and comparative evidence of systematically more favorable treatment toward similarly situated [individuals] not sharing the protected characteristic...." *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 522 (7th Cir. 1994); *accord Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). See methods of proof discussed in Sections B.2 and B.3.

SBA regulations regarding discrimination include 13 C.F.R. 112.4 (prohibiting employment discrimination); 13 C.F.R. 112.7 (prohibiting action that subjects an individual to discrimination on the ground of race, color, or national origin, "in any employment practice, including recruitment or recruitment advertising"); 13 C.F.R. 113.3(b) (prohibiting discrimination with regard to employment practices and prohibiting the "use of employment tests or criteria that discriminate on the basis of race, color, ...or national origin').

Congress deliberately chose not to change the Administrator's statutory discretion to exclude businesses, other than those it expressly identified in the CARES Act. *Cf. Jama v. Immigration and Customs Enforcement, 543 U.S 355, 342,125 S. Ct. 694, 160 L. Ed. 708 (2005).* The Courts do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

*In Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage-age certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.

In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other."); *Regan v. Taxation With Representation*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right...."); accord, e.g., *Wisconsin Education Ass'n Council v. Walker*, 705 F.3d 640, 646–47 (7th Cir. 2013).

The Court in *Camelot Banquet Rooms, Inc., et al, v. United States Small Business Administration, et al.,* F. Supp. 3d, 2021 WL 3680369, (E.D. Wis. Aug. 19, 2021); *Pharaohs GC, Inc. v. U.S. Small Business Admin.*, 990 F.3d 217 (2d Cir. 2021) (af-firming denial of injunction in similar first-round case brought by adult-entertainment club); *American Ass'n of Political Consultants v. U.S. Small Business Admin*., 810 F. App'x 8, 9–10 (D.C. Cir. 2020)

SBA000201

2075417809

(affirming denial of injunctive relief in similar First Amendment challenge to first-round exclusion of lobbying and political consulting business.

See *Pharaohs*, 990 F.3d at 229–30, *supra*. (For Program's first round of loans, the prurience exclusion did not "improperly leverage the subsidy to regulate speech"); *American Ass'n of Political Consultants*, 810 F. App'x at *9 (Program's lobbying exclusion did not "seek to leverage funding to regulate speech outside the contours of the [Program] itself," quoting *Alliance for Open Society*, 570 U.S. at 214–15). Pharaohs also contends that the SBA's exclusion of businesses from the Program based on the prurience restriction violates its equal protection and <u>First Amendment</u> rights. Pharaohs appears to offer three different theories as to why it believes the prurience restriction is unconstitutional. First, Pharaohs says that the restriction impermissibly regulates protected speech. Second, Pharaohs suggests that the restriction would fail rational-basis review because its impermissible purpose is to exclude businesses expressing a disfavored message from a program that was created to assist all small businesses. Finally, Pharaohs contends that the prurience restriction is unconstitutional viewpoint discrimination.

The Administrative Procedure Act requires that the Courts hold unlawful and set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(C). SBA was given "extraordinary broad powers to accomplish these important objectives, including that of lending money to small businesses whenever they could not get necessary loans on reasonable terms from private lenders" *SBA v. McClellan,* 364 U.S. 446, 447 (1960).

Thus, the Courts must determine the ordinary tools of statutory construction to determine Congress's specific intent and make certain that the agency interpretation of the statute is reasonable, rational and consistent with Congress intent  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Animal Legal Def. Fund v. USDA*, 789 F.3d 1206, 1215 (11Cir. 2015); *Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1223 (11th Cir. 2009).

OHA has recognized the limited scope of its authority and has repeatedly held that it "is not the proper forum for a challenge to the validity of a regulation." *Matter of Cognitive Professional Services, Inc*., Case No. BDPE-545 at *3 (March 10, 2015) ("Questions about the validity or constitutionality of regulations do not fall within the jurisdiction of the Office of Hearings and Appeals, and I may not consider them. See 13 C.F.R. § 134.102."); accord *Jim Plunkett, Inc. re: E.S. Edwards & Sons, Inc*., SBA No. 3838 at *2 (October 4, 1993) (finding complaint challenging SBA's regulations as overly complex to be "beyond the jurisdiction of this Office."); *Nations Incorporated, Appellant re: Technical and Management Services Corporation,* SBA No. 3611 at *8 (April 24, 1992) ("[A]ny question concerning the validity of a regulation is beyond this delegated authority."); *International Ordinance, Inc.,* Appellant, SBA 3 Paycheck Protection Program, 85 Fed. Reg. at 20811 (posted on the SBA and Treasury websites on April 2, 2020, and effective April 15, 2020). 4 CARES Act § 1102, 134 Stat. at 287 (codified 15 U.S.C. § 636(a)(36)(B). 7 No. 3319 at *4 (August 6, 1990) ("The constitutional challenge of these regulations by the Appellant is beyond the limited jurisdiction of this Office."

OHA recently issued a decision on a PPP appeal stating that it is not authorized to decide a challenge to SBA's determination that the CARES Act applied 13 C.F.R. § 120.110(b) to PPP

- 13 -

SBA000202
2075417809

loans. See *Family Choice Financial*, Docket No. PPP-8323747201, at 12 (Final Decision attached hereto as Exhibit A). In arriving at its holding, OHA stated that, as a hearing officer for SBA, the ALJ is "exercising the Administrator's delegated authority and it would be surprising if that delegation included the authority to invalidate an SBA regulation." *Family Choice Financial*, Docket No. PPP-8323747201, at 12 (citing Auth. of Educ. Dep't Admin. L. Judges in Conducting Hearings, 14 U.S. Op. Off. Legal Counsel 1, 2–3 (1990), 1990 WL 750326, at *1–2, https://www.justice.gov/file/20131/download.) As stated in *Family Choice*, "Family Choice must press this argument, if at all, on review before a federal court." OHA made this finding while acknowledging the case of *Nat'l Ass'n of Home Builders v. U.S. SBA*, in which a district court held that § 120.110, in the context of the ineligibility of passive businesses who are members of the *National Association of Home Builders*, cannot be applied to first-draw PPP loans. See *Nat'l Ass'n of Home Builders v. U.S. SBA*, No. 20-11780, 2021 U.S. Dist. LEXIS 186548 (E.D. Mich. Sept. 28, 2021)

I do not have authority to determine the prospective or retroactive application of SBA's Standard Operating Procedures (SOP), rules, and regulations. *Landgraf v. USI Film Products*, 511 U.S. 244 (1994).

Administrative Law Judges have no constitutionally based judicial power, see *Ramspeck v. Federal Trial Examiners Conference*, 345 U.S. 128, 132-33 (1953), but are employees of the executive branch department or agency employing them. See 20 U.S.C. § 1234(c) (statute establishing the Office of Administrative Law Judges within the Department of Education provides that "ALJs shall be officers or employees of the Department.").

As such, ALJs are bound by all policy directives and rules promulgated by their agency, including the agency's interpretations of those policies and rules. See *Nash v. Bowen*, 869 F.2d 675, 680 (2d Cir.), cert, denied, 493 U.S. 813 (1989); *Mullen v. Bowen*, 800 F.2d 535, 540- 41 n.5 (6th Cir. 1986); *Brennan v. Department of Health and Human Services*, 787 F.2d 1559 (Fed. Cir.), cert, denied, 479 U.S. 985 (1986); *Goodman v. Svahn*, 614 F. Supp. 726, 728 (D.D.C. 1985*); Association of Administrative Law Judges, Inc. v. Heckler*, 594 F. Supp. 1132, 1141 (D.D.C. 1984); c f *D'Amico v. Schweiker*, 698 F.2d 903, 906 (7th Cir. 1983). Accord 34 C.F.R. § 81.5(b) (embodying in Department regulations the requirement that ALJs adhere to policies and rules of the agency).

ALJs do not exercise the broadly independent authority of an Article III judge but operate as subordinate executive branch officials who perform quasi-judicial functions within their agencies. In that capacity, they owe the same allegiance to the Secretary's policies and regulations as any other Department employee.

I am authorized to follow SBA's implemented interpretation of policy, rules and regulations as mandated by Congress.

U.S. Federal District Court is the proper forum to determine whether SBA's interpretation of Congress CARES ACT and PPP statutes were reasonable and rational, and that the agency did not exceed its statutory authority. *Chevron , U.S.A. , Inc. v Nat. Res. Def. Council, Inc.,* 467 U.S. 837 (1984*); Friends of the Everglades v. S. Fla. Water Mgmt. Dist.,* 570 F.3d 1210, 1223 (11th Cir. 2009); *Animal Legal Def. Fund v. USDA,* 789 F.3d 1206, 1215 (11th Cir. 2015).

SBA000203

2075417809

    New Century Foundation has not carried its burden to show a clear error of fact or law in the Final SBA Loan Review Decision. 13 C.F.R. § 134.1210. Therefore, I must **DENY** the appeal.

IV.  <u>Conclusion</u>

    I DENY the appeal and AFFIRM the final loan review decision of the SBA.

    This is an initial agency decision. However, unless a request for reconsideration is filed pursuant to 13 C.F.R. § 134.1211(c), this decision shall become the final decision of SBA 30 calendar days after its service. 13 C.F.R.§ 134.1211. In accordance with the regulations, you may file a request for reconsideration within 10 calendar days after service of the Judge's decision under 13 134,1211(c)(1). You can serve your petition via email to OHAPPPInquiries@sba.gov.

    It is borrower's responsibility to review the rules and procedures.

IT IS SO ORDERED.

*Raul Pardo*
_____

RAUL PARDO
Administrative Judge

- 15 -

SBA000204

**Before the**
**UNITED STATES SMALL BUSINESS ADMINISTRATION**
**Office of Hearings and Appeals**

---

PAYCHECK PROTECTION PROGRAM
APPEAL OF:

NEW CENTURY FOUNDATION                                    Decision No. 2075417809

      Appellant

Appealed from
SBA PPP Loan No. 2075417809

---

**Request for Reconsideration**

On June 16, 2022 the Office of Hearings and Appeals (OHA) of the United States Small Business Administration (SBA) issued decision number 2075417809 (the "Decision") by Judge Raul Pardo denying forgiveness of Paycheck Protection Program (PPP) loan number 2075417809 granted to New Century Foundation (NCF). Because of the errors of fact and law discussed in this Request for Reconsideration, NCF respectfully requests that this decision be overturned.

## I. Judge Prado Erroneously Found that NCF Maintained a Discriminatory Job Posting

Judge Pardo's decision states that "after receiving its PPP loan, New Century Foundation maintained an online job posting for a full-time reporter for its monthly online magazine, American Renaissance, which promotes "race-realism" and describes itself as a 'white advocacy' organization. See Exhibit A. The job posting seeks applicants with a '[s]trong commitment to race realism and white advocacy.' See Exhibit B. The job posting also requests that applicants submit a cover letter with '[a] brief description of applicant's political views and how he came to them' and 'why the applicant believes he would be a good fit for American Renaissance.'

In Judge Pardo's view, this job posting seeking applicants with a "[s]trong commitment to race realism and white advocacy" appears to be a discriminatory employment practice that violates SBA's civil rights requirements. See 13 C.F.R. 112.4 (prohibiting employment discrimination); 13 C.F.R. 112.7 (prohibiting action that subjects an individual to discrimination on the ground of race, color, or national origin, "in any employment practice, including recruitment or recruitment advertising"); 13 C.F.R. 113.3(b) (prohibiting discrimination with regard to employment practices and prohibiting the "use of employment tests or criteria that discriminate on the basis of race, color, …or national origin').

1

The Judge's conclusions are factually incorrect. NCF did not publish the cited language at or after the time of its PPP loan application; in fact, the language cited above ceased to be used by NCF for recruitment on its website AmRen.com in 2017 *at the latest*, when NCF ended its recruitment effort. At that time, all links to the job notice were taken down, and only by inadvertence did the language itself remain on the website – as part of a very large internet domain composed of thousands of pages and millions of words. The language would have been invisible to any ordinary visitor to the AmRen.com, and all employees of NCF assumed the language had been removed. After the links to the language were destroyed – in 2017 at the latest – not one person inquired about the job described in the notice, and there is no evidence any job seeker ever saw it.

Therefore it is wrong to say that NCF "maintained an online job posting" after receiving the PPP loan. A job notice is posted online in order for it to be seen. NCF was no longer looking for an employee, did not want the notice seen, and believed it had not only made it invisible but had destroyed it. To say that NCF "maintained an online job posting" is like arguing that a public announcement is still a public announcement even after the sole existing physical copy has been taken down from a public place and put in a drawer. The language of the announcement still exists, but to call it a public announcement is absurd.

This language of the job posting was discovered by Capital One, National Association, which administered the PPP loan. Capital One, with which NCF had had a satisfactory banking relationship for many years, decided, at some point after the PPP loan was granted, that it did not like the political positions taken by NCF, and announced it would no longer accept NCF as a customer. NCF does not know by what means Capital One searched the NCF website, but it is our assumption that it did so with great diligence and technical thoroughness in the hope of finding even the flimsiest pretext on which to recommend to SBA that forgiveness of the loan to NCF be denied. To repeat, the language of the job posting was invisible to any ordinary visitor to AmRen.com.

The language exists with AmRen.com. NCF has kept it precisely in the state in which Capital One found it, confident that no unbiased observer would think it could possibly be called "an online job posting." No one has applied for employment at NCF since at least 2017, so NCF could not have discriminated in hiring even if it had wanted to.

## II.    Even if the job posting cited by OHA were current or had been posted since the grant of the PPP loan, it would still not constitute a forbidden employment practice.

The Decision appears to assume that merely using the terms "white advocacy" and "race realism" in a job posting violates anti-discrimination law. This is incorrect.  NCF is a 501(c)(3) non-profit, recognized since 1994 by the Internal Revenue Service as an educational organization chartered to educate the public on matters of immigration and race relations. It is no different from similar organizations that educate the public on questions of national interest. It is entirely reasonable, even essential, that prospective employees be expected to share the educational goals of the organization. An organization that promotes abortion rights may preferentially hire people

2

who believe in a woman's right to choose over those who believe abortion should be outlawed. In fact, this is the case: a current job posting for NARAL Pro-Choice America requires applicants to have a "a commitment to reproductive freedom" and understand "the intersectional politics of race, class, gender, etc. and commitment to cross-movement building." NARAL Pro-Choice America Job Listing, available at https://jobs.lever.co/prochoiceamerica/a8087f4a-457b-4001-bf3b-dea7fac3e032.

Similarly, a job posting for the Southern Poverty Law Center requires applicants to have a "commitment to fostering an anti-racist work culture and to anti-racist principles and learning" *See* https://www.indeed.com/jobs?q=Magazine%20Writer&start=190&vjk=4d87263e7b4b4dcd.

An even closer parallel to NCF is the Anti-Defamation League (ADL) which is also a 501(c)(3) non-profit organization. Since its founding in 1913, its "immediate object" has been to stop "the defamation of the Jewish people." It is reasonable, even essential, that prospective employees be expected to share that goal. This most probably narrows the field of job candidates, with a likelihood that a majority – perhaps even a large majority – of the employees of the organization are Jewish. Asking prospective employees to adhere to the principles and goals of the ADL is not a forbidden job practice, nor should it be. However, a job applicant need not be Jewish in order to feel strongly that the defamation of the Jewish people should be stopped.

NCF is in a perfectly analogous position. The bulk of its work is in the fields of race realism and white advocacy, so it is (1) reasonable to expect employees to share those goals, and (2) people of any race can share these goals. Over the years, NCF has published on its website many articles by people of color who share NCF's principles and goals. In some cases, the titles of the articles themselves demonstrates the authors' sympathy with NCF's mission. The authors of these articles contributed them knowingly and willingly for publication exclusively at AmRen.com.

"A Black Man's Path to Race Realism"
"Discovering that my Father was White Led me to Race Realism"
"Interview with a Red-Pilled Black Woman"
"The Story of a Hispanic Race Realist"
"The Son of Illegal Honduran Immigrants on Race Realism, "Social Justice," and White Identity"
"How a Young Black Man Became a Race Realist"
"I am Black — and a Race Realist"
"Through the Eyes of a Nigerian Race Realist"
"Chinese Reflections on Europe"
"A Nigerian's View of Race"
"White Man: Why Are You Giving Away Your Country?""

NCF's most high-profile event is its annual conference. Over the years, NCF has showcased three speakers who were people who color who shared NCF's positions. It should

3

therefore be obvious that race realism and white advocacy are by no means exclusive to whites. The videos of these conference speeches are published on the internet as follows:

David Yeagley, enrolled member of the Comanche Tribe, 2014
Fernando Cortez, Mexican nationalist, 2016
Michelle Malkin, Asian-American, 2021

In the case, of Michelle Malkin, AmRen.com has subscribed to an published her syndicated column since early 2020. Attendance at NCF-sponsored conferences is pen to the public and attendees have included Hispanics, African-Americans, and Asians, as well as whites.

To again quote from The Decision:

The "intent of the employer is irrelevant, since Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, *supra.* NCF engaged in hiring practices of petitioner that were racially motivated and supported by its own practices . *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (May 14, 1973).[1]

In *Griggs*, Duke Power Co. was found to be selecting candidates for its management training program by means of an IQ test that was "fair in form but discriminatory in operation" because black candidates scored, on average, lower than white candidates. The Court found that requiring an IQ score of a certain threshold was not a bona fide occupational qualification (BFOQ). It should be obvious that, for any advocacy organization, adherence to the positions to be advocated is a BFOQ for any but the most routine or clerical positions. Race realism and white advocacy are BFOQs for employment by NCF, and not artifices meant to exclude candidates because of race.

To repeat: Knowledge of and support for positions held by NCF – which can be held by people of any race – are a bona fide occupational qualification for employment and are not a prohibited employment practice.

**III. NCF's Activities are Lawful and Protected by the Constitution of the United States**
    **A. To supply arguments to justify actions that may now be illegal is not illegal; it is essential to the democratic process.**

The Decision cites NCF as follows:

Another American Renaissance article, from June 2016, states; "Far-seeing whites should think carefully about arguments against discrimination in principle because discrimination, private and even public, is necessary to our survival. In cases such as *Fisher,* we are drawn to anti-discrimination arguments because the only acceptable, legal targets of public

---

[1] NCF notes that the Decision relies heavily upon precedent under Title VII of the Civil Rights Act, which does not apply to an organization, like NCF, with fewer than 15 employees.

4

SBA000208

discrimination are ourselves. Such is the astonishing, absurd, and suicidal fix we whites have gotten ourselves into while we are still, for the time being, the majority."

This is an accurate statement of NCF's position, which is a defense of complete freedom of association of the kind promoted by Chicago University scholar Richard Epstein in his 1992 book, *Forbidden Grounds*. In it, he calls for the right to discriminate in employment "for good reasons, bad reasons, or no reason at all." The above quotation from AmRen.com is *not*, however, evidence of illegal hiring practices by NCF.

Prof. Epstein criticizes laws that forbid employment practices that were legal until the 1960s, and the fact that they are no long legal does not make his attack on those laws illegal, nor is it evidence that when he hires candidates for academic positions his practices are illegal. Employment discrimination on the grounds of race, color, or national origin is *still* legal under federal law for employers with 15 employees or fewer, as the Federal Equal Employment Opportunity Commission explains in this public notice. NCF, which has never had more than five employees is therefore exempted. NCF does not, however, base this appeal on this exemption; it argues only that it has never and does not discriminate in employment on the grounds of race.

American law is constantly changing. What was once illegal becomes legal and vice versa. Until recently, it was illegal under state law in every American state to possess marijuana. Advocates for legalization argued passionately for legalization, but no judge or jury would ever have confused such arguments with illegal possession itself. Likewise, until relatively recently, homosexual acts were illegal in all 50 states, and same-sex marriage was impossible. Today, thanks to tireless – and entirely legal – advocacy for gay rights, homosexual acts and same-sex marriage are legal throughout the United States.

Arguments in favor of legislation are essential to the democratic process; without them there can be no democracy. As a 510(c)(3) organization, NCF is prohibited from endorsing specific legislation, but general advocacy in favor of Congressional or regulatory action that would support its positions is an entirely conventional and accepted activity for an educational non-profit. To argue for a principle is not the same as acting on that principle. The Decision comes close to recognizing this, but immediately runs afoul of the facts: "The Appellant can continue to espouse its opinions, beliefs, and mission, but when it is engaged and involved with discrimination in its employment practices, that is not protected."

Indeed, NCF's mission is very much a First-Amendment-protected activity. However, in light of the facts set forth above, it should be clear that NCF has *never* been "engaged and involved with discrimination in its employment practices." The Decision reaches this conclusion based on a defunct job notice that was both invisible to the public and was, on its face, nothing more than a statement of job qualifications that does not discriminate on the basis of race.

**B. Judge Pardo Lacked Authority to Deny PPP Loan Forgiveness on the Basis of Expressive Activity**

5

SBA000209

In support of its finding that NC is ineligible for its PPP loan, the Decision dwells at length on the principle that the government may decline to subsidize certain First Amendment activities. However, the authorities cited by Judge Prado in support of the proposition do not apply here. For example, in *Camelot Banquet Rooms, Inc., v. United States Small Business Administration,* Case No. 21-2589 (7th Cir. 2022) ("*Camelot*"), the court upheld the SBA's regulation concerning businesses that present live performances of a prurient nature. The court found that it was not unlawful for the SBA to apply that regulation to a PPP loan applicant.

However, the SBA regulations do not prohibit PPP loans to organizations that engage in racial advocacy. In the absence of such a regulation, OHA cannot simply apply its own notion of a reasonable constraint on, or refusal to subsidize, protected speech. As the Decision correctly points out, administrative law judges have "no constitutionally based judicial power" and are limited to application of the "policy directives and rules promulgated by their agency . . ." Decision, p. 14. In the absence of an SBA directive or rule permitted denial of loans to organizations that engage in racial advocacy, Judge Pardo's decision to do so is beyond his jurisdiction.

### C. One quarter of the current NCF staff (of four) is of protected-minority status.

The NCF director of special projects, Martin Christopher Rojas, is of Chilean nationality. He has always identified as Hispanic. His father became a naturalized US citizen only in 2016. He was raised bilingual, and has published fiction in Spanish. An English translation of one of his short works can be found here. Mr. Rojas has worked, with a few breaks, full-time for NCF since 2016. He is an invaluable member of the NCF staff and takes part in all important NCF decisions.

For NCF, he writes under the name of Chris Roberts, and can be reached at Roberts@nc-f.org.

Photos of his passport are included herewith.

6

SBA000210



SBA000211



In light of the above, NCF respectfully requests that decision number 2075417809 of June 16, 2022 be reversed, and that NCF be granted forgiveness of PPP loan 2075417809.

**United States Small Business Administration**
**Office of Hearings and Appeals**

PETITION FOR RECONSIDERATION:

Decided: July 08, 2022

NEW CENTURY FOUNDATION  d/b/a

Docket No.  PPP 2075417809

AMERICAN RENAISSANCE [1]

Petitioner

SBA No. 2075417809

ORDER DENYING PETITIONER/APPELLANT'S PETITION FOR RECONSIDERATION
APPEAL AND AFFIRM OFFICE OF HEARING AND APPEAL'S INITIAL DECISION

## I.  APPEARANCES

Samuel Taylor, Borrower/Appellant, 2705 Green Holly Springs Ct., Oakton, VA 22124
No Appearance listed on PFR Appeal.

## II.  JURISDICTION

In March 2020, in response to the Covid-19 pandemic and the resulting economic upheaval, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. 116-136, 134 Stat. 281 (2020). *See Nat'l Assn of Home Builders v. U.S. SBA*, No. 20-11780, 2021 WL 4458660, at *1 (E.D. Mich. Sept. 28, 2021), appeal docketed, No. 21-1765 (6th Cir. Nov. 30, 2021). Section 1102 of the Act established the Paycheck Protection Program (the Program), which was "intended to help businesses cover expenses and make payroll for their workers to keep them employed during the pandemic" by loaning money to eligible small businesses. *Nat'l Assn*. 2021 WL 4458660, at *1. Importantly, "if the loaned funds are used for 2075417809 - 2 - specified expenses," the borrowing business could receive forgiveness of its loan. *In re Gateway Radiology Consultants, P.A*., 983 F.3d 1239, 1247 (11th Cir. 2020).

Congress first authorized $349 billion in loans. CARES Act § 1102(b)(1). One month later, it upped this figure to $659 billion. Paycheck Protection and Health Care Enhancement Act, Pub. L. No. 116-139, § 101(a)(1), 134 Stat. 620 (2020).

---

[1] Wikipedia, "The New Century Foundation is a white supremacist organization founded in 1994 by Jared Taylor **known primarily for publishing a magazine, American Renaissance**."

SBA000213

2075417809

The CARES Act provides that, "[e]xcept as otherwise provided, . . . the [SBA] Administrator may guarantee" PPP loans "under the same terms, conditions, and processes" as other Section 7(a) loans. *See* CARES Act § 1102, 134 Stat. at 287 (codified at 15 U.S.C. § 636(a)(36)(B)). Congress authorized SBA to issue implementing regulations. CARES Act § 1114 (codified at 15 U.S.C. § 9012). Shortly thereafter SBA implemented and issued several interim final rules under the Program Congress placed the Program under Section 7(a) of the Small Business Act, making the SBA the agency entrusted to administer the Program. *See* CARES Act § 1102(a) Paragraph (36) to 15 U.S.C. § 636(a)). Section 7(a) loans are the SBA's main program for helping small businesses. *Gateway*, *supra.* 983 F.3d at 1248.

OHA conducts Paycheck Protection Program (PPP) appeals under the authority of 13 C.F.R. part 134 Subpart L.

### III.  PFR PROCEDURE & APPEAL BACKGROUND

A Petition for Reconsideration may be granted by OHA upon a "clear showing of an error of fact or law material to the decision." A PFR does not allow an unsuccessful party an additional opportunity to argue its position, and the PFR must rise from a manifest error of law or mistake of fact. *Size Appeal of Envtl. Prot. Cert. Co., Inc.*, SBA No. SIZ-4935, at 2 (2008) (PFR). "A [PFR] is appropriate only in limited circumstances, such as situations where OHA has misunderstood a party, or has made a decision outside the adversarial issues presented by the parties," *citing Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988) (*quoting Above The Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983)). Thus, "[t]he moving party's argument must leave the Administrative Judge with the definite and firm conviction that key findings of fact or conclusions of law of the earlier decision were mistaken." *Size Appeal of TKTM Corp.*, SBA No. SIZ-4905 (2008) (*citing Size Appeal of Taylor Consultants, Inc.*, SBA No. SIZ-4775, at 11-12 (2006)); *Size Appeal of KVA Elec., Inc.*, SBA No.SIZ-5057 (2009).

On June 16, 2022, OHA found Appellant is ineligible for the amount PPP loan received due to discrimination despite certifying on the Form 2483 its business agreed not to discriminate in any business practice, including employment practices and services to the public based on categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA regulations, rules, policy, federal statutes, and case law.

On June 27, 2022, the U.S. Small Business Administration (SBA) Office of Hearings and Appeals (OHA) received a Petition for Reconsideration (PFR) in the above-captioned matter from the Petitioner/Appellant, New Century Foundation.

The Petitioner/Appellant, pursuant to 13 C.F.R § 134.1211(c), and files this timely Petition for Reconsideration of the Initial Decision entered in the above-captioned matter.  SBA did not file a Response to PFR within the 10 days as allowed by regulation.

2

SBA000214

2075417809

Petitioner/Appellant seeks OHA to reconsider OHA's Initial Decision because it argues that SBA regulations do not prohibit PPP loans to organizations that engage in racial advocacy and separation of races; that its job announcement is protected by the U.S. Constitutional First Amendment; that ALJ acted beyond its legal authority; and its employment practices were not discriminatory. In the absence of such a regulation, OHA cannot simply apply its own notion of a reasonable constraint on, or refusal to subsidize, protected speech that are lawful and protected by the Constitution of the United States.

New Century Foundation, a Non-Profit Organization, d/b/a as /Trade Name as American Renaissance list its principal place of business as Box 527, Oakton, VA 22124-0527 (AR 12, 28).

Appellant lists 5 employees at time of loan application and 4 employees at time of Forgiveness application (AR 3)

For the reasons, *infra,* Petitioner/Appellant New Century Foundation's PFR is DENIED, and OHA's Initial Decision is AFFIRMED.

## A. CARES Act 2020

On March 25, 2020, in response to the economic distress caused by the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. 116-136, 134 Stat. 281 (2020). Among other provisions, the CARES Act established the PPP at Section 1102. The Program lends money to eligible small businesses to assist them in covering expenses and making payroll for their workers to keep them employed during the pandemic. If the loan funds are used for certain specified expenses, the borrowers can receive full forgiveness of the loan.

## B. Standard of Review

Title 13 C.F.R § 134.1210, provides that the standard of review of an OHA appeal is whether the SBA final loan review decision was based on clear error of fact or law.

The Appellant has the burden of proof. As provided for in 13 C.F.R § 134.1211(c), the request for reconsideration must clearly show an error of fact or law material to the decision.

1. <u>SBA Reasons for Finding Petitioner/Appellant ineligibility to PPP loan and Forgiveness:</u>

SBA has determined that the borrower was ineligible for the PPP loan. The reason for SBA's decision is as follows:

After a review of the documentation provided, the SBA concludes that the borrower's business activities are ineligible per SBA guidelines. To be eligible for a Paycheck Protection Program loan, each Borrower must certify on the Form 2483 that businesses must agree not to

3

SBA000215
2075417809

discriminate in any business practice, including employment practices and services to the public based on categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations.

SBA contends that New Century Foundation has violated the civil rights requirements that apply to recipients of PPP loans, including 13 C.F.R. 112 and 113.

After receiving its PPP loan, New Century Foundation maintained an online job posting for a full-time reporter for its monthly online magazine, American Renaissance, which promotes "race-realism" and describes itself as a "white advocacy" organization. *See* Exhibit A. The job posting seeks applicants with a "[s]trong commitment to race realism and white advocacy." *See* Exhibit B. The job posting also requests that applicants submit a cover letter with "[a] brief description of applicant's political views and how he came to them" and "why the applicant believes he would be a good fit for American Renaissance.

This job posting seeking applicants with a "[s]trong commitment to race realism and white advocacy" appears to be a discriminatory employment practice that violates SBA's civil rights requirements. *See* 13 C.F.R. 112.4 (prohibiting employment discrimination); 13 C.F.R. 112.7 (prohibiting action that subjects an individual to discrimination on the ground of race, color, or national origin, "in any employment practice, including recruitment or recruitment advertising"); 13 C.F.R. 113.3(b) (prohibiting discrimination regarding employment practices and prohibiting the "use of employment tests or criteria that discriminate based on race, color, …or national origin').

New Century Foundation also appears to be ineligible for a PPP loan because it restricts patronage for any reason other than capacity. *See* 13 C.F.R. 120.110(i); SOP 50 10 5(K) (effective April 1, 2019).

The SOP cross-references SBA's civil rights regulations, including 13 C.F.R. 113.3(a), which prohibits discrimination "with regards to goods, services, or accommodations offered or provided by the aided business or enterprise, whether or not operated for profit, because of race, color, religion, sex, handicap, or national origin." The SOP indicates, as an example, that a fitness center that markets to one gender would be ineligible absent evidence that the business is in fact open to both men and women, such as "documented membership demographics."

New Century Foundation, which operates American Renaissance and sponsors annual conferences, appears to broadly promote the exclusion of and discrimination against non-white persons. This is supported by the publicly available reports we reviewed by the Southern Poverty Law Center and the Anti-Defamation League, both of which analyzed American Renaissance publications and outlined considerable evidence of New Century Foundation's statements and activities in pursuit of discrimination against non-white person and its inference in its job posting announcement policy of separation of the races (see quote below). *See* Exhibit C, Exhibit D.

Additionally, a range of publicly available statements shows New Century Foundation's discriminatory approach. For example, an American Renaissance article posted in May 2020

4

SBA000216
2075417809

states that. "[s]o long as blacks and whites continue to live together, whites will pay the high price of sharing their society with an inveterately violent racial minority." *See* Exhibit E.

A September 2011 article titled "Fade to Brown" states that "[o]ur nation achieved character and greatness precisely because of discrimination and that "[o]ur ancestors understood that people and races are not interchangeable, and that failure to discriminate would produce a warring mix of incompetents and unassimilable" *See* Exhibit F.

Another American Renaissance article, from June 2016, states; "Far-seeing whites should think carefully about arguments against discrimination in principle because discrimination, private and even public, is necessary to our survival. In cases such as Fisher, we are drawn to anti-discrimination arguments because the only acceptable, legal targets of public discrimination are ourselves. Such is the astonishing, absurd, and suicidal fix we whites have gotten ourselves into while we are still, for the time being, the majority." *See* Exhibit G. Submitted are Exhibits A-G (AR 42-129).

## C.  Petitioner/Appellant's PFR For Reversal of OHA's Initial Decision

On January 28, 2022, the Petitioner/Appellant, Samuel Taylor, President of New Century Foundation, initially filed, unrelated to its current PFR Appeal, an appeal document into the case portal to SBA's reason for denial of its PPP loan and Forgiveness of its loan. (Dkt#2). The Petitioner/Appellant recited the following arguments:

Since SBA did not cite examples of discrimination, requiring an appeal amounts to a demand that NCF prove a negative. This is a logical impossibility. It is instead incumbent upon the SBA to submit factual accusations that can be rebutted. SBA cannot make such factual accusations because NCF has never violated 13 C.F.R., Parts, 112, 113, and 117 of SBA Regulations.

In a letter addressed to SBA dated December 14, 2021, the lender, Capital One made specific accusations. If those are the bases for SBA's denial of loan forgiveness — and we can only speculate because SBA itself makes no specific accusations — they are groundless. NCF is a 501(c)3 non-profit educational organization whose primary activities are publishing articles, videos, and podcasts, and hosting conferences.

Its mission is to educate the public on matters of race, race relations, and immigration. NCF is small. It has never had more than five employees, and now has four. In its hiring decisions, NCF considers only the job-related qualifications of the candidate and whether the candidate has knowledge and beliefs consistent with the organization's mission.

In its letter, Capital One cites an online NCF job posting NCF did not even know was still on its website. The last time NCF solicited job applications was in 2017. NCF has had male and female employees, and to its knowledge has never received a job application from anyone

5

SBA000217
2075417809

belonging to protected categories other than sex, so it would have been impossible to discriminate against anyone in those other categories.

To the extent SBA relied upon the job listing cited by Capital One in reaching its adverse decision, it is punishing speech protected by the First Amendment to the United States Constitution. The job listing did not specify race, gender, or other protected characteristics as a requirement for job applicants; it stated only that candidate for employment should agree with NCF's mission.

An applicant of any race might agree with NCF's mission, and there is no evidence that NCF has or would reject a candidate based on race.

This conclusion would be uncontroversial if an organization advertised for employees who agreed with advocacy on behalf of black people, Hispanics, Native Americans, or other people of color. We strongly suspect that neither the SBA nor any other government agency would construe such an advertisement as a civil rights violation, so long as the organization did not use race as a basis for a hiring decision.

Unless SBA can demonstrate that its decision is based upon NCF's conduct, rather than its beliefs, SBA is engaged in unlawful viewpoint discrimination that will be subject to strict scrutiny by a court. NCF engage in forbidden discrimination in its business practices or services to the public. When NCF publishes articles, videos, and podcasts, they are made available publicly on the internet, so it is impossible to discriminate against anyone in any protected class.

NCF has published articles written by people of many backgrounds, including racial minorities. It has published videos and podcasts featuring people of many backgrounds, including racial minorities. Similarly, when NCF hosts conferences, it never discriminates against potential attendees based on any categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations.

Petitioner/Appellant appeal brief also includes the following:  The NCF **director of special projects**, Martin Christopher Rojas, is of Chilean nationality. He has always **identified as Hispanic**. His father became a naturalized US citizen only in 2012. He was raised bilingual, and has published fiction in Spanish, an example of which can be found here. Mr. Rojas has worked, with a few breaks, full-time for NCF since 2016. He is an invaluable member of the NCF staff and takes part in all important NCF decisions.[2]

It is a matter of public record that people of many backgrounds attend NCF's conferences, including racial minorities. It is also of public record that NCF has had people of

---

[2] Author, under the pseudonym "Chris Roberts," White Survival in the Current Century - American Renaissance (archive.ph) first sentence: "Like never before, I am convinced that whites must create their own separate country to survive." Note "Chris Roberts" bio has same job title as Martin Christopher Rojas.

6

SBA000218

2075417809

many backgrounds speak at its conferences, including racial minorities. It is true that NCF has published articles pointing out that choice is an essential part of freedom. It has published articles arguing that private entities should have the right to choose employees and clients on whatever grounds they see fit.

This constitutionally protected speech does not mean that NCF has ever discriminated against a member of a protected class. Indeed, NCF has never wished to do so, nor has it ever had an opportunity to do so. In sum, SBA claims NCF is ineligible for PPP loan forgiveness because NCF engaged in forbidden discrimination. SBA cited no instances of such discrimination, and there has been none. If SBA believes there has been discrimination, let it offer examples so NCF can respond to them. Otherwise, NCF requests SBA's decision be overturned and NCF's request for PPP loan forgiveness be approved.

In support of NCF's position, a letter dated November 05, 2021, sent to Appellant's Lender, Capital One Financial Corp., The Kennedy Privacy Law Firm alleged that the Lender violated the civil rights laws of the United States and that its decision to deny NCF of its Forgiveness loan is arbitrary and an unlawful decision.

It accuses the Lender of bad-faith failure to carry out its responsibilities and exceeding its delegated authority under the PPP program. In denying Forgiveness of NCF's loan, The Kennedy Privacy Law Firm contends that the Lender did not cite a single instance of such discrimination by NCF and in fact there has never been such discrimination (AR 155-56).

After OHA's Initial Decision, Petitioner/Appellant's PFR Appeal posed similar arguments against the Initial Decision which found Petitioner/Appellant ineligibility for PPP loan and Forgiveness of loan.  The Petitioner/Appellant provided a supplemental argument for OHA's reversal as follows:

1.  <u>Judge Pardo Erroneously Found That NCF Maintained a Discriminatory Job Posting</u>

The Judge's conclusions are factually incorrect. NCF did not publish the cited language at or after the time of its PPP loan application; in fact, the language cited above ceased to be used by NCF for recruitment on its website AmRen.com in 2017 at the latest, when NCF ended its recruitment effort. At that time, all links to the job notice were removed, and only by inadvertence did the language itself remain on the website – as part of a very large internet domain composed of thousands of pages and millions of words. The language would have been invisible to any ordinary visitor to AmRen.com, and all employees of NCF assumed the language had been removed. After the links to the language were destroyed – in 2017 at the latest – not one person inquired about the job described in the notice, and there is no evidence any job seeker ever saw it.

Therefore, it is wrong to say that NCF "maintained an online job posting" after receiving the PPP loan. A job notice is posted online for it to be seen. NCF was no longer recruiting, did not want the notice seen, and believed it had not only made it invisible but had destroyed it. To

7

SBA000219
2075417809

say that NCF "maintained an online job posting" is like arguing that a public announcement is still a public announcement even after the sole existing physical copy has been taken down from a public place and put in a drawer. The language of the announcement still exists, but it cannot possibly be called a public announcement.

The language of this defunct job posting was discovered by Capital One, National Association, which administered the PPP loan. Capital One, with which NCF had had a satisfactory banking relationship for many years, decided, at some point after the PPP loan was granted, that it did not like the positions endorsed by NCF, and announced it would no longer accept NCF as a customer. NCF does not know by what means Capital One searched the NCF website, but NCF assumes that it did so with great diligence and technical thoroughness in the hope of finding even the flimsiest pretext on which to recommend to SBA that forgiveness of the loan to NCF be denied. To repeat, the language of the job posting was invisible to any ordinary visitor to AmRen.com.

The language still exists within AmRen.com. NCF has kept it precisely in the state in which Capital One found it, confident that no unbiased observer would think it could possibly be called "an online job posting."

2. <u>Even if the job posting cited by OHA were current or had been posted since the grant of the PPP loan, it would still not constitute a forbidden employment practice</u>

The Decision appears to assume that merely using the terms "white advocacy" and "race realism" in a job posting violates anti-discrimination law. This is incorrect. NCF is a 501(c)(3) non-profit, recognized since 1994 by the Internal Revenue Service as an educational organization chartered to educate the public on matters of immigration and race relations. It is no different from similar organizations that educate the public on questions of national interest. It is entirely reasonable, even essential, that prospective employees be expected to share the educational goals of the organization. An organization that promotes abortion rights may preferentially hire people who believe in a woman's right to choose over those who believe abortion should be outlawed. In fact, this is the case: A current job posting for NARAL Pro-Choice America requires that applicants have a "a commitment to reproductive freedom" and understand "the intersectional politics of race, class, gender, etc. and commitment to cross-movement building." NARAL Pro-Choice America Job Listing. *See* https://jobs.lever.co/prochoiceamerica/a8087f4a-457b-4001-bf3b-dea7fac3e032.

Similarly, a job posting for the Southern Poverty Law Center requires applicants to have a "commitment to fostering an anti-racist work culture and to anti-racist principles and learning."

An even closer parallel to NCF is the Anti-Defamation League (ADL) which is also a 501(c)(3) non-profit organization. Since its founding in 1913, its "immediate object" has been to stop "the defamation of the Jewish people." It is reasonable, even essential, that prospective employees be expected to share that goal. This probably narrows the field of job candidates, with a likelihood that a majority – perhaps even a large majority – of the employees of the

8

SBA000220

2075417809

organization are Jewish. Asking prospective employees to adhere to the principles and goals of the ADL is not a forbidden job practice, nor should it be. However, a job applicant need not be Jewish to feel strongly that the defamation of the Jewish people should be stopped.

NCF is in a perfectly analogous position. The bulk of its work is in the fields of race realism and white advocacy, so it is (1) reasonable to expect employees to share those goals, and (2) people of any race can share these goals. Over the years, NCF has published on its website many articles by people of color who share NCF's principles and goals. In some cases, the titles of the articles themselves demonstrate the authors' sympathy with NCF's mission. The authors of these articles contributed them knowingly and willingly for publication exclusively at AmRen.com.

> "A Black Man's Path to Race Realism"; "Discovering that my Father was White Led me to Race Realism"; "Interview with a Red-Pilled Black Woman"; "The Story of a Hispanic Race Realist"; "The Son of Illegal Honduran Immigrants on Race Realism, 'Social Justice,' and White Identity"; "How a Young Black Man Became a Race Realist"; "I am Black — and a Race Realist"; "Through the Eyes of a Nigerian Race Realist"; "Chinese Reflections on Europe"; "A Nigerian's View of Race"; "White Man: Why Are You Giving Away Your Country?"

NCF's most high-profile event is its annual conference. Conferences are publicly advertised, and attendance is open to the public. Attendees have included Hispanics, African Americans, and Asians, as well as whites. No one has ever been denied admission because of race. NCF has showcased three conference speakers who were people who color and who shared NCF's positions. It should be obvious that race realism and white advocacy are by no means exclusive to whites. The videos of these conference speeches are published on the internet as follows:

David Yeagley, enrolled member of the Comanche Tribe, 2014 Fernando Cortez, Mexican nationalist, 2016 Michelle Malkin, Asian-American, 2021 In the case of Michelle Malkin, AmRen.com has subscribed to and published her syndicated column since early 2020.

In Griggs, Duke Power Co. was found to be selecting candidates for its management training program by means of an IQ test that was "fair in form but discriminatory in operation" because black candidates scored, on average, lower than white candidates. The Court found that requiring an IQ score above a certain threshold was not a bona fide occupational qualification (BFOQ). It should be obvious that, for any advocacy organization, adherence to the positions to be advocated is a BFOQ for any but the most routine or clerical positions. Race realism and white advocacy are BFOQs for employment by NCF and not artifices meant to exclude candidates because of race.

To repeat: Knowledge of and support for positions held by NCF – which can be held by people of any race – are a bona fide occupational qualification for employment and seeking such knowledge and support in employees is not a prohibited employment practice.

9

SBA000221
2075417809

3.  <u>NCF's Activities are Lawful and Protected by the Constitution of the United States</u>

    i.      To supply arguments to justify actions that may now be illegal is not illegal; it is essential to the democratic process.

Quote from OHA's Initial Decision:

Another American Renaissance article, from June 2016, states; "Far-seeing whites should think carefully about arguments against discrimination in principle because discrimination, private and even public, is necessary to our survival. In cases such as Fisher, we are drawn to anti-discrimination arguments because the only acceptable, legal targets of public discrimination are ourselves. Such is the astonishing, absurd, and suicidal fix we whites have gotten ourselves into while we are still, for the time being, the majority."

This is an accurate statement of NCF's position, which is a defense of complete freedom of association of the kind promoted by Chicago University scholar Richard Epstein in his 1992 book, Forbidden Grounds. In it, he calls for the right to discriminate in employment "for good reasons, bad reasons, or no reason at all." The above quotation from AmRen.com is not, however, evidence of illegal hiring practices by NCF.

Prof. Epstein criticizes laws that forbid employment practices that were legal until the 1960s, and the fact that they are no longer legal does not make his attack on those laws' illegal, nor is it evidence that when he hires candidates for academic positions his practices are illegal. Employment discrimination on the grounds of race, color, or national origin is still legal under federal law for employers with 15 employees or fewer, as the Federal Equal Employment Opportunity Commission explains in this public notice. NCF has never had more than five employees.[3]

American law is constantly changing. What was once illegal becomes legal and vice versa. Until recently, it was illegal under state law in every American state to possess marijuana. Advocates for legalization argued passionately for legalization, but no judge or jury would ever have confused such arguments with illegal possession itself. Likewise, until relatively recently, homosexual acts were illegal in all 50 states, and same-sex marriage was impossible. Today, thanks to tireless – and entirely legal – advocacy for gay rights, homosexual acts and same-sex marriage are legal throughout the United States.

Arguments in favor of legislation are essential to the democratic process; without them there can be no democracy. As a 510(c)(3) organization, NCF is prohibited from endorsing specific legislation, but general advocacy in favor of Congressional or regulatory action that would support its positions is an entirely conventional and accepted activity for an educational non-profit. To argue for a principle is not the same as acting on that principle. The Decision

---

[3] State and/or local employment discrimination laws may also apply to your business. State and local government websites may have information about these laws. New Century Foundation job announcement took place in the State of Virginia.

2075417809

comes close to recognizing this, but immediately runs afoul of the facts: "The Appellant can continue to espouse its opinions, beliefs, and mission, but when it is engaged and involved with discrimination in its employment practices, that is not protected."

Indeed, NCF's mission is very much a First Amendment-protected activity. Moreover, considering the facts set forth above, it should be clear that NCF has never been "engaged and involved with discrimination in its employment practices." The Decision reaches this conclusion based on a defunct job notice that after 2017 was both invisible to the public and was, on its face, nothing more than a statement of job qualifications that does not discriminate based on race.

4. <u>Judge Pardo Lacked Authority to Deny PPP Loan Forgiveness on the Basis of Expressive Activity</u>

In support of its finding that NCF is ineligible for its PPP loan, the Decision dwells at length on the principle that the government may decline to subsidize certain First Amendment activities. However, the authorities cited by Judge Pardo in support of that proposition do not apply here. For example, in *Camelot Banquet Rooms, Inc., v. United States Small Business Administration,* Case No. 21-2589 (7th Cir. 2022) ("*Camelot*"), the court upheld the SBA's regulation concerning businesses that present live performances of a prurient nature. The court found that it was not unlawful for the SBA to apply that regulation to a PPP loan applicant.

However, SBA regulations do not prohibit PPP loans to organizations that engage in racial advocacy. In the absence of such a regulation, OHA cannot simply apply its own notion of a reasonable constraint on, or refusal to subsidize, protected speech. As the Decision correctly points out, administrative law judges have "no constitutionally based judicial power" and are limited to application of the "policy directives and rules promulgated by their agency . . . ." In the absence of an SBA directive or rule permitting denial of loans to organizations that engage in racial advocacy, Judge Pardo's decision to do so is beyond his jurisdiction.

5. <u>One quarter of the current NCF staff (of four) is of protected-minority status</u>

The NCF director of special projects, Martin Christopher Rojas, is of Chilean nationality. He has always identified as Hispanic. His father became a naturalized US citizen only in 2012. He was raised bilingual, and has published fiction in Spanish, an example of which can be found here. Mr. Rojas has worked, with a few breaks, full-time for NCF since 2016. He is an invaluable member of the NCF staff and takes part in all important NCF decisions.

## IV.  STATUTORY AUTHORITY

The Coronavirus Aid, Relief, And Economic Security Act (CARES Act) (Public Law 116-36) (enacted March 27, 2020), Small Business Act (15 United States Code (USC), Chapter 14A, Section 631 *et seq*)[4], and Administrative Procedure Act (APA) (5 USC, Chapter 5, Section

---

[4] The portion(s) of the CARES Act not amending other laws/acts is codified at **15 USC, Chapter 116, Section 9001**

11

SBA000223

2075417809

500 *et seq*) contain the controlling statutes; Title 13 of the Code of Federal Regulations (CFR), Interim Final Rule (IFR) #1 (*Federal Register*, Vol. 85, No. 73, Pages 20811-20817) (effective April 15, 2020), IFR #15 (*Federal Register*, Vol. 85, No. 105, Pages 33010-33015) (effective May 28, 2020), and IFR #20 (*Federal Register*, Vol. 85, No. 124, Pages 38304-38312) (effective March 27, 2020) contain the controlling regulations; SBA Standard Operating Procedure, *Lender and Development Company Loan Programs,* (SOP 50 10 5(K)) (effective April 1, 2019) contains applicable policy.

On April 15, 2020, the SBA promulgated an interim final rule implementing the Program. *See* 85 Fed. Reg. at 20,811 (April 15, 202).  The Federal Register notice published with this rule explained that the Program's rules incorporated the existing eligibility restrictions for Section 7(a) loans. Id. at 20,812. It also explained that "businesses that are not eligible for [Program] loans are identified in 13 CFR 120.110." Id. And § 120.110(b) bars "[f]inancial businesses primarily engaged in the business of lending, such as banks, finance companies, and factors" from receiving Section 7(a) loans.  The same categories of businesses are thus ineligible for Program loans. *See* 85 Fed. Reg. at 20,812; 13 C.F.R. § 120.110(b).

Congress was presumably aware of the SBA's existing regulations when it gave the Administrator the discretion to "*guarantee covered loans under the same terms, conditions, and processes as ... loan[s] made under*" Section 7(a). *Cares Act § 1102(a)(2) (codified at 15 U.S.C. § 636(a)(36)(B))* (emphasis added); *see Fitzgerald v. Dep't of Homeland Sec*., 837 F.3d 1346, 1355 (Fed. Cir. 2016) (discussing the presumption that Congress is "aware of applicable regulations when enacting pertinent legislation"). And those terms and conditions included the ineligibility of loans for entities which were financial businesses primarily engaged in the business of lending.   13 C.F.R. § 120.110(b).

Congress granted SBA broad authority to make rules and regulations, to take actions that "are necessary or desirable in making . . . loans," 15 U.S.C. § 634(b)(6)-(7), and to establish general policies to "govern the granting and denial of applications for financial assistance by the Administration," 15 U.S.C. § 633(d). This authority extends to the PPP lending program. Additionally, the CARES Act expressly provides the PPP lending program as being a part of SBA's 7(a) Loan Program. Congress made the decision not to enact the PPP as a freestanding program, but rather to utilize the pre-existing infrastructure of SBA's Section 7(a) Loan Program. *See* 85 Fed. Reg. at 20811 (recognizing the CARES Act "temporarily adds a new product, titled the 'Paycheck Protection Program,' to [SBA's] 7(a) Loan Program"). This decision was reinforced by Congress placing the PPP lending program within the Section 7(a) lending program by specifying that "[e]except as otherwise provided", the Administrator may guarantee PPP loans "under the same terms, conditions, and processes" as a loan made under Section 7(a). 15 U.S.C. § 636(a)(36)(B). This subjects the PPP lending program to the policies and regulations applicable to SBA's 7(a) Loan Program.

---

*et seq.*

12

SBA000224

2075417809

Pursuant to the CARES Act, SBA promulgated several regulations concerning PPP eligibility, including the First IFR. *See* Paycheck Protection Program, 85 Fed. Reg. at 20811 (posted on the SBA and Treasury websites on April 2, 2020, and effective April 15, 2020); CARES Act § 1102, 134 Stat. at 287 (15 U.S.C. § 636(a)(36)(B)).

The First IFR, which was effective at the time of its PPP loan application, advised all PPP lenders and Appellants of the basic PPP eligibility criteria, including the incorporation of 13 C.F.R. § 120.110. In that regard, the First IFR informed PPP lenders and Appellants, "Businesses that are not eligible for PPP loans are identified in 13 C.F.R. 120.110 and described further in SBA's Standard Operating Procedure (SOP) 50 10, Subpart B, Chapter 2, except that nonprofit organizations authorized under the Act are eligible." 85 Fed. Reg. at 20812.

SBA has retained the application of 13 C.F.R. § 120.110 and the SOP throughout the duration of the PPP. *See* Paycheck Protection Program as Amended by Economic Aid Act, 86 Fed. Reg. 3692, 3698, 3705–3706, 3708–3709, (January 12, 2021) (consolidates and restates multiple PPP Interim Final Rules regarding loan program requirements, including incorporation of 13 C.F.R. § 120.110, its related SOP provisions, and the borrower certification requirement of the First Interim Rule); Paycheck Protection Program-Loan Forgiveness Requirements and Loan Review Procedures as Amended by Economic Aid Act, 86 Fed. Reg. 8283, 8296 (February 3, Docket No. 9716822710 Page 10 of 13 2021) (consolidates and restates multiple PPP Interim Final Rules regarding forgiveness requirements, including requirement that ineligible borrowers will not receive loan forgiveness); 86 Fed. Reg. 15083 (among other things, revises the PPP rules to incorporate the American Rescue Plan Act's amendments to the PPP)

Within the Section 7(a) Loan Program, 13 C.F.R. § 120.110(b) specifically provides as a term and condition of that program, that "(b) Financial businesses primarily engaged in the business of lending, such as banks, finance companies, and factors (pawn shops, although engaged in lending, may qualify in some circumstances)." SBA explained in the Standard Operating Procedure issued after the enactment of the regulation (and noted in 86 Fed. Reg. 3692 (January 14, 2021)) that lenders were ineligible because "[l]enders create and hold interest-bearing notes. The act of holding such notes for their potential investment income is counter to SBA's philosophy that a small business should occupy the time, attention, and labor of the owners/operators in the continual task of providing goods and services and not with enterprises which merely hold property." SOP 50 10 4, Subpart A, Chapter 2 at 29.

OHA has jurisdiction to decide this PFR. *See* 13 C.F.R. Part 134, Subpart L

## V. ANALYSIS

ISSUE: Can the CARES ACT, PPP policy, legislation/ statutes, rules, and regulations promulgated by Congress and implemented by the Small Business Administration (SBA) exclude, restrict, or otherwise deem ineligible certain businesses who discriminate or engage in illegal discriminatory activities to receive PPP loans and/or Forgiveness? The answer is yes.

13

SBA000225
2075417809

The four sample excerpts noted herein from NCF articles exhibit discrimination, as well as proclaiming and enforcing separation of the races. The inference of discrimination in the posting makes it clear that protected class individuals would be denied, excluded, discouraged, and restricted from applying, and thus NCF engaged in illegal discriminatory employment practices.

1. American Renaissance article posted in May 2020 states that "[s]o long as blacks and whites continue to live together, whites will pay the high price of sharing their society with an inveterately violent racial minority."

2. A September 2011 article titled "Fade to Brown" states that "[o]ur nation achieved character and greatness precisely because of discrimination," and that "[o]ur ancestors understood that people and races are not interchangeable, and that failure to discriminate would produce a warring mix of incompetents and unassimilables." *See* Exhibit F (clearly a strong inference of a separation of the races policy).

3. Another American Renaissance article, from June 2016, states: "Far-seeing whites should think carefully about arguments against discrimination in principle because discrimination, private and even public, is necessary to our survival."

4. The first sentence in an American Renaissance article "White Survival in the Current Century," dated June 08, 2020, reads: "Like never before, I am convinced that whites must create their own separate country to survive."

Both Title VI and Title VII are not dispositive but nonetheless have significant impact and legal application in employment discrimination cases.  SBA's policy, rules and regulations under the CARES Act and Paycheck Protection Program (PPP) have significant legal authority in employment discrimination cases.

NCF contends that employment discrimination on the grounds of race, color, or national origin is still legal under federal law for employers with 15 employees or fewer, as the Federal Equal Employment Opportunity Commission explains in this public notice. NCF has never had more than five employees.[5]  However, Title VII and Title VI statutes make it clear that states have employment anti-discrimination statutes as did the State of Virginia at the time NCF posted job announcement in northern Virginia. The characterization by NCF that discrimination is still legal could be interpreted as a tacit admission to supporting discrimination so long as the employee requirement limitation is not met under Title VII as it alleges.

Virginia Human Rights Act
**§ 2.2-3900. Short title; declaration of policy**
A. This chapter shall be known and cited as the Virginia Human Rights Act.

---

[5] State and/or local employment discrimination laws may also apply to your business. State and local government websites may have information about these laws. New Century Foundation job announcement took place in the State of Virginia.

14

SBA000226
2075417809

B. It is the policy of the Commonwealth to:

1. Safeguard all individuals within the Commonwealth from unlawful discrimination because of race, color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, age, marital status, sexual orientation, gender identity, military status, or disability in places of public accommodation, including educational institutions and in real estate transactions.

2. Safeguard all individuals within the Commonwealth from unlawful discrimination in employment because of race, color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, age, marital status, sexual orientation, gender identity, disability, or military status.

3. Preserve the public safety, health, and general welfare. Further the interests, rights, and privileges of individuals within the Commonwealth; and

4. Protect citizens of the Commonwealth against unfounded charges of unlawful discrimination. 1987, c. 581, §§ 2.1-714, 2.1-715; 1997, c. 404; 2001, c. 844; 2020, cc. 1137, 1140; 2021, Sp. Sess. I, cc. 477, 478.

Title VI of the Civil Rights Act of 1964 seeks to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices. In essence, the statute conditions an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of the funds, and it provides an administrative mechanism for terminating federal financial support for institutions engaged in prohibited discrimination.

The statute severely limits the circumstances under which a plaintiff may bring a private action under Title VI to challenge an employment practice, stating that Title VI only applies to "any employment practice of any employer ... where a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. § 2000d. Congress enacted this limitation of the statute to allay its "concern that the receipt of any form of financial assistance might render an employer subject to the commands of Title VI rather than Title VII." *Johnson v. Transp. Agency, Santa Clara Cnty., Cal.,* 480 U.S. 616, 628 n. 6, 107 S. Ct. 1442, 94 L. Ed. 2d 615 (1987).

New Century Foundation may fit under the umbrella and auspices of Title VI of the Civil Rights Act of 1964 42 U.S.C.S. § 2000d of the Civil Rights Act of 1964, 42 U.S.C.S. §§ 2000d-2000d-6, which forbids any person or institution which receives federal funds to discriminate based on race, color, or national origin. The purpose of Title VI is twofold: 1) to avoid the use of federal funds to support discriminatory practices, and 2) to provide individual citizens effective protection against these practices.

The first purpose is fulfilled by the statutory procedures found under Title VI for the

15

SBA000227
2075417809

termination of federal funds due to intentional engagement in discriminatory practices. 42 U.S.C.S. § 2000d-1; 45 C.F.R. §§ 80.1- 80.13 and apps. A & B (1979). These procedures are highly structured and provide a great number of preconditions before such funding can be terminated.

The general rule is that "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Rust v. Sullivan*, 500 U.S. 173,194, 111 S. Ct, 1759, 114 L. Ed. 2d 233 (1991).

However, the government does not violate a plaintiff's rights "by declining to subsidize its First Amendment activities." *Regan*, 461 U.S. at 548. "The Court has never held that Congress must grant a benefit . . . to a person who wishes to exercise a constitutional right." Id. at 545. Likewise, there is no indication that the restriction here "was intended to suppress" protected conduct or speech of Appellant, New Century Foundation. The Appellant can continue to espouse its opinions, beliefs, and mission, but when it is engaged and involved with discrimination in its employment practices, that is not protected.

"The case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to aim at the suppression of dangerous ideas." And while a funding restriction might also be unconstitutional if it regulates a recipient's speech outside of the government program. *See FCC v. League of Women Voters of Cal.,* 468 U.S. 364, 399-400, 104 S. Ct. 3106, 82 L. Ed. 2d 278 (1984).

The government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech. It may not compel as a condition of federal funding the affirmation of a belief that by its nature cannot be confined within the scope of the Government program. *Agency for Int'l Dev. V. All For Open Soc'y Int'l, Inc*. 570 U.S. 205,214, 133 S. Ct. 2321, 186 L. Ed. 2d 398 (2013).

The government may set funding terms and conditions that "specify the activities Congress wants to subsidize" unless those terms and conditions "seek to leverage funding to regulate speech outside the contours of the program itself." Id. at 214-15*; Rust*, 500 U.S. at 197 (rejecting challenge to subsidy program that did not "effectively prohibit [the recipient[s] from engaging in the protected conduct outside the scope of the federally funded program").

The government's decision not to subsidize certain activities need only "bear a rational relation to a legitimate government purpose*." Regan*, 461 U.S. at 547 (applying rational-basis review to, as here, a challenge to a selective subsidy under both the Free Speech and Equal Protection Clauses,); accord *Boy Scouts of Am. V. Wyman*, 335 F. 3d 80, 91-92, 97 (2d Cir. 2003).

The Spending Clause grants Congress broad discretion to fund private programs or activities for the "general Welfare," Art. 1. §8, cl. 1, including authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends.

SBA000228

2075417809

There are societal as well as personal interests on both sides of this equation. The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).

Congress has excluded many other categories of businesses: banks, lenders, finance companies, and some pawn shops; life insurance companies; businesses located in foreign countries; pyramid sale distribution plans; businesses engaged in any illegal activity; private clubs; government-owned businesses; loan packagers; businesses with an "Associate" who is in prison, on probation, on parole, or who has been indicted for a felony or crime of moral turpitude; and businesses that have previously defaulted on SBA or other federally assisted loans. *See* 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa), incorporating 13 C.F.R. § 120.110.

New Century Foundation maintained an online job posting for a full-time reporter for its monthly online magazine, American Renaissance, which promotes "race-realism" and describes itself as a "white advocacy" organization. *See* Exhibit A. The job posting seeks applicants with a "[s]trong commitment to race realism and white advocacy." *See* Exhibit B. The job posting also requests that applicants submit a cover letter with "[a] brief description of applicant's political views and how he came to them" and "why the applicant believes he would be a good fit for American Renaissance." (Posting was made for opening in Northern Virginia office, Exhibit "B" (AR 47).

NCF job announcement NCF describes itself as a "white advocacy" organization. It has published articles arguing that private entities should have the right to choose employees and clients on whatever grounds they see fit. NCF hires based on whether the candidate has knowledge and beliefs consistent with the organization's mission, a separation of the races.

NCF requested that applicants submit a cover letter with "[a] brief description of applicant's political views and how he came to them" and "why the applicant believes he would be a good fit for American Renaissance."

NCF espouses "[o]ur ancestors understood that people and races are not interchangeable, and that failure to discriminate would produce a warring mix of incompetents and unassimilable"

NCF supports discrimination as its mission is clear, "Far-seeing whites should think carefully about arguments against discrimination in principle because discrimination, private and even public, is necessary to our survival."

NCF if not by direct evidence, clearly has engaged in discriminatory employment practices. NCF's posting of its employment job announcement and practices clearly aligned itself with the knowledge and beliefs consistent with the organization's mission, "race-realism" and "white advocacy" and separation of the races.

17

SBA000229

2075417809

Appellant's attempt to obscure its true intentions and purpose to discriminate against non-white persons in its business is overridden by the government's authority to exclude certain businesses and activity that are not in the public or government interest to support.

Circumstantial evidence, also known as indirect evidence, requires the fact finder to make an inference or presumption. *Hamilton v. Southland Christian Sch., Inc*., 680 F.3d 1316, 1320 (11th Cir. 2012). "Circumstantial evidence can include suspicious timing, inappropriate remarks, and comparative evidence of systematically more favorable treatment toward similarly situated [individuals] not sharing the protected characteristic…." *Loyd v. Phillips Bros., Inc*., 25 F.3d 518, 522 (7th Cir. 1994); accord *Troupe v. May Dep't Stores Co*., 20 F.3d 734, 736 (7th Cir. 1994).

It is also recognized in employment discrimination cases where an employer ordinarily entertains applications for a certain type of job, that a prospective employee is deterred from applying by the very discriminatory practices he is protesting yet can show that he would have applied had it not been for those practices, a sufficient preliminary link between discrimination and adverse consequence is established. *See* Teamsters, 431 U.S. at 362-71; *Babrocky v. Jewel Food Co. & Retail Meatcutters,* 773 F.2d 857, 867 (7th Cir. 1985). [**11].

These cases are analogous to the similar scheme New Century Foundation perpetuated by its discriminatory job announcement in Exhibit "B", the exclusion of other protected class individuals who were deterred from applying because of its insidious discriminatory job announcement language it attempted to mask that it applied to all individuals regardless of color, race, religion, sex, and similar protected class members, however, their intend was otherwise and clearly illegal.

Congress clearly intended that any business, not just those that meet the other 7(a) requirements, should be eligible for PPP loans. Despite this direction from Congress, the SBA adopted a rule excluding from PPP loan guarantee eligibility a wide range of businesses-including businesses engaging in discrimination. Petitioner/Appellant supports its claim that "all such businesses are eligible for a loan guarantee." *DV Diamond Club of Flint, LLC v. United States Small Bus. Admin.,* 459 F. Supp. 3d 943, 956 (E.D Mich. 2020); *Terry v. Tyson Farms, Inc*. 604 F. 3d 272, 283 (6th Cir. 2010). New Century Foundation's position is not correct or legally sustainable.

New Century Foundation has violated the civil rights requirements that apply to recipients of PPP loans, including 13 C.F.R. 112 and 113. In its SBA Form 2483 applying for PPP loan, New Century Foundation certified that it would "comply, whenever applicable, with the civil rights and other limitations in this form." The SBA Form 2438 provides that "[a]ll businesses receiving SBA financial assistance must agree not to discriminate in any business practice, including employment practices and services to the public on the basis of categories cited in 13 C.F.R., Parts 112,113, and 117 of SBA Regulations."

SBA regulations regarding discrimination include 13 C.F.R. 112.4 (prohibiting employment discrimination); 13 C.F.R. 112.7 (prohibiting action that subjects an individual to

18

SBA000230
2075417809

discrimination on the ground of race, color, or national origin, "in any employment practice, including recruitment or recruitment advertising"); 13 C.F.R. 113.3(b) (prohibiting discrimination with regard to employment practices and prohibiting the "use of employment tests or criteria that discriminate on the basis of race, color, …or national origin'). Congress deliberately chose not to change the Administrator's statutory discretion to exclude businesses, other than those it expressly identified in the CARES Act. Cf. Jama v. Immigration and Customs Enforcement, 543 U.S 355, 342,125 S. Ct. 694, 160 L. Ed. 708 (2005). The Courts do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.")

This job posting seeking applicants with a "[s]trong commitment to race realism and white advocacy" appears to be a discriminatory employment practice that violates SBA's civil rights requirements. *See* 13 C.F.R. 112.4 (prohibiting employment discrimination); 13 C.F.R. 112.7 (prohibiting action that subjects an individual to discrimination on the ground of race, color, or national origin, "in any employment practice, including recruitment or recruitment advertising"); 13 C.F.R. 113.3(b) (prohibiting discrimination regarding employment practices and prohibiting the "use of employment tests or criteria that discriminate based on race, color, …or national origin').

New Century Foundation also appears to be ineligible for a PPP loan because it restricts patronage for any reason other than capacity. *See* 13 C.F.R. 120.110(i); SOP 50 10 5(K) (effective April 1, 2019). The SOP cross-references SBA's civil rights regulations, including 13 C.F.R. 113.3(a), which prohibits discrimination "with regards to goods, services, or accommodations offered or provided by the aided business or enterprise, whether or not operated for profit, because of race, color, religion, sex, handicap, or national origin." The SOP indicates, as an example, that a fitness center that markets to one gender would be ineligible absent evidence that the business is in fact open to both men and women, such as "documented membership demographics."

In *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage-age certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.

In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other."); *Regan v. Taxation With Representation*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right…."); accord, e.g., *Wisconsin Education Ass'n Council v. Walker*, 705 F.3d 640, 646–47 (7th Cir. 2013).

The Court in *Camelot Banquet Rooms, Inc., et al, v. United States Small Business Administration, et al.*, F. Supp. 3d, 2021 WL 3680369, (E.D. Wis. Aug. 19, 2021*); Pharaohs GC, Inc. v. U.S. Small Business Admin.*, 990 F.3d 217 (2d Cir. 2021) (affirming denial of

19

SBA000231

2075417809

injunction in similar first-round case brought by adult-entertainment club); *American Ass'n of Political Consultants v. U.S. Small Business Admin.*, 810 F. App'x 8, 9–10 (D.C. Cir. 2020).

Thus, the Courts must determine the ordinary tools of statutory construction to determine Congress's specific intent and make certain that the agency interpretation of the statute is reasonable, rational and consistent with Congress intent *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Animal Legal Def. Fund v. USDA*, 789 F.3d 1206, 1215 (11Cir. 2015); *Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1223 (11th Cir. 2009).

OHA has recognized the limited scope of its authority and has repeatedly held that it "is not the proper forum for a challenge to the validity of a regulation." *Matter of Cognitive Professional Services, Inc.*, Case No. BDPE-545 at *3 (March 10, 2015) ("Questions about the validity or constitutionality of regulations do not fall within the jurisdiction of the Office of Hearings and Appeals, and I may not consider them. *See* 13 C.F.R. § 134.102."); accord *Jim Plunkett, Inc. re: E.S. Edwards & Sons, Inc.*, SBA No. 3838 at *2 (October 4, 1993) (finding complaint challenging SBA's regulations as overly complex to be "beyond the jurisdiction of this Office."); *Nations Incorporated, Appellant re: Technical and Management Services Corporation*, SBA No. 3611 at *8 (April 24, 1992) ("[A]ny question concerning the validity of a regulation is beyond this delegated authority."); *International Ordinance, Inc*., Appellant, SBA Paycheck Protection Program, 85 Fed. Reg. at 20811 (posted on the SBA and Treasury websites on April 2, 2020, and effective April 15, 2020). CARES Act § 1102, 134 Stat. at 287 (codified 15 U.S.C. § 636(a)(36)(B). 7 No. 3319 at *4 (August 6, 1990) ("The constitutional challenge of these regulations by the Appellant is beyond the limited jurisdiction of this Office."

OHA recently issued a decision on a PPP appeal stating that it is not authorized to decide a challenge to SBA's determination that the CARES Act applied 13 C.F.R. § 120.110(b) to PPP loans. *See Family Choice Financial*, Docket No. PPP-8323747201, at 12 (Final Decision attached hereto as Exhibit A). In arriving at its holding, OHA stated that, as a hearing officer for SBA, the ALJ is "exercising the Administrator's delegated authority and it would be surprising if that delegation included the authority to invalidate an SBA regulation." *Family Choice Financial*, Docket No. PPP-8323747201, at 12 (citing *Auth. of Educ. Dep't Admin. L. Judges in Conducting Hearings,* 14 U.S. Op. Off. Legal Counsel 1, 2–3 (1990), 1990 WL 750326, at *1–2, https://www.justice.gov/file/20131/download.) As stated in Family Choice, "*Family Choice* must press this argument, if at all, on review before a federal court." OHA made this finding while acknowledging the case of *Nat'l Ass'n of Home Builders v. U.S. SBA*, in which a district court held that § 120.110, in the context of the ineligibility of passive businesses who are members of the *National Association of Home Builders*, cannot be applied to first-draw PPP loans. *See Nat'l Ass'n of Home Builders v. U.S. SBA*, No. 20-11780, 2021 U.S. Dist. LEXIS 186548 (E.D. Mich. Sept. 28, 2021)

I do not have authority to determine the prospective or retroactive application of SBA's Standard Operating Procedures (SOP), rules, and regulations. *Landgraf v. USI Film Products*, 511 U.S. 244 (1994).

SBA000232
2075417809

New Century Foundation has brought in its PFR appeal and questioned my authority.  To Clarify my role, Administrative Law Judges have no constitutionally based judicial power, *see Ramspeck v. Federal Trial Examiners Conference*, 345 U.S. 128, 132-33 (1953), but are employees of the executive branch department or agency employing them. *See* 20 U.S.C. § 1234(c) (statute establishing the Office of Administrative Law Judges within the Department of Education provides that "ALJs shall be officers or employees of the Department.").

As such, ALJs are bound by all policy directives and rules promulgated by their agency, including the agency's interpretations of those policies and rules. *See Nash v. Bowen*, 869 F.2d 675, 680 (2d Cir.), cert, denied, 493 U.S. 813 (1989); *Mullen v. Bowen*, 800 F.2d 535, 540- 41 n.5 (6th Cir. 1986); *Brennan v. Department of Health and Human Services*, 787 F.2d 1559 (Fed. Cir.), cert, denied, 479 U.S. 985 (1986); *Goodman v. Svahn*, 614 F. Supp. 726, 728 (D.D.C. 1985); *Association of Administrative Law Judges, Inc. v. Heckler*, 594 F. Supp. 1132, 1141 (D.D.C. 1984); *cf. D'Amico v. Schweiker*, 698 F.2d 903, 906 (7th Cir. 1983); *accord*. 34 C.F.R. § 81.5(b) (embodying in Department regulations the requirement that ALJs adhere to policies and rules of the agency).

ALJs do not exercise the broadly independent authority of an Article III judge but operate as subordinate executive branch officials who perform quasi-judicial functions within their agencies. In that capacity, they owe the same allegiance to the Secretary's policies and regulations as any other Department employee. Thus, I have followed the regulations, rules, and policies as I am authorized and have not exceeded my legal boundary.

U.S. Federal District Court is the proper forum to determine whether my ruling and SBA's interpretation of Congress CARES ACT and PPP statutes were reasonable and rational, and that the agency did not exceed its statutory authority. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837 (1984); *Friends of the Everglades v. S. Fla. Water Mgmt. Dist*., 570 F.3d 1210, 1223 (11th Cir. 2009); *Animal Legal Def. Fund v. USDA,* 789 F.3d 1206, 1215 (11th Cir. 2015).

New Century Foundation, job posting seeking applicants with a "[s]trong commitment to race realism and white advocacy", advocacy and inference of the separation of the races  is determined to be a discriminatory employment practice that violates SBA's civil rights policy, rules, and regulations. *See* 13 C.F.R. 112.4 (prohibiting employment discrimination); 13 C.F.R. 112.7 (prohibiting action that subjects an individual to discrimination on the ground of race, color, or national origin, "in any employment practice, including recruitment or recruitment advertising"); 13 C.F.R. 113.3(b) (prohibiting discrimination regarding employment practices and prohibiting the "use of employment tests or criteria that discriminate based on race, color, …or national origin').

Petitioner/Appellant's arguments and defenses, *supra*. for approving PPP eligibility and forgiveness of the PPP Loans have been considered.  However, this appeal is not the proper

SBA000233

2075417809

forum with constitutional jurisdiction to interpret Congress's intent and whether my application, as well as of implementing SBA's rules, regulations and policy exceeded authorized authority.

### VI.  <u>CONCLUSION</u>

THEREFORE, I DENY New Century Foundation, Petitioner/Appellant's PFR, AFFIRM OHA's Initial Decision, and find that Petitioner/Appellant is ineligible for a PPP loan and for Forgiveness in the full loan amount received.

OHA's Initial Decision is AFFIRMED as there is no material errors of fact or law found in Petitioner's PFR to overturn the Initial Decision. 13 C.F.R. § 134.1211(c)(1). The instant PFR is DENIED. 13 C.F.R. § 134.1211(c).

Unless the SBA Administrator elects to review this decision pursuant to 13 C.F.R. § 134.1211(c)(3) & (d), OHA's decision on the request for reconsideration is a reconsidered initial OHA decision and becomes the SBA's final decision 30 calendar days after its service. *See* 13 C.F.R. § 134.1211(c).

It is the borrower's responsibility to review the rules and procedures to appeal to U.S. District Court.

IT IS SO ORDERED.

*Raul Pardo*

RAUL PARDO
Administrative Judge

22